# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-175V**
**Filed: September 1, 2026**

| | |
|---|---|
| KRISTI KELLEY,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Sean Franks Greenwood, The Greenwood Law Firm, Houston, TX, for petitioner.*
*Benjamin Patrick Warder, U.S. Department of Justice, Washington, DC, for respondent.*

**DECISION**[1]

On January 6, 2021, petitioner, Kristi Kelley, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa, *et seq.* (2012),[2] alleging that she suffered transverse myelitis ("TM") resulting from the influenza ("flu") vaccination she received on November 30, 2017. (ECF Nos. 1, 8, 37.) For the reasons set forth below, I conclude that petitioner is *not* entitled to an award of compensation.

## I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations,

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

In many cases, however, the vaccine recipient may have suffered an injury *not* of the type covered in the Vaccine Injury Table. In such instances, an alternative means exists to demonstrate entitlement to a Program award. That is, the petitioner may gain an award by showing that the recipient's injury was "caused-in-fact" by the vaccination in question. § 300aa-13(a)(1)(B); § 300aa-11(c)(1)(C)(ii). In such a situation, of course, the presumptions available under the Vaccine Injury Table are inoperative. The burden is on the petitioner to introduce evidence demonstrating that the vaccination actually caused the injury in question. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991).

In this case, petitioner has alleged that the flu vaccine caused her to suffer TM. Because the alleged injury is not listed on the Vaccine Injury Table, petitioner must demonstrate causation-in-fact.

The showing of "causation-in-fact" must satisfy the "preponderance of the evidence" standard, the same standard ordinarily used in tort litigation. § 300aa-13(a)(1)(A); *see also Althen*, 418 F.3d at 1278-79; *Hines*, 940 F.2d at 1525. Under that standard, petitioner must show that it is "more probable than not" that the vaccination was the cause of the injury. *Althen*, 418 F.3d at 1279. She need not show that the vaccination was the sole cause but must demonstrate that the vaccination was at least a "substantial factor" in causing the condition at issue and was a "but for" cause. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen*, 418 F.3d at 1278 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). Ultimately, petitioner must satisfy what has come to be known as the *Althen* test, which requires: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Id*.

A petitioner may not receive a Vaccine Program award based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Medical records are generally viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. § 300aa-13(b)(1). A petitioner may rely upon circumstantial evidence. *See Althen*, 418 F.3d at 1280. Moreover, the *Althen* court noted that a petitioner need not necessarily supply evidence from medical literature supporting petitioner's causation contention, so long as the petitioner supplies the medical opinion of an expert. *Id*. at 1279-80. While scientific certainty is not required, that expert's opinion must be based on "sound and reliable" medical or scientific explanation. *Boatmon v. Sec'y of Health & Human Servs*., 941 F.3d 1351, 1359 (Fed. Cir. 2019).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1). The special master is required to consider the entirety of the evidentiary record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines*, 940 F.2d at 1528).

## II. Procedural History

Petitioner initially filed a declaration and medical records marked as Exhibits 1-21. (ECF Nos. 1, 10, 12-13, 15.) Respondent then filed his Rule 4(c) Report, recommending against compensation. (ECF No. 27.) Respondent disputed that petitioner's medical records provided a medical opinion that would support vaccine causation of TM, but also asserted that the medical records did not preponderantly establish that petitioner suffered TM. (*Id.* at 35-38.)

Petitioner subsequently filed expert opinions by immunologist Omid Akbari, Ph.D. (Ex. 23-74) and neurologist Joseph Jeret, M.D. (Exs. 76-108), as well as additional medical records (Exs. 22, 75, 109). Respondent filed responsive reports by immunologist Marcela Pasetti, Ph.D. (Exs. A-B) and neurologist Raymond Price, M.D. (Exs. C-D).

Thereafter, an entitlement hearing was set to commence in January of 2025. (ECF No. 57.) Petitioner filed supplemental reports by Drs. Jeret and Akbari (Exs. 113-144), along with declarations from three witnesses (Exs. 145-47). Respondent filed supplemental reports by his experts (Exs. E-F), and petitioner filed a further report by Dr. Jeret (Ex. 149).

Petitioner later advised in a status report that she wished to proceed with a motion for a ruling on the written record in lieu of the scheduled hearing. The hearing was canceled, and petitioner filed a motion for a ruling on the written record on July 1, 2024. (ECF No. 74.) Respondent filed his response on September 12, 2024 (ECF No. 83) and petitioner filed a reply on October 10, 2024 (ECF No. 84). However, petitioner then later filed updated medical records (Exs. 154-59), and respondent was therefore given the opportunity to file a supplemental response, which he did on July 28, 2025. (ECF No. 96.) Petitioner then filed a reply on August 11, 2025. (ECF No. 97.)

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.[3]

---

[3] In her reply to respondent's supplemental response, petitioner states the following: "Were the Special Master to opine that Petitioner is not entitled to compensation, the Petitioner requests a live hearing before the Special Master." (ECF No. 97, p. 4.) This request is rejected. As noted above, I have concluded that it is appropriate to resolve this case on the existing record. Moreover, I have the discretion to reach that conclusion even over petitioner's objection. *Kreizenbeck*, 945 F.3d at 1366. But in any event, petitioner had been given the opportunity to proceed to a hearing and it was petitioner who voluntarily requested leave to file the instant motion for a ruling on the written record in lieu of proceeding to that hearing. (ECF No. 70.) It is entirely reasonable and appropriate to hold her to that deliberate decision. What petitioner's request otherwise contemplates is a senseless waste of judicial resources wherein the parties engage in extensive briefing and the special master embarks upon a detailed, but merely provisional, review of the complete evidentiary record in order to resolve the case, but where the resulting analysis (herein totaling some 75 pages given petitioner's long and uncertain medical history) only counts if it favors one party over the other. Instead, the Vaccine Act and Vaccine Rules otherwise provide sufficient remedies, such as reconsideration or review, should petitioner ultimately believe she has reasonable grounds to challenge the outcome of her case.

## III. Factual History

### a. As reflected in the medical records[4]

Prior to the vaccination at issue, petitioner's medical history included asthma, GERD, hypothyroidism, migraines, chronic kidney stones, endometriosis, ovarian cysts, and pulmonary emboli. (*See, e.g.*, Ex. 8, p. 8.) She also had a history of occipital neuralgia, for which she had an occipital nerve stimulator placed in 2012. (*Id.* at 8; Ex. 6, p. 3.) On July 28, 2017, petitioner underwent a total laparoscopic hysterectomy, bilateral salpingectomy, right oophorectomy, and cystoscopy (Ex. 3, pp. 96-98), with her recovery being complicated by pelvic and abdominal pain (*e.g.*, *id.* at 2-14, 43). Petitioner also reported a history of constipation, especially following her surgery. (*Id.* at 15; Ex. 14, p. 75.) In 2016 and 2017, petitioner experienced several episodes of pleuritic chest pain and/or shortness of breath; however, her workup was unremarkable. (*E.g.*, Ex. 7, pp. 16-17, 32-34; Ex. 8, pp. 185-92, 216-26.)

Petitioner received the flu vaccination at issue on November 30, 2017. (Ex. 2, p. 1.) She was forty-one years old at the time of vaccination. (*Id.*) On January 9, 2018, petitioner presented to her primary care provider, Dr. Nowell, with a chief complaint of numbness and tingling. (Ex. 7, p. 6.) Petitioner reported experiencing a viral illness the week prior with nausea and vomiting lasting for approximately 48 hours. (*Id.*) However, petitioner explained that she was able to return to work with no issues until two days prior, when she noticed numbness and tingling in the bottom of both feet. (*Id.*) Over two days, petitioner's condition worsened with the numbness and tingling ascending upward to the upper part of the legs and the abdominal umbilicus area. (*Id.*) Additionally, at the time of the encounter, petitioner reported experiencing some tingling in both of her arms. (*Id.*) Petitioner also described unsteadiness and weakness when she tried to get up, as well as balance issues. (*Id.*) On physical examination, petitioner had unsteady gait and balance and some discoordination of her feet and hands, but no respiratory difficulties were noted. (*Id.* at 7.) Based on the onset of petitioner's condition and her symptom complex, Dr. Nowell's assessed petitioner with possible Guillain-Barré syndrome ("GBS") and referred her to neurology. (*Id.* at 6.)

Later that day, petitioner presented to the University of Mississippi Medical Center ("UMMC") Emergency Department ("ED") for a workup for possible GBS. (Ex. 8, p. 232.) Petitioner reported a recent history of gastroenteritis ten days prior, which included daily vomiting and diarrhea and resolved after four days. (*Id.* at 233.) She complained of gradually worsening weakness and numbness in all four extremities, along with paresthesia in her upper legs, hands, and fingers. (*Id.* at 232.) Petitioner explained that her symptoms began two days prior, when she first noticed numbness and weakness in her lower extremities. (*Id.* at 232-33.) Over 48 hours, the weakness, numbness, and heaviness in petitioner's lower extremities progressed to the point where she could no longer ambulate independently, and she also experienced new onset of tingling, numbness, and weakness in her upper extremities. (*Id.*) Petitioner

[4] Petitioner filed extensive medical records in this case. While I have reviewed all of the medical records filed, it is not necessary to explain every single record or encounter.

also reported associated heaviness in the chest, but she denied experiencing any shortness of breath and her respiration was noted to be even and unlabored. (*Id.*) On physical exam, petitioner had slightly decreased strength in the upper and lower extremities. (*Id.* at 234-35.) However, no drift was detected in any of petitioner's extremities on exam. (*Id.* at 235.) The ED provider documented that petitioner's history and physical exam were concerning for GBS, noting that petitioner had gastroenteritis and subsequently developed an ascending neurologic syndrome. (*Id.* at 236.) Petitioner's chest x-ray, CT of the head without contrast, and labs were unremarkable.[5] (*Id.* at 236, 374-76, 378-80.) A lumbar puncture was performed, and petitioner was admitted to the inpatient neurology service. (*Id.* at 235-36.)

Upon admission, petitioner was examined by the neurology team. (Ex. 8, pp. 242-46.) The neurology resident documented that petitioner presented with ascending weakness, numbness, and tingling after a bout of suspected gastroenteritis. (*Id.* at 242.) Physical examination revealed weakness in the upper and lower extremities bilaterally; unsteady gait; and deep tendon reflexes of 2/4 in the bilateral biceps and triceps, 3/4 in the knees, and 1/4 in the ankles symmetrically with the plantar response revealing equivocal toes. (*Id.* at 244-45.) On sensory examination, petitioner's sensation was intact to pinprick and proprioception, although regarding pinprick petitioner reported she "feels it less in stocking glove distribution" and "on back she feels it 'more' as ascending on exam to level of T8 where it feels the same from thereon." (*Id.* at 245.) The neurology resident documented an assessment of suspected acute demyelinating polyneuropathy. (*Id.* at 246.)

The following day, January 10, 2018, petitioner was examined by neurologist Dr. Uschmann and his resident, Dr. Thompson. (Ex. 8, pp. 272-75.) Petitioner reported experiencing chest "heaviness" overnight and a worsening of the paresthesia in her chest and hands, as well as continued pain and tingling in her legs. (*Id.* at 272.) She experienced one episode of vertigo and nausea earlier that morning, which lasted for approximately one hour and improved with Phenergan. (*Id.*) Petitioner's physical examination was significant for weakness in the bilateral upper and lower extremities; deep tendon reflexes of 3/4 in bilateral biceps, triceps, patellar, and ankles symmetrically with toes downgoing on the right and equivocal on the left; and decreased sensation to pinprick over bilateral upper and lower extremities distally, posteriorly to about T8, and anteriorly to about the T4 dermatome. (*Id.* at 272-73.) Dr. Thompson assessed petitioner with "subacute onset of progressive extremity weakness and extremity/trunk paresthesias of unclear etiology." (*Id.* at 274.) While petitioner's history was initially concerning for GBS, Dr. Thompson remarked that "examination and CSF studies would be more consistent with myelopathy or demyelinating condition." (*Id.*) Furthermore, Dr. Uschmann documented that petitioner was

> admitted last night with suspicion of AIDP, however, on assessment, her symptoms are much more compatible with a myelopathy. She is generally hyper-reflexive, has an upgoing toe on the L. There was no clonus. She

[5] Petitioner's urinalysis did reveal large leukocytes and a white blood cell count of 46; however, petitioner was asymptomatic.

has an ascending sensory level with positive dysesthesia now to about T4. No jaw jerk.

(*Id.* at 275.) However, he noted that petitioner's CSF studies did not evidence an inflammatory process and indicated that obtaining an MRI of petitioner's spine was not possible due to her occipital nerve stimulator. (*Id.*) Given her worsening condition, the plan was to start petitioner on high dose IV steroids "without a confirmed diagnosis." (*Id.*)

On January 11, 2018, petitioner underwent a CT myelogram of the entire spine to evaluate for myelopathy. (Ex. 8, p. 381.) Regarding the cervical spine, the reading radiologist documented that imaging revealed normal appearance of the spinal cord with no cord compression. (*Id.*) A small disc bulge was observed centrally at C2-C3 with mild ventral thecal sac narrowing, but petitioner's cervical myelogram was otherwise unremarkable. (*Id.*) The thoracic and lumbar myelogram showed mild degenerative disc disease and small disc protrusion at T7-T8. (*Id.*) However, the radiologist documented that petitioner's thoracic and lumbar myelogram revealed no spinal cord abnormality or cord compression. (*Id.*) In recording his assessment, the radiologist cautioned that a CT myelogram cannot evaluate for internal abnormalities in the spinal cord, such as signal abnormality, which might be appreciable by MRI only. (*Id.*)

That same day, petitioner was seen by Dr. Uschmann and Dr. Thompson. (Ex. 8, p. 278.) Dr. Thompson documented that petitioner complained of mild weakness in her arms and a transient episode of lightheadedness, but she reported no other significant changes overnight. (*Id.*) Strength testing revealed 4+/5 strength with bilateral dorsiflexion; 4/5 strength with right elbow flexion and wrist flexion; 4-/5 strength with right shoulder abduction and adduction, right elbow extension and wrist extension, left elbow flexion and wrist flexion, and bilateral plantarflexion and knee extension; and 3/5 strength with left elbow extension and wrist extension, hip extension, and bilateral knee extension. (*Id.* at 279.) Sensory examination continued to reveal decreased pinprick over bilateral lower extremities and upper extremities distally, posteriorly to about T8, and anteriorly to about the T4 dermatome. (*Id.*) Petitioner had 3/4 deep tendon reflexes in the bilateral biceps, triceps, patellar, and ankles symmetrically with toes downgoing on the right and upgoing on the left. (*Id.*) Dr. Thompson assessed petitioner with weakness and documented that petitioner presented with "subacute onset of progressive extremity weakness and extremity/truck paresthesias of unclear etiology. Examination and CSF studies are suggestive of myelopathy rather than inflammatory condition." (*Id.* at 280.) The plan was to start petitioner on Solu-Medrol,[6] given her worsening condition, and to proceed with petitioner's diagnostic workup. (*Id.*

[6] Solu-Medrol is a trademark preparation of methylprednisolone, which is a synthetic glucocorticoid used as an anti-inflammatory and immunosuppressant in a wide variety of disorders. *Solu-Medrol*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=46174 (last visited Aug. 31, 2026); *Methylprednisolone*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=31014 (last visited Aug. 31, 2026).

at 281.) Dr. Uschmann concurred the assessment and plan articulated by Dr. Thompson. (*Id.*)

In a neurology progress note dated January 12, 2018, Dr. Thompson noted that petitioner's weakness and paresthesias were "[m]uch improved" since the initiation of steroids. (Ex. 8, p. 292.) He continued to assess petitioner with "subacute onset of progressive extremity weakness and extremity/truck paresthesias of unclear etiology." (*Id.* at 295.) Moreover, Dr. Thompson documented that "[e]xamination was suggestive of myelopathy, though diagnosis unclear as MRI could not be obtained. CSF studies [were] completely normal, making a diagnosis of an inflammatory condition such as transverse myelitis o[r] AIDP, less likely." (*Id.*) In his attending supplement, Dr. Uschmann recorded the following:

> Working diagnosis has been transverse myelitis, and this was based on reported symptoms of ascending paresthesias and quadriparesis in combination with objective exam findings, in particular retained muscle stretch reflexes.
>
> By this AM, she had received 1.5 grams of solumedrol, and her symptoms had nearly resolved. This is a very rapid response, but, nevertheless, seems to be in agreement with our presumptive diagnosis.

(*Id.* at 296.)

On January 13, 2018, petitioner underwent an initial occupational therapy evaluation. (Ex. 8, pp. 297-302.) The occupational therapist documented that petitioner was admitted with progressive ascending weakness of all four extremities with decreased sensation in all limbs and posterior sensory changes from T7 down. (*Id.* at 298.) Furthermore, the occupational therapist recorded: "Pt is assumed to have myelopathic progression over AIDP/GBS now with LP less indicative of these. Steroids 3/5 completed. Awaiting further rule out of MS or transverse myelitis." (*Id.*) Based on petitioner's initial evaluation, the occupational therapist recommended that petitioner present for acute rehabilitation upon hospital discharge due to poor activation of her core muscles leading to unsteadiness with mobility and significant weakness in her upper extremities impairing her ability to perform activities of daily living. (*Id.* at 301.)

Later that day, petitioner was examined by Dr. Uschmann and his neurology resident, Dr. Sreenivasan. (Ex. 8, p. 303.) Petitioner's weakness and paresthesias continued to improve with steroid treatment. (*Id.*) On exam, petitioner demonstrated improved strength; intact sensation to light touch throughout; and deep tendon reflexes of 3/4 in bilateral biceps, triceps, patellar, and ankles symmetrically with toes downgoing bilaterally. (*Id.* at 304.) While petitioner's gait appeared unsteady, she was able to pivot on heels and take small steps with assistance. (*Id.*) Dr. Sreenivasan indicated the etiology of petitioner's progressive weakness and paresthesia remained unclear, noting that petitioner's CT myelogram was normal, which ruled out extrinsic compressive disease. (*Id.* at 305.) In his assessment, Dr. Sreenivasan documented:

> Clinically patient is significantly improved after [a] few doses of steroids. Though the working diagnosis is transverse myelitis, there is no confirmation yet, given our inability to obtain an MRI. Pain service was contacted with regard to potential replacement of the occipital nerve stimulator; however it appears that this would have to be done as an outpatient.

(*Id.*)

During a neurology evaluation on January 14, 2018, petitioner reported her strength was improving and that her paresthesia in her hands had resolved, although she complained of an episode of wheezing and minimal paresthesia in her left heel. (Ex. 8, p. 311.) Strength testing demonstrated 4/5 strength in the bilateral shoulders, elbows, wrist, hips, knees, and with plantarflexion, as well as mild giveaway weakness with "somewhat poor effort on examination." (*Id.* at 312.) Petitioner's sensation was intact to light touch throughout and her deep tendon reflexes were 3/4 in her bilateral biceps, triceps, patellar, and ankles symmetrically with toes downgoing bilaterally. (*Id.*) Dr. Uschmann and Dr. Thompson continued to assess petitioner with progressive extremity weakness and extremity/trunk paresthesias of unclear etiology, emphasizing that TM was the working diagnosis but could not be confirmed due to their inability to obtain MR imaging. (*Id.* at 313-14.)

On January 15, 2018, petitioner reported continued improvement in her strength and resolution of wheezing when evaluated by the neurology team. (Ex. 8, pp. 314-15.) Petitioner's physical exam findings were unchanged from the day prior. (*Compare id.* at 315, *with id.* at 312.) The neurology team continued to assess petitioner with progressive extremity weakness and extremity/trunk paresthesias of unclear etiology with a working diagnosis of TM. (*Id.* at 316.)

The following day, the neurology team documented that petitioner continued to experience improving strength, noting that she ambulated in the hallway with assistance and a walker. (Ex. 8, p. 324.) On physical exam, petitioner had normal strength throughout with flexion and 4+/5 strength in the upper and lower extremities with extension; her sensation was intact to light touch throughout; and her deep tendon reflexes were 3/4 in the bilateral biceps, triceps, patellar, and ankles symmetrically with toes downgoing bilaterally. (*Id.* at 325.) Dr. Thompson documented that petitioner completed her five-day course of IV Solu-Medrol, and that a prednisone taper was initiated. (*Id.* at 327.) Additionally, he noted that petitioner was clear for discharge and waiting on acceptance from the acute rehab facility. (*Id.* at 327.)

On January 17, 2018, petitioner was discharged from UMMC and transferred to Methodist Rehabilitation Center ("MRC") for acute rehabilitation. (Ex. 8, pp. 229, 237-38, 335.) Neurological examination at the time of discharge revealed 5/5 strength bilaterally in flexors in the upper and lower extremities and 4+/5 strength bilaterally in extensors in the upper and lower extremities; no appreciated sensory deficit to light

touch; and 3+ deep tendon reflexes in biceps, triceps, brachioradialis, and patellar reflexes symmetrically with toes downgoing bilaterally. (*Id.* at 240.) Petitioner's discharge record lists "[a]cute transverse myelitis in demyelinating disease of central nervous system" as petitioner's principal diagnosis and among her "final diagnoses" for her hospitalization. (*Id.* at 229.) In the discharge summary authored by Dr. Thompson and cosigned by Dr. Auchus, the attending neurologist, petitioner's hospital course is documented as follows:

> Patient was admitted for further workup and management. Initial examination was noted for brisk reflexes, proximal>distal weakness, and upgoing toes on the left and there was concern for myelopathy. She was started on IV Solumedrol x 5 days with considerable improvement in [lower extremity] strength and paresthesias even after the first day of treatment. CT myelogram was performed to rule out compressive lesions and was negative. MRI was not able to be obtained as patient has an occipital nerve stimulator. Due to inability to perform MRI, patient was treated as though she had a transverse myelitis, despite negative CSF studies. She was treated for post-[lumbar puncture] headache. It was discussed with patient possible benefit of having stimulator removed at some point to receive MRI.

(*Id.* at 238.) The neurology team documented "Principal Problem: Weakness" as petitioner's discharge diagnosis. (*Id.*)

Upon her admission to MRC, petitioner was examined by Dr. Villacorta, a physical medicine and rehabilitation physician. (Ex. 5, pp. 786-90.) Dr. Villacorta listed ataxia and weakness of the bilateral upper and lower extremities, sensory changes, and unconfirmed inflammatory myelopathy as the reasons for petitioner's admission. (*Id.*) Additionally, Dr. Villacorta noted that petitioner was known to Dr. Veda, a neurologist, who recommended admission for further workup. (*Id.*) However, she remarked that petitioner's workup had been limited due to the presence of a non-MRI compatible nerve stimulator, which was placed to treat petitioner's occipital neuralgia. (*Id.*) Dr. Villacorta recorded that petitioner's "[w]orking diagnosis was 'suggestive of myelopathy,'" noting that petitioner's CSF study and CT myelogram results ruled out GBS and extrinsic disease, respectively. (*Id.*) At the time of admission, while it was noted that petitioner's condition improved significantly with steroid treatment, petitioner continued to report abnormal sensation in her hands and from the chest down, as well as "[s]ignificant spasms with effort (intention tremors)." (*Id.*) Petitioner denied experiencing any loss of bowel or bladder control. (*Id.*) Dr. Villacorta documented a rehab diagnosis of "[i]nflammatory myelopathy, etiology unknown/undefined, C5 Neuro level (motor and sensory)." (*Id.* at 790.)

While admitted to MRC, petitioner completed physical, occupational, and respiratory therapy. (*See generally* Ex. 5, pp. 698-1092.) On January 31, 2018, petitioner was discharged home, where she was instructed to continue with therapy on an outpatient basis. (*Id.* at 1087-88.) Dr. Villacorta noted that petitioner achieved functional progress during the course of her rehab, noting that petitioner required a

rolling walker for mobility. (*Id.* at 856.) Petitioner's discharge summary reiterates "[i]nflammatory myelopathy, etiology unknown/undefined, C5 Neuro level (motor and sensory)" as her rehab diagnosis. (*Id.* at 1090.) Dr. Villacorta documented that a definitive diagnosis of inflammatory myelopathy was limited by the fact that MR imaging could not be obtained due to the presence of petitioner's occipital nerve stimulator. (*Id.* at 857.) In that regard, Dr. Villacorta noted that, in the years before MR imaging was available, somatosensory evoked potential studies ("SSEP") were considered in the diagnostic evaluation of inflammatory myelopathy. (*Id.* at 858.) Accordingly, Dr. Villacorta ordered full battery evoked potential studies and an EMG/NCS to be performed outpatient. (*Id.*)

Following her discharge from MRC, petitioner established primary care with Dr. Duckworth, an internist. (Ex. 8, pp. 687, 696.) Dr. Duckworth documented that, when petitioner returned to work following her multiple gynecological surgeries, she developed leg weakness and arm heaviness, which ultimately resulted in her being hospitalized and undergoing acute rehabilitation. (*Id.* at 696.) Further, Dr. Duckworth noted that petitioner "was thought to have transverse myelitis." (*Id.*) She noted that petitioner had improved some but still reported feeling extremely weak. (*Id.*) On physical exam, petitioner moved her extremities with caution due to pain, and muscle spasms were observed in her legs. (*Id.* at 697.) Dr. Duckworth assessed petitioner with "[w]eakness, presumably transverse myelitis" and noted that petitioner was planning to undergo an MRI soon for evaluation of possible multiple sclerosis ("MS") or neuromyelitis optica ("NMO"). (*Id.*)

On February 7, 2018, petitioner underwent a full battery evoked potential study, inclusive of tibial and median SSEP. (Ex. 5, p. 9.) The electrodiagnostic provider, Dr. Leis, documented that petitioner was referred for evaluation of possible TM and CNS demyelination and further noted that the purpose of the study was to look for conduction abnormalities in large fiber sensory pathways of the brain and spinal cord that would support a diagnosis of multiple sclerosis. (*Id.*) Petitioner's studies were normal, revealing no evidence of conduction abnormalities in the brainstem, upper or lower limb somatosensory, or visual pathways of the brain and spinal cord. (*Id.*) Accordingly, Dr. Leis concluded that "[t]hese findings do not support a diagnosis of transverse myelitis or disseminated MS." (*Id.*)

Two days later, petitioner returned to Dr. Leis and underwent an electromyography/nerve conduction study ("EMG/NCS"). (Ex. 5, pp. 3-5.) Dr. Leis documented that petitioner presented for further evaluation of her altered sensation, weakness, and involuntary spasms involving all limbs. (*Id.* at 3.) With regard to petitioner's relevant medical history, Dr. Leis noted that petitioner

> was recently discharged from MRC after she presented [with] acute progressive weakness and numbness in both lower limbs. She was hospitalized at UMMC where a diagnosis of possible transverse myelitis was considered. She developed multiple jerking / coarse sharking spells variably involving lower limbs +/- upper limbs asymmetrically. These spells

> have persisted (about 10 spells today involving R>L arms and either leg) and typically lasting < 1 minute. She does not lose consciousness during the spells and can maintain a conversation. However, distractions clearly alter the magnitude and frequency of the jerking movements (e.g., answering questions, performing motor tasks with unaffected limbs, or following commands).

(*Id.*) On physical exam, petitioner's deep tendon reflexes were 2+ in her ankles, 2 to 3+ in her knees, and 2+ in her arms bilaterally. (*Id.*) While petitioner's jaw reflex was slightly brisk, Dr. Leis noted that examination revealed no Babinski signs,[7] clonus, or other pathologic reflexes. (*Id.*) Further, Dr. Leis documented that petitioner's manual muscle testing was characterized by "give-away" and variable effort, particularly in her left lower extremity thereby confounding interpretation, and noted that petitioner's weakness improved briefly with verbal encouragement. (*Id.*) Petitioner's EMG/NCS were normal, with no electrodiagnostic evidence of demyelination or axonal polyneuropathy, isolated mononeuropathies, or lumbosacral or cervical radiculopathies affecting the muscles tested in the upper and lower limbs. (*Id.* at 3-5.) Dr. Leis assessed that the etiology of petitioner's symptoms "remains obscure." (*Id.* at 3.) Further, he remarked that "[t]he multiple coarse jerking / shaking spells involving lower or upper limbs cannot easily be explained by the neurological examination or the electrophysiologic studies and are most suggestive of conversion disorder." (*Id.*) Accordingly, Dr. Leis recommended that intensive psychotherapy be considered. (*Id.*)

On February 13, 2018, petitioner was seen by Dr. Cullom to discuss removal of her occipital nerve stimulator. (Ex. 6, p. 3.) Dr. Cullom documented that petitioner was last seen in 2012 when she had an occipital nerve stimulator placed for treatment of her occipital neuralgia. (*Id.*) Further, he indicated that petitioner recently experienced "rapidly descending paresthesias and paralysis and was thought to have transverse myelitis," noting that petitioner's neurologist was anxious to get an MRI scan "to try and nail down the diagnosis." (*Id.*) Petitioner's occipital nerve stimulator was surgically removed by Dr. Cullom on February 22, 2018. (*Id.* at 4-11.)

Petitioner was evaluated by Dr. Vedanarayanan ("Dr. Veda"), a neurologist, on February 27, 2018, with a chief complaint of weakness that began in January of 2018 in her legs and rapidly progressed upwards. (Ex. 14, pp. 9-12.) Petitioner estimated that her weakness extended up to the C6 level, and further noted that she saw an improvement in her symptoms after three days of treatment with IV steroids during her hospitalization. (*Id.* at 9.) She reported experiencing blurred and double vision with onset of the weakness. (*Id.*) At the time of the encounter, petitioner was able to perform activities of daily living independently, ambulating with the assistance of a

[7] Babinski sign or reflex is a "dorsiflexion of the big toe on stimulating the sole of the foot," with a positive finding representing "a sign of a lesion in the central nervous system." *Babinski reflex*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=102809(last visited Aug. 26, 2026); *see also Babinski sign*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=106098 (last visited Aug. 26, 2026) (noting that "Babinski sign" is sometimes "a misnomer for Babinski reflex").

rolling walker, and wearing a brace on her lower left extremity for support. (*Id.*) She complained of numbness in her feet and involuntary movements in her lower extremities, which she described as muscle twitches, which she reported were triggered by fatigue but had improved. (*Id.*) Additionally, petitioner denied any issues with bladder or bowel control. (*Id.*) Physical examination revealed mildly increased tone in both lower extremities; mild generalized weakness in the bilateral upper and lower extremities; "a few patchy areas of decreased pinprick sensation on her anterior thigh[,] more noticeable on the left[,] and also on her torso"; deep tendon reflexes of 2+ in the biceps and triceps, brisk at knee, and ankle with plantars equivocal; mild past pointing and carelessness towards the end of finger-nose-finger testing; slow rapid alternating movements; and difficulties with tandem walk heel-to-shin maneuver.[8] (*Id.* at 10-11.) Dr. Veda assessed petitioner with acute TM, which improved with steroids. (*Id.*)

On March 8, 2018, petitioner underwent MR imaging of her cervical and thoracic spine with and without contrast. (Ex. 14, pp. 69-70.) Petitioner's MRI of the thoracic spine was normal. (*Id.* at 69.) Although petitioner's MRI of the cervical spine was limited due to motion, the reading radiologist opined that the study was still adequate for interpretation. (*Id.* at 70.) Petitioner's MRI of the cervical spine was unremarkable with no significant stenosis and no evidence of myelitis or neural impingement. (*Id.*)

Petitioner returned to Dr. Veda on March 12, 2018. (Ex. 14, pp. 15-18.) At this encounter, Dr. Veda continued to document an assessment of acute TM. (*Id.* at 18.) However, he recorded that petitioner had recently undergone MR imaging with and without contrast of her cervical and thoracic spine, which were unremarkable with no evidence of myelitis. (*Id.* at 15, 18.) Dr. Veda recommended that petitioner undergo an MRI of the brain to evaluate for lesions in the subcortical white matter "that could explain her symptoms." (*Id.* at 18.)

On March 28, 2018, petitioner followed up with Dr. Veda. (Ex. 14, pp. 23-26.) Dr. Veda noted that petitioner underwent an MRI of the brain on March 20, 2018, which was unremarkable. (*Id.* at 23.) Physical examination revealed improvement in petitioner's gait and strength, and she reported that her energy levels had improved, although she still gets tired while trying to complete chores at home. (*Id.* at 25.) Dr. Veda continued to document an assessment of acute TM. (*Id.*) At this encounter, petitioner also reported chest pain, and a chest x-ray was performed, which showed a small pleural effusion. (*Id.* at 26.) Additionally, petitioner reported experiencing issues emptying her bladder completely. (*Id.*) A bladder scan was performed after she voided, and petitioner's bladder was empty. (*Id.*) On April 3, 2018, petitioner called Dr. Veda's clinic and reported two episodes of nighttime urinary incontinence. (*Id.* at 28.)

Petitioner followed up with Dr. Duckworth on April 6, 2018, regarding a urinary tract infection. (Ex. 8, pp. 727, 740.) Petitioner reported a three-day history of dysuria,

[8] Dr. Veda's documentation of petitioner's physical exam findings is somewhat inconsistent and confusing to follow. (Ex. 14, p. 11.) For example, he remarked that petitioner's deep tendon reflexes were 2+ in the biceps and triceps but brisk at the knee and ankle with equivocal plantars. (*Id.*) However, on that same page, he listed that all of petitioner's deep tendon reflexes as 2 bilaterally with downgoing plantars. (*Id.*)

but she denied hematuria or current incontinence. (*Id.* at 740.) She also indicated that, since her last appointment, she had her occipital nerve stimulator removed, after which she experienced left-sided chest pain. (*Id.*) At the time of the encounter, petitioner complained of a dry cough and significant chest pain. (*Id.*) Dr. Duckworth's impression was that petitioner's chest wall pain was possibly due to her positioning during the nerve stimulator removal procedure that would hopefully resolve with time. (*Id.* at 741.) With regard to petitioner's weakness, Dr. Duckworth documented that petitioner's strength had improved with therapy and noted that petitioner could now undergo MR imaging. (*Id.*) Dr. Duckworth continued to assess petitioner's weakness as presumable TM. (*Id.*)

On April 11, 2018, petitioner presented to the ED at UMMC with complaints of a one-day history of increasing weakness in her upper and lower extremities, not being able to walk, and a feeling of heaviness, numbness, and tingling in her bilateral upper extremities. (Ex. 8, pp. 745, 748.) She also noted a one-day history of increased frequency and dysuria with some sporadic urinary incontinence over the past couple of months. (*Id.* at 748.) Additionally, petitioner complained of associated low back pain, chest tightness/pain, and shortness of breath. (*Id.* at 749, 752.) Petitioner reported experiencing a similar episode in January of 2018, and was diagnosed with C6 TM, which improved with a five-day course of steroids. (*Id.* at 748, 752.) On physical examination, petitioner demonstrated 4+/5 strength in all extremities; somewhat diminished sensation to soft touch in the bilateral lower extremities with normal sensation to soft touch in the bilateral upper extremities; and hyperreflexic patellar tendons. (*Id.* at 750.) Petitioner was admitted to the inpatient neurology service for MR imaging and further workup. (*Id.* at 751-52.)

Later that day, petitioner was evaluated by the neurology team, including Dr. Anderson and his neurology resident, Dr. Abuzeid. (Ex. 8, pp. 781-90.) Petitioner reported a past medical history inclusive of TM, which was diagnosed in January of 2018, and further indicated that her treating neurologist, Dr. Veda, instructed her to come to the ED for treatment of her TM. (*Id.* at 781.) Physical examination revealed 5/5 strength throughout with normal bulk and tone; intact sensation to light touch, temperature, proprioception, and vibration, but decreased sensation to pinprick in the bilateral upper and lower extremities distally; 2/4 deep tendon reflexes in the bilateral biceps, triceps, patellar, and ankles symmetrically with a downgoing plantar response on the right, a positive Hoffman sign[9] on the right upper extremity, and a positive Babinski sign on the left lower extremity; and unsteady gait. (*Id.* at 785-86.) In his attending attestation, Dr. Anderson noted that, while petitioner reported a history of "myelitis," her recent MRI was normal. (*Id.* at 781.) Dr. Abuzeid's assessment included myelitis, and the plan was to start petitioner on IV steroids and obtain repeat MR imaging and CSF studies. (*Id.* at 781, 789-90.)

[9] Hoffman sign is "increased excitability to electrical stimulation in the sensory nerve" with the ulnar nerve typically being tested. A positive Hoffman sign is demonstrated when a sudden nipping of the nail of the index, middle, or ring finger produces flexion of the terminal phalanx of the thumb and of the second and third phalanges of some other finger. *Hoffmann phenomenon*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=97600 (last visited Aug. 31, 2026); *Hoffmann sign*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=106299 (last visited Aug. 31, 2026).

MR imaging with and without contrast of petitioner's brain and orbits was normal with no evidence of any demyelinating plaques, mass or enhancing lesion, or infarct. (Ex. 8, pp. 898-900.) Petitioner's MRI of the cervical spine with and without contrast revealed mild disc bulges without cord compression but was otherwise normal, showing no signal abnormality and no evidence of demyelinating plaques, mass, or lesions. (*Id.* at 900.) MR imaging of petitioner's thoracic spine with and without contrast demonstrated mild degenerative changes but was otherwise unremarkable. (*Id.* at 900-01.) No demyelinating plaques, mass, lesions, or cord compression were identified in the thoracic cord. (*Id.* at 901.) The reading radiologist documented that there was a potential signal on sagittal sequence at T2-T3, which was likely an artifact due to motion. (*Id.*) Petitioner's repeat CSF studies were unremarkable, with normal protein, glucose, and immunoglobulin G ("IgG") index levels and zero oligoclonal bands. (*Id.* at 754-56, 792.)

On April 12, 2018, petitioner was reexamined by Dr. Anderson and Dr. Abuzeid. (Ex. 8, pp. 814-17.) Dr. Abuzeid noted that petitioner experienced pain episodes overnight requiring Norco and Toradol, although petitioner demonstrated improvement of her symptoms at the time of examination. (*Id.* at 815.) On physical exam, petitioner had 4/5 strength in the bilateral upper and lower extremities with normal bulk and tone; mild paresthesias in the bilateral upper and lower extremities with intact sensation to pinprick and light touch throughout; symmetric reflexes with downgoing toes bilaterally; and unsteady gait. (*Id.* at 816.) Tingling in the extremities, numbness and tingling in both hands, and myelitis are listed as the diagnoses for the encounter. (*Id.* at 817.) However, Dr. Abuzeid documented that petitioner's CSF studies were benign so far and that imaging revealed no evidence of myelitis. (*Id.*) The plan was to deescalate petitioner's steroid treatment and focus on pain control. (*Id.*)

In a neurology progress note dated April 13, 2018, it was documented that petitioner complained of shortness of breath overnight. (Ex. 8, pp. 818-19.) Petitioner's chest x-ray and arterial blood gas test were both normal. (*Id.*) Dr. Anderson suspected petitioner's shortness of breath were related to either pain or anxiety. (*Id.*) Petitioner reported subjective improvement in her neurologic symptoms, and physical and occupational therapy cleared her for outpatient therapy. (*Id.*) Dr. Abuzeid continued to assess petitioner with tingling in the extremities, numbness and tingling in both hands, and myelitis, while emphasizing that petitioner's CSF studies were benign and that her MR imaging did not reveal any myelitis. (*Id.* at 821.) Moreover, Dr. Anderson documented that petitioner's symptoms could be attributed to a small fiber neuropathy with dysautonomia and suggested that petitioner undergo an outpatient workup with Dr. Veda. (*Id.* at 818.) Petitioner underwent a follow up EMG/NCS, which revealed no electrodiagnostic evidence of a lower motor neuron process, such as peripheral neuropathy, myopathy, or left lumbosacral radiculopathy, although an upper motor neuron process could not be excluded. (*Id.* at 818, 904-07.) Dr. Anderson also recommended a paraneoplastic panel and GAD antibody testing (*Id.* at 818), which were sent to the Mayo Clinic for analysis (*Id.* at 892-94). Petitioner's serum paraneoplastic antibody panel was negative; however, testing identified the GAD

antibody and petitioner's profile was "consistent with predisposition to thyrogastric disorders, including thyroiditis, pernicious anemia, and type 1 diabetes, but has low specificity for neurological autoimmunity." (*Id.* at 892.)

On April 14, 2018, petitioner was seen by Dr. Anderson and his neurology resident, Dr. Aman. (Ex. 8, pp. 827-31.) Petitioner reported improvement in her lower extremity weakness and demonstrated no new neurological deficits. (*Id.* at 827.) On exam, petitioner gave poor effort, appeared anxious, and used pressured speech. (*Id.* at 827-28.) Bilateral leg weakness, tingling in the extremities, numbness and tingling in both hands, and myelitis are listed among petitioner's diagnoses for the encounter. (*Id.* at 830.) Dr. Anderson and Dr. Aman continued to reiterate that petitioner's CSF studies were benign and that the MR imaging did not show myelitis. (*Id.*) Additionally, they noted that petitioner would need to undergo quantitative sudomotor axon reflex testing ("QSART") in Dr. Veda's clinic on an outpatient basis to assess for possible small fiber neuropathy. (*Id.*; *see also id.* at 818.)

The next day, petitioner was examined by Dr. Anderson and Dr. Aman. (Ex. 8, pp. 831-34.) At this encounter, petitioner reported improvement in her lower extremity weakness and denied any new neurological deficits. (*Id.* at 831.) Again, on exam, petitioner gave poor effort, appeared anxious, and used pressured speech. (*Id.* at 831-32.) Dr. Anderson and Dr. Aman noted that petitioner was cleared medically for discharge and was awaiting rehab placement per petitioner's request. (*Id.* at 834.)

On April 16, 2018, petitioner was evaluated by Dr. Auchus and his neurology resident, Dr. Buford. (Ex. 8, pp. 837-43.) The neurology team agreed that petitioner had achieved the maximum benefit of hospitalization, and the plan was to discharge petitioner home with 24-hour supervised care provided by her family. (*Id.* at 753-54, 764.) In the discharge summary, Dr. Buford documented petitioner's hospital course as follows:

> [Petitioner] was admitted to the Neurology service on 4/11/18 for generalized weakness, especially [bilateral lower extremity] weakness, with a patient reported history of myelitis. Patient was worked up with MRI brain, orbits, Cspine, Tspine all of which were negative with no findings of demyelinating disease. . . . [Lumbar puncture] was performed which likewise was negative. All lab workup has been negative . . . . Patient complained of headaches post-[lumbar puncture]. . . . Patient continued to improve throughout her hospital course. Patient plans to follow up with Dr. Veda.

(*Id.* at 754.) However, at the time of anticipated discharge, petitioner stated that her pain was returning and reported feeling like she did at the time of admission. (*Id.* at 837.) Specifically, Dr. Buford documented that petitioner was crying and stating that she could not walk, although he noted that she successfully ambulated in the room with some assistance and that her strength was appropriate. (*Id.* at 840.) Petitioner's motor examination demonstrated 3/5 strength in the bilateral lower extremities and 4/5

strength in the bilateral upper extremities; however, Dr. Buford indicated her exam was characterized by poor effort and pseudo-weakness of the bilateral lower extremities. (*Id.* at 838.) Reflexes were symmetric with toes downgoing bilaterally, and petitioner had intact sensation to pinprick and light touch throughout, although she reported mild paresthesia in the bilateral upper and lower extremities. (*Id.*) Petitioner indicated that she was in communication with Dr. Veda and inquired about receiving IVIG and PLEX. (*Id.* at 840.) Dr. Buford denied her request, informing petitioner that she had no clinical indication for IVIG or PLEX therapy based on her extensive workup and that unnecessary treatment could ultimately cause her harm. (*Id*.) While petitioner requested to speak with the attending, it is noted that Dr. Auchus agreed with Dr. Buford's assessment and plan of care. (*Id.* at 840-43.) Additionally, petitioner complained of worsening headache, and requested an epidural blood patch. (*Id.* at 768, 840.) Anesthesiology was consulted, and petitioner received an epidural blood patch the following day. (*Id.* at 793, 843.)

Petitioner was ultimately discharged from UMMC and transferred to MRC for inpatient rehabilitation on April 18, 2018. (Ex. 8, pp. 767-68; Ex. 5, pp. 154-56.) In the discharge summary, Dr. Buford documented that petitioner was admitted to the neurology service on April 11 for generalized weakness, especially in the bilateral lower extremities. (Ex. 8, p. 768.) Although petitioner reported a history of myelitis, Dr. Bufford stressed that petitioner had undergone an extensive workup while hospitalized, including repeat MR imaging of the brain, orbits, cervical spine, and thoracic spine, and repeat lumbar puncture, which were all negative with no findings of demyelinating disease. (*Id.*) Migraine, myelitis, tingling in the extremities, numbness and tingling in both hands, and bilateral leg weakness are listed among petitioner's active problems at the time of discharge. (*Id.* at 767.)

Upon her arrival at MRC, petitioner underwent a therapeutic recreation inpatient rehabilitation initial evaluation. (Ex. 5, pp. 154-56.) The admitting provider noted that petitioner presented to UMMC ED upon the direction of her neurologist, Dr. Veda, with complaints of recurring lower extremity weakness and ataxia, as well as ascending paresthesia and numbness in the bilateral lower extremities. (*Id.* at 154.) Further, the admitting provider documented that neurology was consulted and underwent a workup, which revealed negative CSF testing and no evidence of myelitis on MRI. (*Id.*) Additionally, the admitting provider recorded that, following her prior discharge from MRC, petitioner had undergone SSEP testing for her "myelitis" diagnosis, which revealed no neurophysiological abnormalities and prompted Dr. Leis to suggest conversion disorder as a possible alternative diagnosis. (*Id.*) However, it was noted that petitioner's treating neurologist, Dr. Veda, was not convinced by a possible diagnosis of conversion disorder and was referring petitioner to a neuroimmunology for further evaluation, including QSART. (*Id.*) Ataxic paraparesis, dysesthesia, and possible conversion disorder were recorded as petitioner's rehab diagnoses. (*Id.*)

Later that day, petitioner was evaluated by MRC's physical medicine and rehabilitation team. (Ex. 5, pp. 294-97.) The assessing provider documented bilateral lower extremity weakness, ataxia, generalized dysesthesia, unconfirmed/undefined

myelitis, and possible conversion disorder as the reasons for petitioner's admission. (*Id.* at 294.) On physical exam, petitioner "demonstrated almost exag[g]erated effort" to raise her legs off the bed, achieving only 30-degree hip flexion on the right and 10-degree hip flexion on the left. (*Id.* at 296.) Petitioner's ankle plantar flexion, ankle dorsiflexion, and toe flexion and extension were intact. (*Id.*) Her deep tendon reflexes in her patella were measured as 2+ on the right and 1+ on the left, and she tested negative for clonus and Babinski sign. (*Id.*) Additionally, petitioner reported experiencing hypo/hyper paresthesia from C3 down. (*Id.*) The provider assessed petitioner with (1) ataxic paraparesis with a working diagnosis of conversion disorder involving neurological symptoms; (2) bladder and bowel dysfunction; (3) neuropathic pain; (4) respiratory insufficiency; and (5) mood disorder. (*Id.* at 297.)

Petitioner underwent a psychiatric diagnostic interview the following day, April 19, 2018. (Ex. 5, pp. 289-91.) During the interview, petitioner acknowledged that she was experiencing some psychological difficulty adjusting to her new health issues and related sequalae, noting that she was very discouraged by what felt like a setback in her recovery and the uncertainty of her medical condition. (*Id.* at 290.) The provider documented that petitioner felt somewhat upset by the possibility of a conversion disorder diagnosis, especially the stigmatizing effects, and expressed concern that such a diagnosis would cause her providers to stop looking for a physiological cause of her symptoms, creating a barrier to getting the treatment she feels she needs. (*Id.*) However, petitioner reported that she wanted "to remain open-minded about that diagnosis" and get the proper treatment if she does indeed have conversion disorder. (*Id.*) The provider observed petitioner's mood during the interview as anxious with bouts of dysthymia. (*Id.*) Overall, the findings from the evaluation suggested that petitioner had adjustment disorder with a history of anxiety disorder. (*Id.* at 291.) The plan was to rule out personality disorder, particularly obsessive convulsive disorder, and conversion disorder. (*Id.*)

On April 27, 2018, petitioner had a follow up psychotherapy session. (Ex. 5, p. 292.) The provider recorded that petitioner appeared distressed, reported feeling disappointed and frustrated, and was tearful during most of the session. (*Id.* at 292.) During the session, petitioner expressed feeling very dissatisfied because it felt that all her therapists were approaching her treatment with conversion disorder as the working diagnosis, rather than a rule-out diagnosis. (*Id.*) Further, the provider noted that petitioner was concerned that her providers were not taking her seriously when she communicated experiencing pain or fatigue; that her providers would give up on determining the physiological cause of her symptoms; and that a diagnosis of conversion disorder would be accompanied by associated stigma. (*Id.*) Unspecified adjustment disorder and a history of anxiety disorder were listed as the diagnoses for the session. (*Id.*)

At a follow up psychotherapy session on April 30, 2018, petitioner reported feeling much better relative to her last session and stated that she was looking forward to being discharged and resuming outpatient therapy. (Ex. 5, p. 293.) Although she still experienced some pain, petitioner indicated that the pain is less intense and noted that

her mobility had "greatly improved." (*Id.*) Additionally, petitioner reported that her treating neurologist, Dr. Veda, believed that her symptoms "may be due to lupus, as was suggested by recent tests" and that she would therefore continue with steroid therapy, which improved her symptoms in the past. (*Id.*) Petitioner expressed feeling hopeful that "this new diagnosis might indicate a new treatment approach that could improve her symptoms." (*Id.*) The provider encouraged petitioner to continue engaging in psychotherapy after discharge as there was still a chance that her symptoms were due to conversion disorder. (*Id.*) While initially hesitant to the idea, petitioner indicated that continuing with psychotherapy could be beneficial in helping her process her unpleasant rehabilitation experience, and she indicated that she could obtain the services of a counselor or psychologist, if necessary. (*Id.*)

Petitioner was discharged home from MRC on May 1, 2018, and was instructed to continue with physical and occupational therapy on an outpatient basis. (Ex. 5, p. 333.) The discharge summary indicates that petitioner "made some functional progress" during the course of her rehabilitation. (*Id.* at 336.) At the time of discharge, petitioner demonstrated modified independence with self-care, required supervision with transfers, and was ambulating with a contact guard assist. (*Id.*) A subtle tremor was observed in petitioner's right arm, and petitioner still had some balance issues with inconsistent gait deviations. (*Id.*) The psychology team documented that petitioner was cognitively stable but noted that she was still trying to adjust to the idea of conversion disorder of which she remained doubtful. (*Id.*)

The next day, petitioner followed up with Dr. Veda, who documented that petitioner had recently experienced "relapsed symptoms of whole body paresthesias and increasing muscle weakness," resulting in hospitalization and subsequent inpatient rehabilitation. (Ex. 14, p. 30.) He noted that there were concerns regarding petitioner's effort at times during her hospitalization and rehabilitation. (*Id.*) At the time of the encounter, petitioner reported tingling and numbness in her feet ascending up to her ankle; leg spasms; pain mainly localized in the lower back; tingling in her fingers; persistent functional deficits in her hands; difficulty with urinating; constipation; and blurry vision. (*Id.*) Dr. Veda recorded that petitioner's physical examination revealed paraparesis worse in her left lower extremity. (*Id.* at 31.) Additionally, Dr. Veda noted that petitioner's exam demonstrated "very brisk" tendon reflexes in her lower extremities, which were out of proportion to her reflexes observed in her upper extremities. (*Id.*) Even though petitioner did not demonstrate spasticity, Dr. Veda opined that these finding "reflect upper motor neuron dysfunction." (*Id.*) He documented his assessment as mild paraparesis of both lower extremities, worse on the left side, and muscle weakness. (*Id.*) Further, he remarked that petitioner's evaluation, inclusive of extensive imaging, had "failed to show grade lesion in the spinal cord or brain." (*Id.*) Accordingly, Dr. Veda recommended that petitioner continue with physical therapy and strengthening exercises. (*Id.*) He also recommended lab work to check immunoglobulin levels and testing for NMO antibodies. (*Id.* at 31-32.)

On May 25, 2018, petitioner followed up with Dr. Veda, reporting that while she felt her strength had increased somewhat in her upper extremities, her fatigue persisted.

(Ex. 14, p. 34.) Additionally, petitioner continued to complain of a burning pain in her feet. (*Id.*) Petitioner denied any issues with bladder or bowel control. (*Id.*) At the time of the encounter, she was ambulating with a cane and no longer required the assistance of a walker. (*Id.*) Petitioner's physical examination revealed strength of 5/5 in all muscles examined; a deep tendon reflex score of 2 in all areas examined with negative Hoffman and Babinski signs; and normal sensory findings. (*Id.* at 35-36.) Dr. Veda assessed petitioner with paraparesis of both lower extremities, muscle weakness, and hypogammaglobulinemia. (*Id.* at 36.)

Petitioner returned to Dr. Veda for a follow up visit on June 29, 2018. (Ex. 14, pp. 42-44.) Dr. Veda documented that petitioner continued to slowly improve with therapy, noting that she was now able to climb stairs. (*Id.* at 42.) However, she now required the assistance of a walker with seat attachment in addition to a cane for assistance with ambulation. (*Id.*) Petitioner also continued to report fatigue and returning sensation to her feet, which was causing some burning pain. (*Id.*) She also reported experiencing two episodes of ataxia, each lasting four to five days, where she woke up feeling dizzy and had coordination problems in both her upper and lower extremities. (*Id.*) Petitioner's physical examination was unchanged from her prior visit on May 25, 2018. (*Compare id.* at 43-44, *with id.* at 35-36.) Dr. Veda continued to list his assessment as paraparesis of both lower extremities, though he noted this condition was mild and worse in the left lower limb, as well as muscle weakness. (*Id.* at 44.)

On July 19, 2018, petitioner followed up with Dr. Veda regarding her paraparesis of her bilateral lower extremities. (Ex. 14, pp. 50-51.) Dr. Veda documented that petitioner continued to slowly improve with therapy, noting that was now ambulating without the assistance of a cane or walker, had not experienced any recent falls, and could perform all activities of daily living, including the performance of light household chores. (*Id.* at 50.) Petitioner reported that the numbness and tingling in her feet was no longer constant or painful. (*Id.*) She continued to endorse her complaint of persistent fatigue. (*Id.*) Dr. Veda's continued to assess petitioner with paraparesis of the lower extremities, and he recommended that petitioner continue with physical and occupational therapy and gradually taper her medication. (*Id.* at 51.)

On August 22, 2018, petitioner presented to Dr. Saligram at the Texas Institute of Neurological Disorders ("TIND") for evaluation of possible multiple sclerosis. (Ex. 16, pp. 47-49.) At that encounter, petitioner reported that her symptoms started on January 7, 2018, and included fatigue; muscle spasms; nerve pain; stumbling; weakness in her legs; numbness in her feet, legs, and back; nighttime tremors in both hands; chest and back pain with deep inhalation; worsened asthma and itchiness "all over"; and bladder dysfunction. (*Id.* at 47.) She also reported blurred vision, double vision, and pain in her eyes, particularly in her right eye. (*Id.*) On physical exam, petitioner demonstrated normal strength bilaterally and deep tendon reflexes of 1-2+ symmetrically with no Babinski sign. (*Id.* at 48.) Additionally, petitioner's sensory exam was normal in both the upper and lower extremities. (*Id.*) Dr. Saligram assessed petitioner with visual disturbance, weakness of the bilateral lower extremities, hyperreflexia, multiple sclerosis, and internuclear ophthalmoplegia of the right eye. (*Id.*) Petitioner was started

on a 20-day course of oral prednisone, and Dr. Saligram ordered MR imaging. (*Id.* at 48-49.)

One week later, petitioner underwent MR imaging with and without contrast of her brain, cervical spine, and thoracic spine. (Ex. 16, pp. 26-31.) Petitioner's MRI of the brain revealed "[s]mall focus centrally T1 hypointense, peripherally FLAIR signal hyperintensity in the subcortical white matter of the right frontal lobe" with no enhancement or diffusion restriction. (*Id.* at 26.) With regard to this finding, the reading radiologist assessed petitioner with "[c]hronic appearing small lacunar infarct in the right frontal subcortical white matter." (*Id.* at 27.) However, the radiologist documented that the appearance and location of the infarct "would be atypical for demyelinating disease," and noted that petitioner's MRI of the brain was otherwise normal. (*Id.*) Petitioner's MRI of the cervical and thoracic spine revealed no abnormal cord signal or enhancement and no evidence of demyelinating disease. (*Id.* at 29, 31.) The reading radiologist assessed that both studies were "essentially normal" with minimal age-appropriate cervical and thoracic spondylosis. (*Id.* at 29, 31.)

Petitioner followed up with Dr. Saligram to review her imaging on August 31, 2018. (Ex. 16, pp. 44-46.) At this encounter, petitioner reported that

> she still has burning pain all over her body, feeling like she is on fire. Her arms are heavy [and] on fire and she is having spasms. She has pain on her right side when she takes a deep breathe [sic]. Spasms in both her legs and feet. She still has the pain in her right eye, double vision, blurred vision.

(*Id.* at 44.) Physical examination revealed weakness in all four limbs; grip strength of 4/5, 4-/5 strength in the lower extremities bilaterally, and foot drop; very brisk reflexes; numbness in the extremities and torso; and a somewhat spastic gait. (*Id.* at 45.) Dr. Saligram continued to assess petitioner with visual disturbance, weakness of the bilateral lower extremities, hyperreflexia, multiple sclerosis, and internuclear ophthalmoplegia of the right eye. (*Id.*) Petitioner was instructed to follow up in two weeks. (*Id.* at 46.)

Later that day, petitioner presented to the ED at Medical City Arlington Hospital ("MCAH") with a chief complaint of worsening numbness in the bilateral upper extremities and a burning sensation across her chest. (Ex. 10, p. 29.) Petitioner reported a past medical history of TM and noted that she had been experiencing intermittent numbness and tingling in all extremities since the beginning of the year. (*Id.*) She also reported that a recent MRI revealed evidence of a new lesion, as well as a new eye symptom in her right eye. (*Id.*) Additionally, petitioner communicated that she was currently being evaluated by Dr. Saligram for MS. (*Id.*) Physical examination revealed no motor deficits, but petitioner reported numbness in her upper bilateral extremities. (*Id.* at 32.) The ED provider documented a primary impression of paresthesia with a secondary impression of gait difficulty. (*Id.* at 34.) Petitioner was admitted to the hospitalist inpatient service at the request of Dr. Saligram for IV Solu-Medrol and further evaluation. (*Id.* at 33, 35.)

In documenting petitioner's history of present illness, the admitting hospitalist provider, Dr. Bibeau, noted the following:

> Patient states that she was diagnosed with transverse myelitis in 01/2018 and relapsed in 04/2018. She also has been following up with Dr. Saligram, neurologist, and underwent an MRI on Wednesday and was noted to have a lesion in the brain. Patient states for the past 2 weeks, she has been progressively worsening with weakness in her lower extremities. She states her left leg is limp and she has to drag it and wears a brace. She also complains of painful numbness and tingling to her bilateral lower extremities, blurry vision, diplopia and nystagmus. She states her bilateral legs and bilateral arms are "burning" and have increased in severity over the past 2 weeks. She was on a prednisone taper dose, which has not helped. She admits to numbness and tingling, especially to her left arm and shoulder and soreness. She states along her right breast she has a squeezing-type pain and pleurisy-like pain, so she was directed to the Emergency Room.

(Ex. 10, p. 46.) No sensory or motor deficits were noted on exam. (*Id.* at 48.) Dr. Bibeau documented a primary clinical impression of an acute exacerbation of TM and noted that petitioner was currently being worked up for MS by Dr. Saligram. (*Id.*) Dr. Saligram was consulted, and petitioner was to continue with her 3-day course of IV Solu-Medrol. (*Id.*)

On September 1, 2018, Dr. Saligram examined petitioner regarding her complaints of progressive lower extremity weakness, increased blurred vision, diplopia, and increased pain, tingling, and numbness in her lower extremities. (Ex. 10, p. 49.) Dr. Saligram documented that petitioner had a past medical history of "[t]ransverse myelitis x 2" and noted that she was being worked up for MS versus NMO. (*Id.*) Petitioner reported feeling slightly better after the first steroid dose. (*Id.*) In regard to petitioner's current clinical presentation, Dr. Saligram remarked that petitioner's symptoms "may be an MS exacerbation or TM." (*Id.*) Physical exam revealed weakness in the bilateral lower extremities and in her upper bilateral extremities distally, nystagmus, and diplopia. (*Id.* at 49-50.) Dr. Saligram's assessment included progressive worsening weakness of lower extremities, worsening vision, history of TM, and asthma. (*Id.* at 49.) She recommended that petitioner continue with her 3-day course of IV Solu-Medrol and participate in physical and occupational therapy. (*Id.*) Additionally, Dr. Saligram ordered a lumbar puncture and CSF analysis for MS and NMO. (*Id.*) Petitioner underwent a lumbar puncture later that day (*Id.* at 234), and CSF analysis revealed zero white blood cells, normal protein levels, normal IgG index and IgG synthesis levels, low myelin basic protein levels, and elevated glucose (*Id.* at 61). Petitioner's CSF studies also detected the presence of oligoclonal bands (*Id.*); however, the clinical significance of the numerical band count could not be "definitively defined" (*Id.* at 221).

The next day, Dr. Saligram reassessed petitioner, noting that petitioner had received two doses of IV Solu-Medrol and reported that she was feeling better. (Ex. 10, p. 123.) However, petitioner complained of decreasing vision in her right eye. (*Id.*) Physical examination revealed weakness in petitioner's bilateral lower extremities and bilateral upper extremities distally; brisk reflexes throughout; and numbness and tingling in the extremities. (*Id.*) Additionally, petitioner had nystagmus on exam and complained of diplopia, as well as decreased vision in her right eye. (*Id.*) Dr. Saligram assessed petitioner with progressive worsening weakness of lower extremities, worsening vision; history of TM; asthma; and chronic pain. (*Id.*) Additionally, she documented that petitioner was to continue with IV Solu-Medrol for three more days. (*Id.*) Dr. Saligram reexamined petitioner on September 3, 2018, documenting that petitioner presented with a possible MS exacerbation. (*Id.* at 121.) Petitioner stated that her strength had improved but reported vision loss in her right eye requiring an eye patch. (*Id.*) Petitioner's physical examination findings and Dr. Saligram's assessment were unchanged from the day prior. (*Id.*)

On September 4, 2018, petitioner was examined by Dr. Boggaram with the neurology team. (Ex. 10, p. 118.) Petitioner endorsed significant improvement of her lower extremity weakness and reported that the visual symptoms in her right eye were "somewhat better." (*Id.*) Physical examination revealed intact sensation to pain, touch, and proprioception; 2+ deep tendon reflexes symmetrically with downgoing plantars (negative Babinski sign); 5/5 strength bilaterally with normal bulk and tone; and visual acuity of the right eye limited to 20/200. (*Id.*) Dr. Boggaram's assessment included optic neuritis and history of TM. (*Id.*) Additionally, Dr. Boggaram noted that petitioner's CSF protein and cell count levels were normal, and that MS markers remained pending, including NMO antibodies. (*Id.*) On September 5, 2018, Dr. Boggaram reevaluated petitioner, noting that her visual symptoms continued to slowly improve and that petitioner reported no new complaints. (*Id.* at 115.) Dr. Boggaram documented that petitioner had completed her five-day course of IV Solu-Medrol and would follow up with her neurologist on an outpatient basis. (*Id.*) Petitioner's physical examination findings and Dr. Boggaram's assessment were unchanged from the day prior. (*Id.*)

The hospitalist team continued to follow petitioner throughout her hospitalization. (Ex. 10, pp. 53-114.) On September 4, 2018, Dr. Bibeau documented an assessment of "Probable MS. Visual loss to right eye and acute exacerbation of transverse myelitis," which was causing acute on chronic pain. (*Id.* at 97-98.) He noted that petitioner had a low pain threshold (*Id.* at 98), and pain management was an issue throughout the remainder of her hospitalization (*Id.* at 26). On September 6, 2018, Dr. Bibeau recorded that the nursing team reported that petitioner "continues to call them constantly with pain concerns" and was "pushing for treatment even to the point of mild hypotension." (*Id.* at 89.) The next day, petitioner continued to complain of persisting pain and described experiencing spasms. (*Id.* at 85.) On September 8, 2018, Dr. Bibeau documented that the nursing staff reported that petitioner was pushing for IV and oral pain meds to be given together, despite being drowsy at times. (*Id.* at 81.) Accordingly, he remarked that petitioner "seems willing to push staff to give her higher doses of pain medication than would be safe for her to take." (*Id.*) Additionally, Dr. Bibeau

documented that when he entered the room, petitioner "had no tremor," but "[a]fter I started talking to her, she started having diffuse tremors to both [upper extremities] and [lower extremities], and asked me what were are going to do about this." (*Id.*) Dr. Bibeau noted that he would consider a telepsych evaluation the following week, if petitioner was agreeable. (*Id.* at 84.)

On September 9, 2018, petitioner reported that she was feeling better and that her pain was controlled. (Ex. 10, p. 76.) Accordingly, Dr. Bibeau noted petitioner was ready for discharge to inpatient rehab when approved. (*Id.* at 80.) However, on September 10, 2018, petitioner complained of continued generalized body aches, back pain, and left-sided chest pain. (*Id.* at 71.) Dr. Folefack noted that petitioner would need further documented that petitioner would need a left rib series due to her new complaints of "left base chest pain." (*Id.* at 74.) In a hospitalist progress note dated September 11, 2018, Dr. Folefack documented that petitioner was "upset that her X ray wasn't done yesterday, and that She did not get prn IV opioids. States she only want[s] Neurology to manage her pain." (*Id.* at 65.) Petitioner's left rib imaging was negative for a fracture and negative for an acute pulmonary process. (*Id.* at 68-69.) On September 12, 2018, petitioner reported that her pain was controlled and that she was feeling better, despite experiencing a headache overnight. (*Id.* at 58.) Petitioner was discharged from MCAH to inpatient rehabilitation on September 13, 2018. (*Id.* at 24-26.) "P]robable multiple sclerosis with visual loss to right eye suggestive of possible optic neuritis in setting of acute exacerbation of previously diagnosed transverse myelitis"; chronic pain syndrome; migraine headache with exacerbation; and anxiety disorder were listed among petitioner's discharge diagnoses. (*Id.* at 26.)

Petitioner was admitted to inpatient rehab on September 13, 2018. (Ex. 10, p. 647.) In documenting petitioner's history, the admitting physical medicine and rehabilitation provider, Dr. Cheng, documented the following:

> The patient is a 42 year old female who admitted to Medical City Arlington with an acute exacerbation of Transverse Myelitis. She is being followed by Dr. Saligram, Neuro and underwent an MRI on Wednesday – also noted to have a lesion on the brain. She presents with increasing weakness in [bilateral lower extremities] x2 weeks with the left leg particularly affected and requiring her to donn [sic] a[] leg brace for stability. She also complains of bilateral upper and lower extremities burning which has also increased over the last 2 weeks.

(*Id.*) He also noted that petitioner continued to experience chronic pain. (*Id.*) On physical exam, petitioner endorsed paresthesias to light touch in bilateral feet, arms, and chest, particularly on the left side of her upper body, as well as visual deficits in the right eye, characterized as decreased peripheral vision. (*Id.* at 649.) Petitioner's strength was documented as 3/5 with shoulder abduction bilaterally, 4-/5 with elbow extension bilaterally, 4/5 with elbow flexion bilaterally, 3/5 with hip flexion bilaterally, 4/5 with knee extension bilaterally, and 4+/5 with bilateral ankle dorsiflexion and great toe extension, although ankle dorsiflexion was noted to be slightly weaker on petitioner's left

side. (*Id.*) Additionally, Dr. Cheng documented that petitioner had a positive Hoffman sign on the left hand and one beat clonus with ankle jerk bilaterally. (*Id.*) Within his assessment, Dr. Cheng documented: "Transverse myelitis exacerbation – Visual loss to right eye (optic neuritis) and acute exacerbation of transverse myelitis. Also multiple sensory deficits, and asymmetric pattern of weakness. Undergoing MS workup via Dr. Saligram . . . for multiple sclerosis thus far has been unrevealing." (*Id.* at 650.) His assessment also included acute on chronic pain due to TM, and possible left serratus strain. (*Id.*) TM is documented as the etiologic diagnosis, and nontraumatic spinal cord is listed as the impairment group. (*Id.* at 647.)

While at inpatient rehabilitation, the hospitalist team was asked to consult for medical management of petitioner's recent TM exacerbation, possible MS, migraine headache, and chronic pain syndrome. (Ex. 10, p. 653.) Dr. Folefack documented that petitioner had a history of TM and

> Presented to the Emergency Department on 08/31/2018 with a complaint of headache and generalized weakness. Patient was diagnosed with exacerbation of her transverse myelitis and possible evlolving multiple sclerosis . . . Further hospital stay was remarkable for exacerbation of chronic pain syndrome requiring IV opiod. Patient also treated for exacerbation of her migraine headache.

(*Id.*) On physical examination, petitioner demonstrated a chronic left foot drop, 4/5 strength in the lower extremities bilaterally, and 5/5 strength in the upper extremities bilaterally. (*Id.* at 654.) Dr. Folefack's assessment included "[a]cute exacerbation of transverse myelitis with transient uptake neuritis" with vision not reestablished, and chronic pain syndrome. (*Id.*) The initial evaluation form for outpatient therapy lists acute TM as petitioner's primary diagnosis, noting that petitioner reported that she was diagnosed with TM in January, relapsed in April, and became progressively worse in August. (*Id.* at 1064.)

Dr. Cheng and Dr. Folefack continued to follow petitioner throughout the course of her inpatient rehabilitation, and their respective assessments remained unchanged. (*See generally* Ex. 10, pp. 640-45, 656, 658-62, 688-715.) Petitioner was discharged home on September 22, 2018, and was instructed to continue with occupational, physical, and speech therapy on an outpatient basis. (*Id.* at 636, 640-45, 1063.)

On October 8, 2018, petitioner had a follow-up appointment with Dr. Saligram at TIND. (Ex. 16, pp. 41-43.) Petitioner complained of worsening pain behind her eyes, dizziness, loss of peripheral vision in both eyes, blurred and double vision, memory problems, fatigue, numbness and tingling, and issues with mobility. (*Id.* at 41.) She also reported that she still had some bladder incontinence, lesions, muscle spasms, and nerve pain. (*Id.*) Physical examination revealed weakness in all four extremities, worse in the lower extremities; numbness in the extremities and torso; very brisk reflexes with an absent Babinski sign; and a somewhat spastic gait. (*Id.* at 42.) Dr. Saligram assessed petitioner with weakness of both lower extremities; acute loss of vision;

anesthesia of skin; chronic pain; optic neuritis; and chronic fatigue. (*Id.* at 42-43.) Additionally, Dr. Saligram ordered repeat MRIs, documenting that "[s]o far have no lab or imaging findings that would confirm MS, however clinically she does seem to have it." (*Id.* at 43.)

Petitioner underwent MRI imaging with and without contrast of her brain, cervical spine, and thoracic spine on October 18, 2018. (Ex. 16, pp. 32-35.) The reading radiologist interpreted the findings as unchanged as compared to petitioner's prior MR imaging of August 29, 2018. (*Id.* at 32, 34.) Specifically, the radiologist documented that "there is an unchanged chronic appearing small lacunar infarct in the right frontal subcortical white water, atypical for demyelinating disease" with "[n]o new white matter lesion in the brain, cervical or thoracic spinal cord" and "[n]o enhancement to suggest active demyelination." (*Id.* at 34-35.) Petitioner's imaging of the cervical and thoracic spine showed normal cord size and signal intensity with no abnormal intramedullary or leptomeningeal enhancement. (*Id.* at 33-34.)

On January 11, 2019, petitioner presented to UT Southwestern Medical Center ("UTSMC"), where she was seen by Dr. Okuda, a neurologist, and his fellow for an evaluation of possible MS. (Ex. 13, pp. 16-21.)[10] At this encounter, petitioner provided a detailed overview of the history of her condition, noting that she received her flu shot two weeks before the onset of her symptoms in January of 2018, as well as a stomach virus the week prior. (*Id.* at 16-17.) Petitioner reported that, during her first hospitalization in January of 2018, "[s]he was diagnosed with transverse myelitis, because she had hyperreflexia in the lower extremities." (*Id.* at 17.) The fellow documented that petitioner's lumbar puncture was unremarkable and that "[s]he did not have lesions on imaging because she could not have an MRI given her occipital stimulators," which were later removed. (*Id.*) Petitioner reported experiencing two recurrences in April and August of 2018, both of which led to hospitalization; however, she indicated the August event involved vision loss. (*Id.*) While petitioner reported that her MRI in April was unremarkable, she indicated that her MRI in August revealed "a lesion." (*Id.*) The fellow documented that he reviewed petitioner's outside records with Dr. Okuda, including MR imaging of her brain and spine, and recorded that petitioner's MR imaging revealed "[n]o T2 lesions characteristic for in situ demyelination." (*Id.* at 20.) On physical exam, petitioner had 5/5 strength in all her extremities, except for her hips, bilateral shoulder abduction, plantarflexion, and dorsiflexion, which were measured at 4/5; her deep tendon reflexes were 2+ bilaterally and symmetric with slight decrease in the bilateral patellar and negative Hoffman sign bilaterally; decreased sensation but symmetric to light touch and temperature in the arms and legs; and slow gait with reduced stride, arm swing, and some circumduction of the left hip and slight inversion of the foot. (*Id.*) Dr. Okuda and his fellow determined that petitioner did not meet the criteria to support a diagnosis of MS. (*Id.*) They recommended an aggressive therapy

[10] It is unclear whether petitioner filed a copy of the medical records for her evaluation at UTSMC Multiple Sclerosis Clinic. Accordingly, this decision relies on the information pertaining to Dr. Okuda's evaluation of petitioner included within the record for petitioner's subsequent encounter at UTSMC in January of 2020. (*See* Ex. 13, pp. 8-21.)

plan, inclusive of rehabilitation, neurophysiological assessment, treatment of her weakness, and continued symptomatic management. (*Id.*)

Petitioner presented to Dr. Phan, an internist, at Mansfield Medical Associates on January 18, 2019. (Ex. 20, pp. 76-79.) At that encounter, petitioner reported a history of TM with apparent recurrences throughout 2018. (*Id.* at 76.) She also noted that she was recently hospitalized at MCAH for possible MS, although she was subsequently examined by Dr. Okuda at UTSMC, who concluded she did not have MS.[11] (*Id.*) Petitioner indicated her intent to establish care with a neurologist in Texas, as she had relocated from Mississippi in July. (*Id.*) Dr. Phan assessed petitioner with weakness syndrome and consulted neurology. (*Id.* at 77-78.)

On February 9, 2019, petitioner presented to the ED at MCAH with a complaint of worsening weakness in her bilateral lower extremities and the loss of peripheral vision in her right eye. (Ex. 10, p. 1153.) Petitioner reported that she had a history of TM and that she had experienced similar symptoms in the past with exacerbation of her TM. (*Id.*) Physical examination revealed focal weakness and sensory deficits in the bilateral lower extremities. (*Id.* at 1157.) While in the ED, petitioner underwent a CT of the head/brain without contrast, which revealed no acute intracranial process. (*Id.* at 1159.) The ED provider's primary clinical impression was weakness, with TM and vision loss documented as secondary impressions. (*Id.* at 1162.) Neurology was consulted, and petitioner was admitted for IV Solu-Medrol and MR imaging of the head and cervical spine. (*Id.* at 1161-62.) Petitioner's MRI of the cervical spine revealed no significant central canal or foraminal stenosis and no clear abnormal enhancement, although the examination was limited by motion artifact. (*Id.* at 1284.) The MRI of petitioner's brain showed "[v]ery mild nonspecific T2 hyperintensity in the periventricular white matter," which "may be minimal chronic microvascular disease." (*Id.* at 1286.) However, the reading radiologist documented that the MRI findings were not specific for MS or a demyelinating process. (*Id.*)

Petitioner was admitted to the inpatient service of Dr. Phan, who listed "[e]xacerbation of her weakness with a history of transverse myelitis and had been worked up previously for MS" as the reason for admission. (Ex. 10, p. 1176.) Dr. Phan recorded that petitioner presented to the ED after experiencing an approximately three-day long history of increasing weakness in her lower extremities along with blurred vision. (*Id.*) Petitioner reported history of TM and optic neuritis, as well as a history of peripheral vision loss, noting that she previously experienced blurred vision and tunnel vision with an exacerbation of her TM. (*Id.*) Dr. Phan noted that petitioner was previously admitted to MCAH in August; however, her workup for possible MS was inconclusive. (*Id.*) Furthermore, he indicated that petitioner had undergone an evaluation at UTSMC where she was told that she did not have MS.[12] (*Id.*) Dr. Phan

[11] The record states that petitioner was told "she did have MS." (Ex. 20, p. 76.) However, considering the record as a whole, this appears to have been a typographical error (*see id.*), which is consistent with the record for her evaluation with Dr. Okuda (Ex. 13, pp. 16-21).

[12] The record technically states that petitioner "went to UT Southwester for an appointment to see a neurologist there for possible MS workup; however, she was told that she did not have a mass and

documented "[a]cute exacerbation of her recurrent transverse myelitis with likely optic neuritis with weakness" as his clinical impression and consulted Dr. Shan to further evaluate petitioner. (*Id.* at 1177.)

The following day, petitioner was seen by Dr. Shah, a neurologist. (Ex. 10, pp. 1179-80.) Possible MS is listed as the reason for the consultation. (*Id.* at 1179.) Petitioner reported a history of peripheral vision loss, as well as a history of TM diagnosed in Mississippi with multiple relapses treated similarly despite normal imaging studies, although petitioner indicated one MRI of her head showed "some abnormality." (*Id.*) On physical exam, petitioner demonstrated bilateral lower extremity weakness with subjective sensory symptoms just above the pelvic area; her strength was at least 4+/5; and deep tendon reflexes were brisk and symmetrical with downgoing plantar reflex and no clonus. (*Id.* at 1179-80.) Dr. Shah documented his impression as "[p]atient with history of transverse myelitis, visual impairment, now presents with bilateral lower extremity weakness, but also upper extremity weakness. . . Patient has had several relapses. It [would] be extremely unusual to have all these symptoms on normal imaging studies." (*Id.* at 1180.) Accordingly, Dr. Shah planned to review petitioner's imaging studies and consider further testing based on that review, noting that visually evoked potential and somatosensory evoked potential testing would likely be most helpful. (*Id.*) Later that day, petitioner underwent an MRI of the thoracic spine with and without contrast, which was ordered by Dr. Shah. (*Id.* at 1288.) Petitioner's MRI revealed no central canal or foraminal stenosis, no clear abnormal enhancement, and was otherwise unremarkable; however, the study was limited due to motion artifact. (*Id.*)

On February 11, 2019, Dr. Shah documented that petitioner presented with "multiple episodes [of] Lower extremity weakness [and] visual changes / optic neuritis." (Ex. 10, p. 1200.) However, he recorded that petitioner's workup, including MR imaging of her head, cervical spine, and thoracic spine, did not support a diagnosis of MS. (*Id.*) Dr. Shah assessed petitioner with vision loss and gait difficulty. (*Id.*) His assessment remained unchanged when he followed up with petitioner the following day. (*See id.* at 1196.) Beginning on February 11, 2019, Dr. Phan documented "Transverse Myelitis vs other MS, etc" as his primary clinical impression (*Id.* at 1191), and he carried this assessment forward for the remainder of petitioner's hospitalization (*Id.* at 1182, 1185, 1188).

Petitioner was discharged from MCAH to inpatient rehabilitation on February 14, 2019. (Ex. 10, pp. 1149-50, 1466.) During the course of her hospitalization, petitioner received a five-day course of IV Solu-Medrol along with therapy. (*Id.* at 1149.) In the discharge summary, Dr. Phan noted that petitioner was considering going to Johns Hopkins or UTSMC for a "recurrent transverse myelitis study." (*Id.*) Dr. Phan documented "[p]robable recurrent transverse myelitis with optic neuritis with weakness,

neurologist did not do any further workup." (Ex. 10, p. 1176.) The undersigned interprets "mass" as a typographical error, probably the result of voice recognition, and assumes, based on the record as a whole, that Phan meant "MS."

improving" as petitioner's primary diagnosis upon discharge. (*Id.*) However, on February 18, 2019, petitioner submitted a questionnaire to Dr. Phan, requesting the following: "Based on your clinical judgment, can you please specify etiology of weakness (e.g. weakness due to transverse myelitis exacerbation, weakness due to Multiple sclerosis, weakness [not otherwise specified ('NOS')] or other more appropriate diagnosis)?" (*Id.* at 1147.) Dr. Phan responded that petitioner's "weakness likely due to transverse myelitis but may be due to other causes, weakness NOS." (*Id.*) The next day, petitioner submitted a second questionnaire to Dr. Phan seeking clarification regarding the conflicting documented diagnoses of "weakness likely due to transverse myelitis" and "weakness NOS." (*Id.* at 1148.) Specifically, she requested the following: "Due to conflicting diagnosis, can you please clarify the etiology of weakness (e.g[.] weakness likely due to transverse myelitis, weakness NOS or other more appropriate diagnosis)?" (*Id.*) Dr. Phan responded "weakness NOS." (*Id.*)

Petitioner was admitted to inpatient rehabilitation on February 14, 2019, where she completed therapy until her discharge on February 26, 2019. (*See generally* Ex. 10, pp. 1454-66, 1470-1562.) Her treating providers noted that petitioner tolerated therapy well and made excellent progress in addressing her functional deficits, noting that she was modified independent or required supervision with all tasks. (*Id.* at 1457.) Optic neuritis, TM exacerbation, and anxiety were listed among petitioner's diagnoses at the time of discharge. (*Id.* at 1456, 1474.)

On February 28, 2019, petitioner presented to Zen Interventional Pain and Wellness Clinic ("Zen Pain Clinic"), where she was evaluated by Dr. Rozier, a pain specialist. (Ex. 18, pp. 64-65.) "Chronic Nerve pain, questionable transverse myelitis" was listed as the reason for the visit, and "insidious onset of auto immune disease" was documented as the mechanism of injury." (*Id.* at 64.) Petitioner reported experiencing numbness, tingling, and pain in her hands and lower extremities from the knees down. (*Id.*) In documenting his assessment, Dr. Rozier noted that petitioner presented after her fourth relapse and documented that she had symptoms of chronic regional pain syndrome, including neuritis and leg pain. (*Id.* at 65.) Dr. Rozier recommended B-complex vitamin to help petitioner with her numbness. (*Id.*)

On March 12, 2019, petitioner had a follow up encounter at Mansfield Medical Associates to establish transitional care services. (Ex. 20, pp. 69-72.) The provider documented that petitioner had "a complicated history" of optic neuritis and TM, noting that petitioner had recently been discharged from acute rehabilitation for a TM exacerbation. (*Id.* at 69.) While documenting an assessment of acute TM (*Id.* at 71), the provider noted that petitioner had experienced multiple relapses since her initial event, and underwent a workup for MS, which was ruled out. (*Id.* at 72.) Further, the provider remarked that

> MRI of her brain and spine in fact did not demonstrate any demyelinating lesions. Usually, we should see some sort of enhancing lesion. She did have [lumbar puncture] done at MCA. She did have rare lymphocytes however IgG was low. Otherwise, the pathology was not all impressive for

> any infectious etiology. She has plans to be worked up at the Mayo Clinic which is certainly reasonable as this is still not a clear cut diagnosis.

(*Id.*) Moreover, the provider noted that petitioner's symptoms were consistent with deficiencies, with the differential including vitamin B, copper, and vitamin E deficiencies. (*Id.*) Additionally, the provider questioned whether petitioner's condition could be explained by hypokalemic temporary paralysis; however, petitioner responded to steroids making this diagnosis less favored. (*Id.*)

In late March of 2019, petitioner traveled to Mayo Clinic in Jacksonville, Florida, where she was examined by several different specialists. (*See generally* Ex. 22.) First, petitioner was seen by neuro-ophthalmology for decreased visual acuity and eye pain. (*Id.* at 95-100.) Petitioner's exam was unremarkable, including occipital coherence tomography retinal nerve fiber layer thickness in both eyes, which the neuro-ophthalmologist noted would be atypical for optic neuritis. (*Id.* at 95.) The neuro-ophthalmologist documented an impression of "1/2018, 4/2018, 8/2018 & 2/2019 Transient quadriparesis, with 8/2018 & 2/2019 transient visual loss" in both eyes. (*Id.*) Additionally, the neuro-ophthalmologist recorded that the description and exam of petitioner's episodic diplopia are consistent with convergence spasm. (*Id.*)

Petitioner was examined by Dr. Collazo, a neurologist, at Mayo Clinic for possible MS. (Ex. 22, pp. 69-72.) Dr. Collazo noted that petitioner's

> history dates back to January 2018 when after 2 weeks of receiving the flu vaccine she developed an ascending pattern of muscle weakness, myalgias, and paresthesias that over 3 days progressed to being quadriplegic. There was no bladder or bowel dysfunction acutely. She received 5 days of IV methylprednisolone when they thought she was having transverse myelitis, though her MRI of the brain, cervical and thoracic spine did not show evidence of abnormal lesions.

(*Id.* at 70.) Additionally, she noted that petitioner described three subsequent events following the initial onset of her condition in January of 2018. (*Id.* at 70-71.) Specifically, petitioner reported experiencing a recurrent event in April of 2018, although less intense and with no paralysis; a similar event in September of 2018 with bilateral vision loss; and the last event in February of 2019 involving paralysis from the waist down, cognitive symptoms and bilateral vision loss. (*Id.*) At the time of the encounter, petitioner complained of gait impairment; severe pain in her arms, legs, and lower back; foot weakness; muscle spasms in her arms and legs; and some mild cognitive symptoms. (*Id.* at 71.) Petitioner's physical exam was significant for subtle lower extremity weakness that fluctuated with poor effort, cautious gait, symmetric reflexes, and normal sensation to vibration with slightly reduced pinprick diffuse in the arms and legs. (*Id.* at 72.) Dr. Collazo assessed petitioner with (1) spells of quadriparesis and visual impairment of uncertain etiology; (2) chronic pain syndrome; (3) muscle spasms; (4) cognitive complaint; and (5) history of migraine headaches. (*Id.* at 69, 72.) Furthermore, Dr. Collazo recorded that she reviewed petitioner's multiple MRIs of the

brain and the cervical and thoracic spine, all of which were unremarkable with no evidence of demyelinating disease, structural disorder, or a spinal cord process. (*Id.* at 72.) Regarding petitioner's spells of quadriparesis and visual disturbance, Dr. Collazo documented that the differential includes functional neurological disorder, although an atypical migraine or neuromuscular disorder could not be ruled out. (*Id.*) Accordingly, Dr. Collazo ordered an EMG to rule out myopathy, peripheral neuropathy, and ganglionopathy, as well as neuro-psychometric testing for further evaluation of her complaint of memory issues, and referred petitioner for a neuromuscular and headache consult. (*Id.* at 72-78.) Petitioner's EMG/NCS was normal, revealing no evidence of a left lumbosacral radiculopathy, a large fiber peripheral neuropathy, or a myopathy. (*Id.* at 52-55.)

On March 29, 2019, petitioner presented to Dr. Sabsevitz, a clinical psychologist at Mayo Clinic, for a neuropsychological evaluation. (Ex. 22, pp. 38-42.) Dr. Sabsevitz outlined petitioner's relevant medical history, and documented:

> Differentials for her spells of quadriparesis and visual disturbance include functional neurological disorder (FND). However, cannot rule out an atypical migraine or neuromuscular disorder. [Petitioner] reported that she has discussed the possibility of a FND diagnosis but she questions this and has been told by other doctors that it may be transverse myelitis.

(*Id.* at 39.) Evaluation of petitioner's mood was suggestive of "minimal symptoms of clinical depression," with her responses to a self-reported survey demonstrating a tendency to avoid negative and unpleasant aspects of herself and repress undesirable characteristics. (*Id.* at 41.) Dr. Sabsevitz recorded that conversion disorder is the most common diagnosis associated with petitioner's response pattern. (*Id.*) However, he cautioned that a true neurological explanation for her symptom presentation could not be definitively ruled out. (*Id.*) Overall, petitioner's evaluation did not reveal any compelling evidence of a neurodegenerative cognitive process or significant cognitive dysfunction. (*Id.*) Dr. Sabsevitz documented that petitioner was aware that FND can be triggered by a neurological disorder or by a reaction to stress or psychological/physical trauma. While petitioner did not have any obvious risk factors based on her reported history, Dr. Sabsevitz indicated that the absence of these risk factors does not preclude a diagnosis of FND. (*Id.* at 41-42.) Moreover, Dr. Sabsevitz assessed that if petitioner's medical workup continued to be normal, "possible FND should be explored through psychotherapy." (*Id.* at 42.) Somatization disorder is listed as the primary diagnosis for the encounter. (*Id.* at 38.)

Petitioner continued to see Dr. Rozier at Zen Pain Clinic throughout the remainder of 2019.[13] (Ex. 18, pp. 44-63.) Within the record for a follow up encounter on May 7, 2019, Dr. Rozier documented that petitioner "has had chronic transient transverse myelitis." (*Id.* at 58.) Additionally, he noted that petitioner received a lumbar sympathetic nerve block with no improvement. (*Id.* at 59.) At an encounter on June 6,

---

[13] During that time, petitioner also complained of right shoulder pain, which was ultimately diagnosed as right rotator cuff tendonitis and treated with a subacromial amino injection. (Ex. 18, pp. 47-54.)

2019, Dr. Rozier documented that petitioner continued to experience the effects of "transient transverse myelitis" and referred her to a neuromuscular specialist. (*Id.* at 56-57.) However, on July 9, 2019, Dr. Rozier assessed petitioner with "transient transverse myelitis vs poly neuropathy" and reiterated that assessment on September 24, 2019. (*Id.* at 53, 55.) On December 17, 2019, petitioner returned to Dr. Rozier complaining of a flare up with pain, specifically pain in her lower back and legs. (*Id.* at 44-45.) Dr. Rozier documented that petitioner had a history of "acute myelitis vs MS or other rheum/neuro disorder" and noted that petitioner was "[s]till getting worked up for current disease state." (*Id.* at 45.)

On May 10, 2019, petitioner presented to Dr. Phan for evaluation of hypothyroidism. (Ex. 20, p. 57.) Within the record for that encounter, Dr. Phan documented that "[i]n regards to her neuropathy, patient sees Dr. Rozier [and] is being referred to a neuro muscular specialist. She did go to Mayo Clinic regarding her transverse myelitis but states that she will follow up here with Neurology or pain management." (*Id.* at 57.) Although TM is listed under petitioner's past medical history and current medical problems (*Id.* at 57-58), Dr. Phan documented "[i]diopathic progressive neuropathy" as part of his assessment (*Id.* at 59). Petitioner returned to her primary care clinic on June 19, 2019, and was evaluated by nurse practitioner ("NP") Nguyen, under the supervision of Dr. Phan. (*Id.* at 53.) While that encounter addressed respiratory symptoms, the nurse practitioner documented that petitioner had a history of TM necessitating a service dog and also listed acute TM and idiopathic progressive neuropathy among petitioner's current problems. (*Id.* at 53-54.)

Petitioner returned to Mansfield Medical Associates on July 22, 2019, where she was again examined by NP Nguyen. (Ex. 20, p. 49.) NP Nguyen recorded that "patient has long-term disability forms to be completed. [Past medical history] significant for transverse myelitis and occipital neuralgia." (*Id.*) Acute TM and idiopathic progressive neuropathy were listed under petitioner's current medical problems. (*Id.* at 50.)

On August 16, 2019, petitioner presented to the Liver Institute at Mansfield upon referral from Dr. Phan for elevated liver enzymes. (Ex. 17, pp. 48-55.) Petitioner reported a history of TM, which was diagnosed in January of 2018 and required extensive steroid therapy, including 31 doses of high-dose Solu-Medrol and long-term use of prednisone. (*Id.* at 49.) The hepatologist noted that petitioner had undergone MR imaging of the cervical and thoracic spine in March, August, and October of 2018, which were unremarkable without evidence of a spinal cord process, as well as MR imaging of the brain in August and October of 2018, which were overall unremarkable. (*Id.* at 55.) The hepatologist assessed petitioner with abnormal liver function tests, noting that petitioner had abnormal liver enzymes since at least December of 2018. (*Id.*) At a follow up visit on November 8, 2019, petitioner reviewed the results of her recent liver biopsy, which evidenced non-alcoholic fatty liver disease, specifically nonalcoholic steatohepatitis ("NASH"), with stage 2-3 fibrosis. (*Id.* at 19, 25.)

Petitioner followed up with NP Nguyen at Mansfield Medical Associates on September 26, 2019. (Ex. 20, p. 44.) NP Nguyen recorded that petitioner

> has [a] history of transverse myelitis with several flares and occipital neuralgia. She was previously employed as a registered nurse but has been unable to work since 01/07/18 due to overall paralysis and weakness. She has seen neurology. She is in the process of being referred to a neuromuscular specialist per [UTSMC]. Her condition has also led to chronic pain issues for which she is following with a pain specialist. Patient is unable to work due to paralysis and generalized weakness.

(*Id.*) Again, NP Nguyen listed both acute TM and idiopathic progressive neuropathy among petitioner's current medical problems. (*Id.* at 45.) NP Nguyen's assessment included acute TM, and she noted that petitioner's disability paperwork needed to be completed due to petitioner's inability to work as a result of her weakness and paralysis. (*Id.* at 46-48.) At a subsequent encounter, NP Nguyen continued to note petitioner's history of TM and list acute TM and idiopathic progressive neuropathy as current medical problems. (*Id.* at 39-40.)

On January 22, 2020, petitioner was examined by Dr. Blair, a neurologist at UTSMC. (Ex. 13, pp. 8-28.) The certified medical assistant documented that petitioner presented for "polyneuropathy cause[d] by transverse myelitis. She was diagnosed with transverse myelitis about 2 years ago and is pretty sure it was caused by the flu shot." (*Id.* at 12.) However, petitioner reported that MS and GBS had also been considered. (*Id.*) Petitioner also noted that she had experienced a few flare ups, including last February when she lost her vision, and stated she had to relearn how to walk three times. (*Id.*) At the time of the encounter, petitioner reported experiencing muscle spasms, burning, tingling, numbness, stinging, and aching pain in her hands and legs. (*Id.* at 13.) Additionally, petitioner reported that her fingertips felt as if she had multiple layers of gloves on, and she also communicated that she recently started experiencing a sudden onset of pain in her extremities, which she characterized as feeling as if she was "being shot by a gun." (*Id.*)

Dr. Blair reviewed petitioner's medical records from her prior encounter with Dr. Okuda at UTSMC, as well as her Mayo Clinic evaluation (Ex. 13, pp. 14-20), specifically noting that Dr. Okuda did not feel that petitioner met the diagnostic criteria for MS (*Id.* at 24). On physical exam, petitioner demonstrated slow mobility with some issues with tandem gait; deep tendon reflexes of 3+ in the biceps, triceps, brachioradialis, and finger jerks symmetrically, 2+ in knee jerks and ankle jerks symmetrically, 1+ in jaw jerk, and a flexor plantar response bilaterally; giveaway weakness in her bilateral lower extremities; and stiffness of her legs with spasticity testing. (*Id.* at 23.) On sensory exam, petitioner's sensation, including light touch and pinprick, was intact in her bilateral upper and lower extremities, although petitioner reported that light touch feels different in her hands bilaterally. (*Id.*) Dr. Blair assessed petitioner with "transient episodes of severe weakness in her lower extremities and to lesser extent her upper extremities along with visual loss," the exact etiology of which remained unclear. (*Id.* at 24.) However, he noted that petitioner "does have a very mild peripheral neuropathy." (*Id.*) Hereditary and idiopathic peripheral neuropathy is listed as the primary diagnosis for the

encounter. (*Id.* at 12.) Petitioner received instructions on at-home exercises to perform to build up additional strength in her legs, and was started on alpha-lipoic acid, which Dr. Blair remarked is often helpful for treating peripheral neuropathy of any etiology. (*Id.* at 25-27.)

Later that day, petitioner called Dr. Blair's clinic for clarification regarding her diagnosis. (Ex. 13, p. 39.) Specifically, Dr. Blair's certified medical assistant documented the following:

**Progress Notes**

**Childress, Opal, CMA at 01/22/20 1137**
Author Type: Medical Assistant Status: Signed

Patient called and wanted to ask about her diagnosis. She is in a lawsuit and needs them to be clarified.

She states that she DOES NOT have "hereditary and idiopathic peripheral neuropathy" but that her neuropathy is caused from transverse myelitis.

She would like this to be fixed and called once it has been corrected.

Electronically signed by Childress, Opal, CMA at 01/22/20 1143

**Childress, Opal, CMA at 01/22/20 1348**
Author Type: Medical Assistant Status: Signed

Per Dr Blair:

There is no imaging that supports a diagnosis of transverse myelitis.

Dr. Okuda has not made a diagnosis of transverse myelitis or multiple sclerosis.

The Mayo Clinic is not made a diagnosis of transverse myelitis or multiple sclerosis.

She does have a mild peripheral neuropathy of uncertain etiology.

Dr. Blair.
*Routing comment*

Electronically signed by Childress, Opal, CMA at 01/22/20 1352

**Childress, Opal, CMA at 01/22/20 1351**
Author Type: Medical Assistant Status: Signed

Advised patient what Dr Blair said and she is ok with the diagnosis of idiopathic peripheral neuropathy.

**Progress Notes (continued)**

**Childress, Opal, CMA at 01/22/20 1351 (continued)**

She was concerned about it say "hereditary" because neither one of her parents have neuropathy.

No further action is required.

Electronically signed by Childress, Opal, CMA at 01/22/20 1352

(*Id.* at 39-40.)

On February 4, 2020, petitioner returned to Dr. Rozier at Zen Pain Clinic for a flare up of pain in her leg and lower back. (Ex. 18, p. 41.) Dr. Rozier noted that petitioner had a history of acute myelitis versus MS versus other neurological or rheumatological disorder and documented that petitioner was "[s]till getting worked up for current disease state." (*Id.* at 41-42.) Further, Dr. Rozier indicated that they were waiting for a response from petitioner's UTSW physician and still working on a neuromuscular referral. (*Id.* at 44.) Additionally, he documented that petitioner would need a new spinal survey to evaluate plaques. (*Id.*) Petitioner continued to present to Zen Pain Clinic for chronic pain and medication management through 2021. (*Id.* at 3-40.) In the record for petitioner's Zen Pain Clinic encounter on October 13, 2020, Dr. Rozier documented that petitioner underwent MR imaging of her cervical and lumbar spine on October 7, 2020, which revealed mild multilevel degenerative changes without evidence of high-grade narrowing of the thecal sac or foramina with the cervical or lumbar spine. (*Id.* at 32-33.)

On February 13, 2020, petitioner presented to NP Nguyen at Mansfield Medical Associates for evaluation of constant pain. (Ex. 20, p. 34.) Petitioner explained that her pain was localized to the fingers, legs, and feet, and noted that it began a few days ago. (*Id.*) She characterized the pain as "lightning bolt" and shooting. (*Id.*) Additionally, petitioner reported associated symptoms of myalgias, paresthesias, tremors, and weakness in her extremities. (*Id.*) NP Nyguen indicated that petitioner's pertinent medical history included TM. (*Id.*) However, NP Nguyen also documented the following:

> Original symptoms began in 2018 after receiving a flu shot. She experienced flare ups since then. Patient has been evaluated at the MS clinic at UT Dallas and the Mayo Clinic as well as several other specialists. She is currently seeing Dr. Blair, [a] neurologist at UTSW who recommended a trial of alpha lipoic acid and exercises. She also follows with pain management. Patient is here today and is quite distressed as "nothing has been helping." She voices frustration about figuring out what the cause of her symptoms are. She voices concern regarding porphyria. She will discuss this will Dr. Blair.

(*Id.*) On exam, petitioner demonstrated slow gait, bilateral lower extremity weakness, normal tone, and anxious demeanor. (*Id.* at 36.) As part of her assessment, NP Nguyen documented "Polyneuropathy, unspecified." (*Id.*)

Petitioner returned to Mansfield Medical Associates on April 16, 2020, and was examined by Dr. Phan. (Ex. 20, p. 29.) In documenting petitioner's history of present illness, Dr. Phan recorded the following:

> In regards to her polyneuropathy, patient goes to UT Southwestern . . . Patient states feels like lighting bolts and shooting pains. She has had a history of transverse myelitis [and] had been on multiple medications[.] She

> has had some flare ups she had been previously evaluated at MS clinic at UT Dallas and Mayo clinic.

(*Id.*) On exam, petitioner demonstrated slow gait and bilateral lower extremity weakness with normal tone. (*Id.* at 32.) Additionally, Dr. Phan documented that petitioner appeared anxious. (*Id.*) Dr. Phan's assessment included unspecified polyneuropathy.[14] (*Id.*)

On September 23, 2020, petitioner returned to UMMC for a neuroimmunology consultation with Dr. Willis. (Ex. 12, pp. 19-25.) Assessment of petitioner's "undiagnosed neurological symptoms" was documented as the reason for the self-referral. (*Id.* at 19-20.) At the time of the encounter, petitioner reported experiencing decreased peripheral vision; severe fatigue; muscle spasms, worse in the legs as compared to the arms; nerve pain in her hands and feet; bone pain in her lower legs; hypersensitivity in her upper chest; issues with balance; spasms in her hands; numbness in the middle of her back and buttocks; urinary hesitancy and retention with recurrent urinary tract infections; alternating constipation and diarrhea; pain in knees, ankles, and wrist bilaterally with stiffness, puffiness, and pain in her fingers; insomnia; and chest pain and palpitations. (*Id.* at 20-21.) On physical exam, petitioner's strength was measured at 4/5 in all muscles examined; however, Dr. Willis noted that petitioner's effort was "submaximal and variable." (*Id.* at 23-24.) Petitioner's deep tendon reflexes were documented as 2+ in her biceps, triceps, brachioradialis, and ankle bilaterally; 3+ in her knees bilaterally; and normal Hoffman and plantar responses. (*Id.* at 24.) All sensory modalities tested were abnormal in petitioner's lower extremities, and petitioner's unchallenged gait was abnormal with features of astasia abasia.[15] (*Id.*) In her assessment, Dr. Willis documented that petitioner

> describes a number of symptoms including fatigue, brain fog, multiple types of pain, weakness, imbalance, and bladder/bowel dysfunction. Though symptoms are so severe that she cannot function well, her neurological exam shows only mild abnormalities. Previous imaging and laboratory evaluation ha[ve] been nondiagnostic. I do not have a unifying diagnosis for all her symptoms. . . . She could have had an inflammatory event in 1/2018 but suspicion for an underlying immune mediated process that places her at risk for recurrence is low.

(*Id.* at 25.)

---

[14] Petitioner continued to receive primary care at Mansfield Medical Associates through 2021, and records for those encounters document a past medical history of TM. (Ex. 20, pp. 6-28.) Additionally, petitioner filed updated medical records for an encounter with NP Nguyen in January of 2025, which also references petitioner's prior history of TM. (Ex. 157, pp. 1-2.) However, petitioner was not assessed with TM at any of these encounters. (*See* Ex. 20, pp. 6-28; Ex. 157, pp. 1-10.)

[15] Astasia abasia refers to "motor incoordination with an inability to stand or walk despite normal ability to move the lower limbs when sitting or lying down," which is a form of hysterical ataxia. *Astasia-aba'sia*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=59287 (last visited Aug. 27, 2026).

Petitioner returned to Dr. Leis on November 11, 2020, and underwent a repeat full battery evoked potential study. (Ex. 109, p. 21.) Dr. Leis documented that petitioner presented "for evaluation of possible CNS demyelination and multiple persistent or recurring medical diagnoses, notably relapses that she attributes to transverse myelitis ('paralyzed from C6 down') associated with diaphragm dysfunction following flu vaccine in 2018." (*Id.*) While her tibial SSEP, brainstem auditory evoked potential, and visual evoked potential studies were all normal, petitioner's median SSEP study was abnormal bilaterally due to slightly delayed latencies in the cortical N20 potentials and slightly prolonged central condition times bilaterally. (*Id.*) Dr. Leis noted that these findings were suggestive of a conduction defect in the large fiber sensory pathways at or rostral to the mid-cervical cord bilaterally. (*Id.*) Further, he documented that residual from possible TM in 2018 "may be causative"; however, the etiology remained undetermined. (*Id.*) Moreover, Dr. Leis concluded that the studies revealed no evidence of conduction abnormalities in the brainstem, lower limb somatosensory, or visual pathways of the brain or spinal cord. (*Id.*)

Two days later, petitioner followed up with Dr. Willis at UMMC. (Ex. 12, pp. 60-64.) In documenting petitioner's interval history, Dr. Willis noted that petitioner had recently undergone evoked potential testing, which revealed a symmetric delay in the cervical region. (*Id.* at 60.) Petitioner's neurological exam findings were largely unchanged as compared to her initial visit on September 23, 2020, although it was noted that she gave "limited effort" during the motor exam and had shaking in her trunk upon strength testing. (*Compare id.* at 64-65, *with id.* at 25.) With regard to petitioner's recent, repeat MR imaging of October 7, 2020, Dr. Willis documented that imaging of petitioner's cervical spine revealed mild degenerative changes but showed no cord signal abnormality. (*Id.* at 64.) Dr. Willis remarked that based on petitioner's reported history and the results of her recent evoked potential study, "it's possible that her initial event was a myelitis and she now has sequelae from that." (*Id.*) However, she further remarked that, despite extensive evaluation, there is no evidence of an ongoing or potentially recurrent neurological process. (*Id.*) Moving forward, Dr. Willis recommended that petitioner focus on managing her symptoms. (*Id.*)

Petitioner presented for a hepatology follow up appointment on December 7, 2020, for management of NASH. (Ex. 17, p. 8.) At this encounter, petitioner reported "being formally diagnosed with transverse myelitis and has been recommended continuous Physical therapy." (*Id.*) Petitioner continued to follow up with hepatology, and subsequent treatment records also include documentation indicating that petitioner reported receiving a formal diagnosis of TM. (*E.g.*, Ex. 154, pp. 4, 15, 26.) Additionally, starting in July of 2024, petitioner's hepatology records list the 2017 flu vaccine as an allergy, documenting "CAUSED TRANSVERSE MYELITIS." (*Id.* at 28; *see also id.* at 6, 17, 39.)

On December 15, 2020, petitioner had a telemedicine visit with NP Quarles at UMMC to follow up on her weakness and bilateral hand and feet pain, as well as to discuss her issues weaning off Lyrica. (Ex. 159, pp. 1488, 1498-99.) Petitioner

reported experiencing another kidney stone requiring a lithotripsy and complained of bladder urgency and incontinence. (*Id.* at 1499, 1501.) Additionally, she noted she experienced extreme weakness in her arms and legs several weeks prior, which she attributed to extreme fatigue. (*Id.* at 1501.) NP Quarles carried forward Dr. Willis's prior assessment from November 13, 2020, noting that it was "possible" that petitioner's initial event constituted a myelitis of which she was now experiencing sequalae, but also emphasizing the absence of evidence of a neurologic process, whether ongoing or recurrent, despite extensive evaluation. (*Id.* at 1503.) Petitioner was referred to urology and urinary urgency was listed as the primary diagnosis for the encounter. (*Id.* at 1488, 1503.)

Upon referral from NP Quarles, petitioner presented to UMMC urology clinic on February 23, 2021, where she was seen by NP Owens for urinary hesitancy and retention. (Ex. 159, pp. 1526-27.) It was noted that petitioner had a history of kidney stones requiring multiple surgical interventions as well as recurrent UTIs, which first started at 7 years old. (*Id.*) Additionally, NP Owens documented that petitioner had a history of "possible transverse myelitis" and also recorded the following notation: "Developed myelitis after receiving a flu vaccine??" (*Id.*) She also recorded "[e]voked potentials testing done at MMRC showed 'symmetric delay in the cervical region' C6-C7." (*Id.* at 1527.) Petitioner reported experiencing at least ten episodes of nocturnal enuresis since being diagnosed with myelitis three years ago. (*Id.*) NP Owens assessed petitioner with TM, urinary hesitancy and frequency, history of UTIs, and chronic kidney stones. (*Id.* at 1511, 1531-32.)

On February 25, 2021, petitioner followed up with NP Quarles at UMMC Neuroimmunology Clinic for her bilateral leg pain and numbness. (Ex. 159, pp. 1540-59.) At this encounter, petitioner reported an overall improvement in her pain, although she continued to experience muscle pain and spasms. (*Id.* at 1554.) While "[m]yelitis" is listed as petitioner's primary diagnosis for the encounter (*Id.* at 1540), NP Quarles reiterated Dr. Willis's assessment from November 13, 2020, documenting: "Based on the history and evoked potentials, it's possible that her initial event way a myelitis and she now has sequalae from that. There is no evidence, after extensive evaluation, of an ongoing or potentially recurrent neurologic process" (*Id.* at 1559).

On March 30, 2021, petitioner presented to the ED at MCAH complaining of left-sided chest pain, which had started approximately one hour prior. (Ex. 10, p. 2734.) Petitioner explained that she started to experience an onset of chest heaviness with associated shortness of breath. (*Id.*) The ED provider documented that, per the medical record, petitioner presented to the ED the week prior for right-sided chest pain after a fall and was discharged after no acute findings were observed on imaging or labs. (*Id.*) Furthermore, petitioner reported that she was experiencing weakness in her bilateral arms and legs and stated that she could not move her extremities. (*Id.*) Petitioner characterized her symptoms as similar to her TM symptoms three years ago. (*Id.*) On physical exam, the provider viewed petitioner to be "voluntarily tremulous," documenting that there were no signs of "real paralysis" as petitioner's "arm falls to the side and not towards her face when performing paralysis check." (*Id.* at 2739.)

Petitioner's EKG was normal, a chest x-ray revealed no acute process, and CT imaging of the brain and cervical spine were unremarkable. (*Id.* at 2742-44.) Despite petitioner's negative workup, her mother stated that she needed to stay given her condition. (*Id.* at 2744.) The ED provider documented that the plan was to consult neurology and admit petitioner after further evaluation. (*Id.*) However, approximately ten minutes later, petitioner requested discharge paperwork and stated her intent to leave against medical advice ("AMA") despite the discussed risks. (*Id.*) When petitioner was re-evaluated 45 minutes later, she communicated that "she is now able to move her arms" and requested to be discharged, rather than leave AMA. (*Id.* at 2745.) Ultimately, petitioner was discharged home that same day. (*Id.* at 2746.)

Petitioner returned to NP Quarles at UMMC Neuroimmunology Clinic on June 7, 2021, complaining of nerve pain and weakness in her bilateral arms and legs. (Ex. 159, pp. 1595, 1606.) NP Quarles documented:

> Spells of super weakness still not occurring as often but just freaks her out when it happens. Even went to ED via ambulance a few months ago for severe weakness, did not do anything for her really and simultaneously improved and she was d/cd. She was able to identify some stressors of change in temperature, over fatigue, over working muscles and has attempted to improve these things on her own.
>
> No brand new neurological symptoms.

(*Id.* at 1606-07.) Petitioner reported an overall improvement in her muscle spasms; however, she did note that she was still having "really bad muscle pain at night" and requested an increase in her Lyrica dosage. (*Id.* at 1609.) She also continued to complain of fatigue. (*Id.*) Physical examination revealed 4/5 strength in all muscles tested, although limited effort was noted; 2+ deep tendon reflexes throughout, except for in the knees, which were measured at 3+; and overall improved gait with the use of a single cane and leg braces. (*Id.* at 1610-11.) Although "[m]yelitis" is documented as the primary diagnosis for the encounter, NP Quarles continued to reiterate Dr. Willis's November 13, 2020 assessment of "possible" myelitis. (*Id.* at 1595, 1612.)

Three days later, petitioner followed up with NP Owens at UMMC Urology Clinic. (Ex. 159, pp. 1625, 1638.) Petitioner reported experiencing a couple of UTIs since her last visit, with symptoms including bladder pain, increased frequency, urgency, and positive cultures. (*Id.* at 1638.) However, she had no symptoms of a UTI at the time of the appointment. (*Id.* at 1641.) Petitioner also stated that she felt like she passed a kidney stone during that time. (*Id.* at 1638.) Petitioner requested a referral for pelvic floor physical therapy. (*Id.*) NP Owens documented an assessment of myelitis, overactive bladder and dysfunctional voiding, detrusor and sphincter dyssynergia ("DSD"), recurrent UTIs, and kidney stones. (*Id.* at 1641.)

At a follow up appointment with UMMC Neuroimmunology Clinic on November 8, 2021, NP Quarles documented that petitioner was doing "fairly well," although she was

still experiencing deep muscle spasms. (Ex. 159, pp. 1658-59.) On physical exam, petitioner had 4/5 strength in all muscles examined, although NP Quarles continued to document that petitioner displayed limited effort and sharking in her trunk during the motor exam. (*Id.* at 1662-63.) Her gait was noted to be improved although wide-based without a specific neurologic pattern. (*Id.* at 1663.) In documenting her impression, NP Quarles largely reiterated her prior assessment regarding the possibility that petitioner suffered an initial myelitis, although remarking that there was no evidence of a "treatable neurologic process." (*Id.* at 1664.) Additionally, NP Quarles documented that petitioner was scheduled for a L5-S1 spinal cord stimulator trial, as well as occipital decompression surgery, to treat her severe occipital neuralgia, which petitioner hoped would provide some pain relief. (*Id.* at 1659, 1664.) Petitioner also reported improved mobility with her new leg orthotics. (*Id.* at 1664.)

On November 11, 2021, petitioner followed up with NP Owens at UMMC Urology Clinic. (Ex. 159, pp. 1675, 1688.) While petitioner denied issues emptying her bladder, she reported passing two kidney stones and a lot of sediment since her last encounter, as well as some intermittent right flank pain. (*Id.* at 1688-89.) NP Owens documented that petitioner had a history of TM with neurogenic bladder and incomplete bladder emptying. (*Id.* at 1688, 1692.) A CT of petitioner's pelvis and abdomen was ordered to evaluate for additional stones, which revealed an indeterminate lesion superior to the left aspect of the vaginal cuff. (*Id.* at 1692-94.) Myelitis and neurogenic bladder were listed among petitioner's diagnoses for the encounter. (*Id.* at 1675.)

On April 5, 2022, petitioner presented to MCAH ED complaining of shortness of breath, right-sided upper back and chest pain, congestion, and pleuritic pain. (Ex. 158, p. 533.) Petitioner reported a history of a pulmonary embolism secondary to birth control, as well as a history of TM. (*Id.*) She denied any new numbness, weakness, loss of sensation, or incontinence, and noted that she had a spinal cord stimulator placed on her back a week ago. (*Id.*) Due to her prior history of pulmonary embolism and her recent surgical procedure, petitioner was admitted for observation and further evaluation of her chest pain and hemoptysis. (*Id.* at 527, 542-43.) Petitioner underwent a ventilation-perfusion scan, which was normal, and petitioner was ultimately discharged home the next day. (*Id.* at 527.) Petitioner's discharged diagnoses included hemoptysis and hypotension, both resolved at the time of discharge, as well as chronic pain syndrome. (*Id.*)

Petitioner followed up with NP Quarles at UMMC Neuroimmunology Clinic on May 24, 2022. (Ex. 159, pp. 1724,1741-42.) NP Quarles recorded that petitioner underwent occipital nerve decompression, which provided petitioner with significant relief of her occipital neuralgia, although she reported experiencing frontal headaches at a minimum of three times per week. (*Id.* at 1742.) Additionally, she documented that petitioner recently underwent placement of a spinal cord stimulator, "which has helped lower back pain tremendously[,] but since it was placed she has numbness in bilateral shins down. She's always had some numbness in this area but feels like it is more." (*Id.*) NP Quarles documented that "suspicioun [sic] for new CNS relapse is low," but ordered repeat imaging of the upper spinal cord to ensure that there was no evidence of

subclinical disease activity. (*Id.* at 1747.) Petitioner's physical examination was unchanged from her last appointment on November 8, 2021. (*Compare id.* at 1745-46, *with id.* at 1662-63.) In documenting her clinical impression, NP Quarles repeated her assessment that it was "possible" that petitioner's initial event was a myelitis, but continued to stress the absence of evidence of a "treatable neurologic process." (*Id.* at 1747.) Myelitis was documented as the primary diagnosis for the encounter. (*Id.* at 1724.)

Three days later, petitioner returned to NP Owens at UMMC Urology Clinic. (Ex. 159, pp. 1758, 1771.) At this encounter, petitioner reported a recent UTI with some mild bladder pain. (*Id.* at 1771.) NP Owens documented that petitioner had a history of TM and had recently undergone nerve decompression surgery and spinal cord stimulator placement. (*Id.*) Petitioner reported that when she turns her spinal cord stimulator up very high, her bladder becomes more sluggish. (*Id.*) NP Ownes assessed petitioner with TM and a history of kidney stones, UTIs, and DSD (*Id.* at 1775), and myelitis and neurogenic bladder are listed among petitioner's diagnoses for the encounter (*Id.* at 1758).[16]

Petitioner followed up with NP Quarles at UMMC Neuroimmunology on November 8, 2022. (Ex. 159, pp. 1810, 1821.) Petitioner presented with a boot on her left foot following an incident where she kicked a bag of dog food, noting that she planned to see an orthopedist the next week. (*Id.* at 1822.) She reported that her spinal cord stimulator "has been great," endorsing better pain control and improved headaches. (*Id.* at 1825.) Petitioner's physical exam findings remained unchanged compared to her prior visit, with NP Quarles documenting 4/5 strength in all muscles examined while noting that petitioner gave limited effort and was shaking in her trunk throughout the duration of strength testing. (*Compare id.* at 1825-26, *with id.* at 1745-46.) Additionally, petitioner continued to demonstrate a wide-based gait without a specific neurologic pattern. (*Id.* at 1826.) In her assessment, NP Quarles reiterated that it was "possible" that petitioner's initial event was a myelitis, while continuing to stress the absence of evidence of a "treatable neurologic process." (*Id.* at 1827.) She also continued to emphasize the importance of symptom management, documenting that petitioner "has seen significant improvement in many of [her] symptoms with medical management[,] including spinal stimulator." (*Id.*) Myelitis is listed as the primary diagnosis for the encounter. (*Id.* at 1810.)

On November 21, 2022, petitioner presented to Arlington Orthopedic Associates ("AOA") where she was seen by Dr. Stewart with a chief complaint of left foot pain, which started after "she actually kicked a box." (Ex. 156, p. 144.) Dr. Stewart documented that petitioner had "no history of inflammatory disease." (*Id.*) Petitioner reported a history of TM, and noted that she had a spinal cord stimulator. (*Id.*) Dr.

[16] Based on the medical records provided, petitioner followed up with UMMC Urology Clinic through 2024, during which NP Owens continued to note petitioner's history of TM and assess petitioner with TM and neurogenic bladder. (Ex. 159, pp. 1784-1803, 1863-86, 1915-29, 1951-67.) At a follow up encounter on May 19, 2023, the flu vaccine was listed as an allergy based on petitioner's report that the flu vaccine caused her TM. (*Id.* at 1864; *see also id.* at 1894.)

Stewart assessed petitioner with a stress reaction and sesamoiditis in the left foot. (*Id.* at 148.)

On March 6, 2023, petitioner presented to the ED at MCAH complaining of a non-productive cough and neck pain extending down her left arm. (Ex. 158, p. 441.) Petitioner reported a history of C4-C5-C6 TM, as well as a recent COVID-19 infection, which she was treating with Paxlovid. (*Id.*) She stated that she was unable to take her Percocet due to the Paxlovid. (*Id.*) Petitioner denied any paresthesia with her neck pain, although she noted that she had experienced paresthesias or neuropathy in the past secondary to her TM. (*Id.*) The ED provider documented that petitioner had decreased sensation in the upper extremities on exam, which petitioner reported was "old" and due to TM. (*Id.* at 442, 445.) The differential included an upper respiratory infection, pneumonia, pneumothorax, or a flare up of TM. (*Id.* at 447.) Petitioner underwent an MRI of the cervical spine with and without contrast. (*Id.* at 470.) Petitioner's history of TM was documented as the reason for the imaging study. (*Id.* at 448, 465, 470.) The MRI of the cervical spine revealed minimal bilateral foraminal bulge at C5-C6 with no neural foraminal narrowing, no spinal stenosis, and no compression of the existing nerve roots observed. (*Id.* at 470.) Additionally, the radiologist documented that there was "no abnormal enhancement in the cervical region. No transverse myelitis is visualized." (*Id.*) Accordingly, the reading radiologist documented an impression of "[n]o MRI evidence of transverse myelitis" with a minimal bilateral foraminal bulge at C5-C6. (*Id.*) Following her imaging study, petitioner was reexamined by the ED provider who noted that petitioner was doing well with no signs of distress. (*Id.* at 448.) Additionally, the ED provider documented that he discussed petitioner's case in detail with radiology and reviewed petitioner's MR imaging, which revealed no evidence of TM or cord compression. (*Id.*) The ED provider instructed petitioner to follow up with her neurologist, and discharged petitioner home, listing neck pain as his primary clinical impression and bulging disc at the left C-5 vertebrae and COVID-19 per reported history as the secondary impressions. (*Id.* at 448-50.)

Petitioner returned to the ED at MCAH on March 26, 2023, with a chief complaint of a one-day history of right-sided chest wall pain, which was worse with breathing and deep palpation. (Ex. 158, pp. 394, 401.) Petitioner reported a history of chronic pain, TM, pleurisy, and pulmonary embolism. (*Id.* at 394.) Given her known history of pulmonary embolism, petitioner was offered inpatient admission and a ventilation-perfusion scan. (*Id.* at 402.) However, petitioner reported her pain had improved and that her symptoms were not consistent with her prior pulmonary embolism, and thus, she requested to be discharged. (*Id.*) Petitioner was discharged home, and the ED provider documented a primary clinical impression of pleurisy with a secondary impression of chest wall pain. (*Id.* at 403.)

On May 18, 2023, petitioner followed up with NP Quarles at UMMC Neuroimmunology Clinic. (Ex. 159, pp. 1835, 1848.) Petitioner indicated that she was "doing pretty well," noting that she had been taking care of her mother who had recently had surgery. (*Id.* at 1849.) However, she reported that she was experiencing persistent fatigue, which was making her foot drop worse, as well as increased headaches. (*Id.*)

Petitioner acknowledged that she was back on opiates, which were probably contributing to her rebound headaches. (*Id.*) NP Quarles repeated her assessment that it was "possible" that petitioner's initial event was a myelitis while stressing the absence of evidence of a "treatable neurologic process," and she also continued to emphasize petitioner's improvement with medical management. (*Id.* at 1854.) Myelitis is listed as the diagnosis for the encounter. (*Id.* at 1835.)

Petitioner presented to the ED at MCAH on June 16, 2023, complaining of shortness of breath that started around 1:30 PM that day. (Ex. 158, p. 105.) The ED provider documented that petitioner had a prior medical history of asthma, pulmonary embolism, chronic tachycardia, hypertension, hypothyroidism, TM, neurogenic bladder, and stage III non-alcoholic fatty liver disease. (*Id.*) Petitioner reported receiving an epidural injection for her chronic back pain around 90 minutes prior to the onset of her shortness of breath. (*Id.*) The ED provider documented asthma exacerbation as the primary clinical impression, and petitioner was admitted for further evaluation. (*Id.* at 113.) On June 22, 2023, petitioner was discharged home with a discharge diagnosis of bronchitis. (*Id.* at 102.)

On July 20, 2023, petitioner was evaluated by Dr. Crawford at AOA for a chief complaint of bilateral foot and ankle pain. (Ex. 156, p. 134.) After conducting a physical examination, Dr. Crawford documented that petitioner's bilateral ankle pain was most consistent with non-insertional Achilles tendonitis, and that her left foot pain was consistent with second metatarsal stress fracture overlapping with metatarsalgia. (*Id.* at 137.) Additionally, he noted that petitioner had a "[p]resent history of a transverse myelitis of her spine and it has some spasticity which may be causing overload of the foot." (*Id.*) Dr. Crawford counseled petitioner on the natural history of insertional Achilles tendinitis, noting that flareups can often be managed with conservative treatment and recommending the use of cork heel wedges to take tension off of the Achilles tendon insertion. (*Id.*) Petitioner received steroid injections in her bilateral Achilles tendon and her left second metatarsal extensor tendon. (*Id.* at 138.)

Petitioner returned to Dr. Crawford for reevaluation of her bilateral ankle pain and left foot pain on August 22, 2023. (Ex. 156, pp. 112, 115.) While petitioner's bilateral Achilles tendinitis had significantly improved and required no further treatment, petitioner reported that her left second metatarsal foot pain persisted and that the steroid injection only provided short term relief. (*Id.* at 115.) Petitioner opted to try a short leg walking cast to alleviate her left foot pain. (*Id.*)

On September 12, 2023, petitioner followed up with Dr. Crawford regarding her continued left foot pain. (Ex. 156, pp. 108, 110.) Dr. Crawford noted that petitioner's left foot pain was consistent with a third metatarsal stress fracture overlapping with metatarsalgia. (*Id.* at 110.) Furthermore, he documented that petitioner had a "[p]resent history of TM" with some spasticity, "which may be causing overload of the foot and equinus contracture." (*Id.*) Dr. Crawford indicated that at petitioner's next visit, they likely "may discuss doing a percutaneous osteotomy of the third metatarsal neck in combination with a Strayer gastrocnemius recession. She has not responded to

conservative care and continues to have worsening pain and limitations." (*Id.* at 111.) Petitioner returned to Dr. Crawford two days later for application of her short leg walking cast. (*Id.* at 98, 101, 111.)

Petitioner participated in a telehealth visit with NP Quarles on September 26, 2023. (Ex. 159, pp. 1893, 1903.) NP Quarles noted that petitioner recently experienced "a provoked fall" resulting in a broken left foot, which is the same foot that previously required a boot due to a stress fracture. (*Id.* at 1903.) Petitioner reported that she was scheduled to undergo an Achillies release surgery on the left foot in about a month. (*Id.*) While petitioner stated that her orthopedic team felt her Achilles may have contributed to her recent fall, NP Quarles documented that petitioner "knows her wheel on her rolator [sic] got caught on something and caused her to become imbalanced so not sure how much tendon contributed but this has to be done." (*Id.*) Petitioner reported that her spasms and neuropathic pain were improved on Trileptal. (*Id.*) Additionally, petitioner indicated that her hepatologist felt that petitioner's steroid treatments contributed to her development of non-alcoholic fatty liver disease. (*Id.*) Myelitis is listed as the diagnosis for the encounter. (*Id.* at 1893.) In documenting her clinical impression, NP Quarles largely reiterated her longstanding assessment that it is "possible" that petitioner's initial event was myelitis; however, she continued to emphasize the absence of evidence of an "ongoing or potentially recurrent treatable" neurologic process, despite extensive evaluation. (*Id.* at 1908.) She also stressed the lack of evidence of an immunologic process. (*Id.*) NP Quarles continued to document that treatment should focus on symptom management. (*Id.*)

Petitioner underwent a left open gastrocnemius recession and osteotomy of the second and third metatarsal neck on November 2, 2023. (Ex. 156, pp. 89-97.) Thereafter, petitioner completed physical therapy and reported improvement of her pain at subsequent encounters with Dr. Crawford. (*Id.* at 29-62.).

On March 29, 2024, petitioner had a telehealth visit with Dr. Willis. (Ex. 159, pp. 1934, 1941-42.) At this encounter, petitioner reported that she was doing pretty well and that the surgery on her foot and ankle had made a big difference, allowing for improved ambulation and a decreased foot drop. (*Id.* at 1942.) She also indicated that she had increased feeling in her legs and feet, and denied any issues with her neurogenic bladder and bowel. (*Id.*) Petitioner complained that her migraines were awful. (*Id.*) TM is listed as one of petitioner's diagnoses for the encounter (*Id.* at 1934), although TM is not documented as a diagnosis under petitioner's past medical history (*Id.* at 1942-43.) Dr. Willis repeated her impression from November 13, 2020, documenting that "[b]ased on the history and evoked potentials, it's possible that her initial event was a myelitis," while stressing that there was no evidence of an ongoing or potentially recurrent treatable neurologic process despite extensive evaluation. (*Id.* at 1946.) However, she added that there was also no evidence of an immunologic process. (*Id.*) Additionally, Dr. Willis continued to recommend an emphasis on symptom management, noting that petitioner had experienced significant improvement in many of her symptoms with medical management, including a spinal cord stimulator. (*Id.*)

Petitioner presented to Dr. Crawford at AOA for evaluation of right foot pain on February 25, 2025. (Ex. 156, pp. 22, 27.) Based on the physical examination findings, Dr. Crawford assessed petitioner with second and third metatarsal stress fractures with forefront metatarsalgia and Achilles tendonitis of the right foot. (*Id.* at 27.) Furthermore, Dr. Crawford documented that petitioner

> had the same condition on the left foot previously and we failed conservative management and eventually she needed a gastroc recession and second metatarsal neck osteotomy to offload the forefront pressures and decrease risk of persistent second metatarsal stress fracture. This now feels exactly the same but now on the right foot.

(*Id.*) Dr. Crawford noted that petitioner had a history of TM "that has caused the achilles tightness and contracture and forefront metatarsalgia." (*Id.*) He assessed petitioner with equinus contracture of the right ankle, metatarsalgia of the right foot, stress fracture of the metatarsal bone of the right foot, and acute viral TM. (*Id.* at 28.) Petitioner opted to proceed with surgical intervention, and petitioner underwent a right open gastrocnemius recession and osteotomy of the second and third metatarsal neck on March 10, 2025. (*Id.* at 6-21, 27-28.) At her post-op appointment on March 25, 2025, Dr. Crawford continued to assess petitioner with acute viral TM. (*Id.* at 6, 11.)

On April 16, 2025, petitioner presented to the ED at MCAH with a chief complaint of a red area localized over the left TMJ region of her face in addition to a headache, which she rated as 7 out of 10 in terms of severity. (Ex. 158, p. 18.) The ED provider documented that petitioner's past medical history included migraine headache disorder, chronic pain status post spinal cord stimulator placement, and a "recent diagnosis of transverse myelitis," for which she was currently undergoing treatment. (*Id.*) Petitioner was diagnosed with acute cellulitis of the face and was discharged home. (*Id.* at 23-25.)

**b. As reflected by testimonial evidence**

i. <u>Declaration of Petitioner</u>

Petitioner recalls receiving the flu vaccination at issue on November 30, 2017. (Ex. 1, ¶ 2.) At the time, petitioner was recovering from a hysterectomy that she had undergone earlier that year, which limited her physical activity and movement. (*Id.* ¶ 3.)

Petitioner states that on January 7, 2018, she experienced an abrupt onset of exhaustion, as well as weakness and heaviness in her legs, explaining that she could barely lift her legs as it felt like she had just finished a race. (Ex. 1, ¶ 3.) The next day, petitioner's exhaustion persisted, and she started to feel weakness in her arms and lower back. (*Id.* ¶ 4.) She recalls feeling like she had the flu, noting that sleep was the only remedy that provided any relief. (*Id.*) Petitioner explains that she visited the ED at UMMC on January 9, 2018, due to severe pain in her lower back and heaviness in her arms and legs. (*Id.* ¶ 5.) She avers that her entire body was paralyzed up to her C6

vertebra by the time she arrived at the hospital. (*Id.*) After being admitted and evaluated by the neurology team, as well as undergoing testing inclusive of a spinal tap, CT imaging, and bloodwork, petitioner contends she was diagnosed with TM. (*Id.* ¶ 5.) She explains that she completed a five-day course of IV steroids before being discharged to inpatient rehabilitation on January 19, 2018. (*Id.* ¶¶ 5-6.) After completing two weeks of inpatient rehabilitation, petitioner was discharged and continued therapy on an outpatient basis. (*Id.* ¶¶ 6-7.) At the time of discharge, petitioner was still unable to walk and required assistance with all tasks of daily living. (*Id.* ¶ 6.)

In March of 2018, petitioner underwent a procedure to remove her occipital nerve stimulator, which she explains was necessary so she could receive an MRI. (Ex. 1, ¶ 9.) Petitioner explains that, on April 11, 2018, she returned to the ED at UMMC and was ultimately admitted to the inpatient neurology service for worsening weakness, pain, spasms, and some body paralysis. (*Id.* ¶ 10.) She contends that the neurology team assessed her with a TM relapse. (*Id.*) While hospitalized, petitioner underwent additional testing, including an MRI and a spinal tap, and completed a five-day course of IV steroids and pain medication, as well as breathing treatments. (*Id.*) After her hospitalization, petitioner states that she completed another two weeks of inpatient rehabilitation followed by outpatient therapy. (*Id.* ¶¶ 11-12.) Although she made slight improvements, petitioner maintains that she continued to experience debilitating symptoms and required assistance performing basic tasks of daily living. (*Id.* ¶¶ 11-12.)

She clarifies that she relocated to Texas in July of 2018, where she established care with Dr. Saligram at the TIND. (Ex. 1, ¶ 13.) Petitioner avers that Dr. Saligram "did very little to treat my TM injury" and provided minimal help for her condition, noting that Dr. Saligram believed that petitioner was potentially suffering from multiple sclerosis. (*Id.* ¶ 13.) She explains that she sought care from Dr. Saligram throughout August of 2018 due to the worsening of her condition, including increased weakness, pain, exhaustion, and difficulty ambulating. (*Id.* ¶¶ 14-15.) As a result, petitioner explains she was admitted to MCAH for a five-day course of IV steroids before being transferred to inpatient rehabilitation and then transitioning to outpatient rehabilitation in September of 2018. (*Id.* ¶¶ 16-18.)

Petitioner explains that she presented to the ED at MCAH in February of 2019, with complaints of continuous severe weakness, pain, difficulty walking, extreme fatigue, and vision loss in her right eye, which led to her being admitted for another five-day course of IV steroids. (Ex. 1, ¶ 19.) While hospitalized, petitioner lost vision in her left eye. (*Id.*) She avers that her vision loss has mostly resolved, although she continues to have no peripheral vision at the time of writing her written statement. (*Id.*) Following her hospitalization, petitioner completed inpatient physical and occupational therapy and also worked with speech therapy to address her cognitive symptoms, including memory issues. (*Id.* ¶ 20.) During that time, she was also fit with special orthotics, which she still continues to use. (*Id.*) In March of 2019, petitioner transitioned to outpatient rehabilitation and started working with a pain management specialist to treat her severe body pain and occipital neuralgia. (*Id.* ¶¶ 21-22.)

Petitioner declares that in June of 2019, she traveled to Mayo Clinic in Jacksonville, Florida, on the recommendation of her primary care provider "to help with my recurring relapses of TM." (Ex. 1, ¶ 23.) She was evaluated by Dr. Collazo, who performed extensive testing, which petitioner explains ruled out MS. (*Id.*) However, petitioner maintains that Dr. Collazo "stated she agreed with the previous TM diagnosis." (*Id.*)

Moreover, petitioner states that, in November of 2020, she returned to UMMC, where she was evaluated by Dr. Willis, a neuroimmunologist, for her persistent ongoing weakness, exhaustion, and falls. (Ex. 1, ¶ 27.) She explains that Dr. Willis provided a full evaluation, inclusive of bloodwork and a somatosensory evoked potential study. (*Id.*) Petitioner contends that "Dr. Willis reconfirmed my diagnosis of TM, with recurring flare ups of 'aftershocks' that are typical of TM, and permanent C-6 and C-7 spinal cord injuries." (*Id.*) Further, petitioner maintains that Dr. Willis assessed petitioner with "myoclonus, severe nerve pain that is persistent, spasms in both [] arms and legs, and a neurogenic bladder." (*Id.*)

Petitioner explains that she developed cardiac and liver problems, including non-alcoholic fatty liver disease and non-alcoholic steatohepatitis, as a result of the steroids she received to treat her TM. (Ex. 1, ¶¶ 24, 26.) Additionally, she maintains that she continues to experience mobility issues and consistently experiences TM flare ups, which make it nearly impossible to move for days at a time. (*Id.* ¶ 28.) She states that her persistent pain from her TM interferes with her ability to perform activities of daily living, participate in hobbies she enjoyed prior to her injury, work as a nurse, and maintain relationships. (*Id.*) Petitioner declares that her injury has had lasting negative impacts on her physical, mental, social, and emotional wellbeing. (*Id.*)

ii. <u>Other testimonial evidence</u>

Petitioner also filed declarations of Melissa Hanberry, Dawn Harris, and Jennifer Tisdale. (Exs. 145-47.) Ms. Hanberry and Ms. Harris both explain that they had the opportunity to observe the change in petitioner's physical condition as a result of being the parents of patients whom petitioner regularly cared for in her role as a pediatric oncology nurse. (*See* Exs. 145-46.) Prior to her injury, Ms. Hanberry recalls that petitioner seemed "entirely immune from exhaustion," but after her abilities declined, she became hospitalized herself and too weak to visit the oncology floor. (Ex. 145, ¶¶ 4-5.) Ms. Tisdale states that petitioner is her former coworker, explaining that she served as petitioner's charge nurse and supervisor while petitioner worked as a pediatric oncology nurse. (Ex. 147, ¶¶ 1-2.) She similarly recalls that petitioner was a committed presence at the medical center where they worked; however, she ultimately had to leave her job due to her injury, which diminished her capacity for physical and emotional endurance. (*Id.* ¶¶ 3-6.)

## IV. Expert Opinions[17]

### a. Dr. Jeret's[18] Initial Report (Exhibit 76)

Dr. Jeret maintains that TM is the most likely diagnosis in this case, opining that petitioner first developed the condition in January of 2018. (Ex. 76, p. 12.) He also disputes respondent's favored diagnosis of FND, arguing that there is no compelling evidence to support such a diagnosis. (*Id.*)

He begins by noting that diseases impacting the central nervous system ("CNS") can cause numbness, weakness, hyperreflexia, and positive Hoffman and Babinski signs. (Ex. 76, p. 2.) TM is a focal inflammatory demyelinating disorder of the spinal cord and is thus a CNS disease. (*Id.* at 2, 7.) Typical neurological symptoms and findings reported in individuals with TM include weakness in the extremities; abnormal sensations, such as numbness, tingling, and burning; pain in the back, which may travel into the arms, legs, or the chest/abdomen; gait issues such as stumbling or dragging one foot; and bowel or bladder problems, including frequent urination, urinary incontinence, or constipation. (*Id.* at 4-5.)

Dr. Jeret states that MR imaging provides the best mechanism for visualizing the brain and spinal cord and is thus considered the superior method for CNS imaging. (Ex. 76, p. 2.) However, he notes that the quality of MR imaging can be impacted by several different variables, including the cooperation of the patient. (*Id.*) Although CT scans and myelography can also be useful for assessing CNS disease, these imaging methods provide far less details as compared to MR imaging. (*Id.*) EMG/NCS do not

---

[17] Although I have reviewed and considered the multiple reports submitted by both Dr. Akbari and Dr. Pasetti, it is not ultimately necessary to summarize their opinions. In their reports, Drs. Akbari and Pasetti debate whether petitioner has demonstrated a medical theory of causation that could implicate the flu vaccine as a cause of petitioner's alleged TM. (Exs. 23, 114, A, E.) However, because I have concluded in the analysis below that petitioner has not preponderantly established that she ever suffered TM, it is not necessary to resolve whether petitioner's theory is preponderantly supported. Notably, neither Dr. Akbari nor Dr. Pasetti is a medical doctor. Accordingly, their opinions do not add significantly to the dispositive diagnostic question discussed below. Furthermore, it is also not necessary to summarize Dr. Jeret's and Dr. Price's respective opinions regarding vaccine-causation.

[18] Dr. Joseph S. Jeret received his medical degree with Distinction in Research from SUNY Health Science Center at Brooklyn in 1988, before going on to complete an internship at Maimonides Medical Center in Brooklyn, New York, in 1989, as well as a neurology residency and a clinical neurophysiology fellowship at SUNY Health Science Center in 1992 and 1993, respectively. (Ex. 77, p. 1.) Dr. Jeret specifically notes that, pertinent to this case, "[e]voked potential studies were an integral part of [his] residency and fellowship training in 1990-93." (Ex. 76, n.1.) Since then, Dr. Jeret has maintained an active neurology practice. (Ex. 77, p. 1; Ex. 76, p. 2.) He is on staff at South Nassau Community Hospital, Mercy Medical Center, and Icahn School of Medicine/Mount Sinai. (Ex. 77, p. 1; Ex. 76, p. 2.) Dr. Jeret is board certified in neurology, and he maintains an active medical license in New York. (Ex. 77, p. 1; Ex. 76, p. 1.) In his clinical capacity, Dr. Jeret has routinely cares for patients with various neurologic illnesses, including spin and nerve disease, and that "it is not uncommon for [his] patients to have complex clinical presentation and multiple diagnoses." (Ex. 76, p. 1.) He has also authored 77 publications and presentations. (Ex. 77, p. 1.)

typically reveal any abnormalities when a patient has damage to the CNS and are therefore expected to be normal in cases of TM. (*Id.*)

In addition to imaging, Dr. Jeret opines that sensory evoked potential testing can play a significant role in diagnosing CNS disease, including TM. (Ex. 76, p. 2.) Sensory evoked potential testing is a functional assessment that measures electrical activity in the CNS in response to stimulation. (*Id.*) These evoked potential studies are comprised of three tests: (1) Brain Stem Auditory Evoked Response ("BAER") test; Visual Evoked Response ("VER") test; and Somatosensory Evoked Response ("SSEP") test. (*Id.*) Dr. Jeret maintains that before the widespread availability of MRI, evoked potential studies played an important role in diagnosing demyelinating disorders, most notably MS. (*Id.*) However, Dr. Jeret concedes that evoked potential testing alone cannot detect a CNS demyelinating disease. (*Id.*)

Dr. Jeret stresses that SSEP studies are germane to the issue of diagnosis in this case. (Ex. 76, pp. 2-4.) SSEP testing is further classified depending on which nerve pathway is stimulated, with the Median Nerve SSEP and Posterior Tibial Nerve SSEP being the two most common tests. (*Id.* at 2-4.) These tests allow for the assessment of the average delay after the electrical stimulus that the potential can be measured, and determining the site of the delay can be helpful in identifying the site of pathology.[19] (*Id.* at 3-4.) Furthermore, he explains that evoked potential studies can detect abnormalities below the visual resolution of MR imaging. (*Id.* at 6.) Additionally, Dr. Jeret maintains that an MRI may normalize while evoked potential testing may remain abnormal. (*Id.* (citing *SEP: Interpretation*, *in* EVOKED POTENTIALS IN CLINICAL MEDICINE 410-11 (Keith H. Chiappa ed., 2d ed.1989) (Ex. 107)).) Therefore, Dr. Jeret opines that an abnormal SSEP study in the context of normal MR imaging would be "very consistent" with a diagnosis of TM. (*Id.*) Accordingly, Dr. Jeret concludes that "SSEP is the more accurate test to diagnose acute TM and is used to follow its progressive improvement with steroids." (*Id.* at 4 (footnote omitted) (citing J.M. Murthy, *Somatosensory Evoked Potentials by Paraspinal Stimulation in Acute Transverse Myelitis*, 47 NEUROLOGY INDIA 108 (1999) (Ex. 96, pp. 2-3); J. Kalita et al., *Clinical and Evoked Potential Changes in Acute Transverse Myelitis Following Methyl Prednisolone*, 37 SPINAL CORD 658 (1999) (Ex. 90, p. 1.)).) Furthermore, Dr. Jeret states that SSEPs can assist in diagnosing myelopathies of various etiologies, even when MRI is prohibited. (*Id.* at 4 (citing Iryna M. Muzyka & Bachir Estephan, *Somatosensory Evoked Potentials*, *in* 160 HANDBOOK OF CLINICAL NEUROLOGY 523 (K.H. Levin & P. Chauvel eds., 2019) (Ex. 97)).)

In this case, Dr. Jeret notes that petitioner underwent evoked potential testing performed by Dr. Leis on February 7, 2018, which revealed normal VER, BAER, median SSEP, and tibial SSEP studies. (Ex. 76, p. 5 (citing Ex. 5, p. 10).) However, he stresses that when petitioner underwent repeat evoked potential testing by Dr. Leis on November 11, 2020, petitioner's median SSEP study was abnormal bilaterally, with

[19] For example, Dr. Jeret explains that a delayed N13 during median SSEP testing is indicative of a spinal cord problem, and that delays from T12/L3 to the cortex on posterior tibial SSEP imply a spinal cord delay and is the most sensitive parameter. (Ex. 76, p. 4 (citing A. Constantinovici, *Somatosensory Evoked Potentials in Spinal Cord Diseases*, 27 NEUROLOGIE & PSYCHIATRIE 209 (1989) (Ex. 84, p. 1.)

normal VER, BAER, and tibial SSEP studies. (*Id.* (citing Ex. 109, p. 21).) Specifically, Dr. Jeret states that petitioner's abnormal median SSEP demonstrated "a bilateral delay of the N20 (cortical) response and prolonged conduction from the neck (N13) to the cortex (N20)." (*Id.*) Accordingly, Dr. Jeret opines that petitioner's abnormal SSEP study is objective evidence supporting a diagnosis of TM. (*Id.* at 5, 8-9, 12.) Moreover, Dr. Jeret emphasizes that the performing provider, Dr. Leis, documented that the abnormal findings were suggestive of a conduction defect in the larger fiber sensory pathways at or rostral to the mid-cervical cord bilaterally and that "residual from possible transverse myelitis in 2018 may be causative." (*Id.* at 5 (citing Ex. 109, p. 21).) Further, based on his review of the medical records, Dr. Jeret contends that Dr. Leis documented an opinion of "flu shot→ transverse myelitis" and listed "myelitis, transverse" and "post-vaccine event" among petitioner's diagnoses. (*Id.* at 6 (quoting Ex. 109, pp. 22, 24).) Additionally, Dr. Jeret maintains that "the presumptive diagnosis remained myelitis, consistent with the SSEP findings" at subsequent encounters, including neurology visits. (*Id.* (citing Ex. 12, p. 144).)

Dr. Jeret cites the diagnostic criteria proposed by the Transverse Myelitis Consortium Working Group, which outlined the following inclusion criteria: (1) development of sensory, motor, or autonomic dysfunction attributable to the spinal cord; (2) bilateral signs and/or symptoms, though not necessarily symmetric; (3) clearly defined sensory levels; (4) exclusion of extra-axial compressive etiology by MRI of myelography; (5) inflammation within the spinal cord demonstrated by CSF pleocytosis *or* elevated IgG index *or* gadolinium enhancement; and (6) progression to nadir between four hours and 21 days following the onset of symptoms. (Ex. 76, pp. 7-8 (citing Transverse Myelitis Consortium Working Group, *Proposed Diagnostic Criteria and Nosology of Acute Transverse Myelitis*, 59 NEUROLOGY 499 (2002) (Ex. 99, p. 2 tbl. 1) [hereinafter TM Consortium]).) If none of the inflammatory markers are positive at symptom onset, the diagnostic criteria indicate that lumbar puncture and MRI evaluation should be repeated 2-7 days following onset. (*Id.* at 8 (citing TM Consortium, *supra*, at Ex. 99, p. 2 tbl. 1).)

Applying the criteria to this case, Dr. Jeret contends that petitioner satisfied all of the inclusion criteria except for evidence of inflammation within the spinal cord as demonstrated by CSF pleocytosis or elevated IgG index or evidence of gadolinium enhancement on MRI. (Ex. 76, pp. 7-8.) He does not dispute that petitioner's CSF studies and MR imaging of her spine were normal. (*Id.* at 7-8, 10.) However, Dr. Jeret stresses that petitioner's first MRI of her spine could not be performed within the proper time frame due to her occipital nerve stimulator. (Ex. 76, p. 8.) Specifically, he states the following:

> About 4 ½ months after the initial onset [petitioner] was able to get her [occipital nerve] stimulator removed, and shortly after, on 4/12/18, the first spinal MRI was performed, and the results were normal. However, the MRI was suboptimal in quality and not adequate to exclude a small spinal lesion. Furthermore, the time between onset and the imaging results makes it difficult to exclude TM.

(*Id.* at 8.) Dr. Jeret reemphasizes that the TM Consortium's proposed diagnostic criteria call for repeat MR imaging if the first MRI is negative within 2-7 days after symptom onset, not 4.5 months later. (*Id.*) Moreover, Dr. Jeret cites to a case study by Mamootil & Grewal, which describes a patient diagnosed with TM post-vaccination and treated with steroids and plasma exchange therapy. (*Id.* (citing Divya Mamootil & Anmol Grewal, *Viral Versus Vaccine-Associated Acute Transverse Myelitis with Neuromyelitis Optica Immunoglobulin G Antibody and Myelin Basic Protein: A Case Report*, 14 CUREUS, 2022, at 1 (Ex. 94)).) While the patient's first MRI revealed abnormal cord signals in the cervical and thoracic regions, the patients second spinal MRI performed just eight days after the initial imaging demonstrated a near-complete resolution of abnormal signal in the cervical region and an improvement in the thoracic lesion. (*Id.* (citing Mamootil & Grewal, *supra*, at Ex. 94, p. 6.) Therefore, Dr. Jeret opines that the 4.5 month gap between symptom onset and petitioner's first MRI, as well as the steroid therapy petitioner received during that time, demonstrate why a diagnosis of TM cannot be excluded. (*Id.*)

Dr. Jeret also references an article by Shah et al., which classified cases obtained from VAERS as either definite or probable TM, with definite cases of TM requiring the clinical symptoms suggestive of TM in combination with positive MRI or lumbar puncture findings where probable cases were defined by a clinical presentation suggestive of TM without any supporting diagnostic results. (Ex. 76, p. 8 (citing Shreya Shah et al., *Development of Transverse Myelitis After Vaccination, A CDC/FDA Vaccine Adverse Event Reporting System (VAERS) Study, 1985-2017*, 90 NEUROLOGY, 2018, at 1 (Ex. 105, p. 2)).) Based on this terminology, Dr. Jeret opines that petitioner had "probable" TM, which he argues is "the most definitive diagnosis possible when an MRI cannot be performed within seven days of onset." (*Id.*) However, Dr. Jeret contends that there is an argument to be made that abnormal SSEP testing should be included within the diagnostic criteria for TM.[20] (*Id.* at 7-8.) He states that abnormal SSEP testing "should be considered a surrogate marker of conduction delay—much like CSF is a surrogate marker of inflammation and only indirect evidence of TM." (*Id.*) Assuming abnormal SSEP studies should be included among the inclusionary diagnostic criteria, Dr. Jeret argues that "the diagnosis of TM is definite" in this case. (*Id.* at 8.)

[20] Within his report, Dr. Jeret cites to a paper by Frohman & Wingerchuk, which included a diagnostic algorithm for the evaluation of acute myelopathies and myelitis. (Ex. 76, pp. 7-8 (citing Elliot M. Frohman & Dean M. Wingerchuk, *Transverse Myelitis*, 363 NEJM 564 (2010) (Ex. 88, pp. 3-4 fig. 1)).) The diagnostic algorithm does not reference SSEP testing. (*See* Frohman & Wingerchuk, *supra*, at Ex. 88, p. 3 fig. 1).) Dr. Jeret indicates that, during a conversation with Dr. Frohman, a preeminent neuroimmunologist, in 2022, Dr. Frohman "admitted that 'it was a mistake' that SSEPs as criteria were not included in his *NEJM* article." (Ex. 76, p. 7.) Moreover, Dr. Jeret states that Dr. Frohman "acknowledged that he would also have treated [petitioner] for TM, notwithstanding the normal CSF and inability to perform an MRI" and "indicated that a negative MRI 4 ½ months later does not impact a diagnosis of TM." (*Id.*) However, without direct evidence from Dr. Frohman, I do not credit these statements, especially the speculation as to how Dr. Frohman would have treated petitioner. The evidence of record gives no indication Dr. Frohman has ever reviewed petitioner's complete medical history.

In response to respondent's position that petitioner did not have TM as articulated in the Rule 4(c) Report, Dr. Jeret maintains that respondent's conclusion relied on "testing, which is expected to be normal in TM (e.g., EMG/NCV, CT, CT myelography) or was done 4 ½ months later (MRI, EP by Dr Leis) and has no bearing." (Ex. 76, p. 11 (citing ECF No. 27, pp. 35-36).) Although he acknowledges that petitioner's CSF studies were repeatedly negative, Dr. Jeret contends that normal CSF results do not exclude a diagnosis of TM. (*Id.*) Additionally, Dr. Jeret highlights that respondent's position stands in stark contrast to that of "multiple contemporaneously treating physicians diagnosed TM and treated [petitioner] with repeated doses of steroids, narcotics, Baclofen, and gabapentin."[21] (Ex. 76, pp. 10-11.) Lastly, Dr. Jeret emphasizes that petitioner's physical examinations revealed multiple objective and involuntary findings, including abnormal hyperreflexia, positive Babinski response, positive Hoffman sign, and clonus, which are consistent with TM. (*Id.* at 10, 12.) Specifically, he lists the following exam findings:

- Hyperreflexia and left Babinski response on 1/10/18.
- Hyperreflexia on 1/13/18
- Hyperreflexia on 1/15/18
- Hyperreflexia and bilateral Babinski responses on 1/17/18
- Hyperreflexia on 4/3/18
- Hyperreflexia, positive left Babinski, positive right Hoffman sign on 4/11/18
- Right Hoffman sign on 4/16/18
- Hyperreflexia on 8/31/18
- Hyperreflexia on 10/8/18
- Gait with circumduction (typical of CNS dysfunction) on 1/11/19
- Hyperreflexia, gait with circumduction (typical of CNS dysfunction) on 1/22/20
- Hyperreflexia in knees on 9/23/20

(*Id.* at 10.)

Moreover, Dr. Jeret contends that respondent's favored diagnosis of FND/conversion disorder is not supported by any compelling evidence. (Ex. 76, pp. 9-10, 12.) First, he explains that the objective exam findings of hyperreflexia, positive Babinski response, positive Hoffman sign, and an abnormal SSEP are incompatible with and unexplained by a diagnosis of FND. (*Id.*) Dr. Jeret emphasizes that out of the multitude of medical records filed in this case, only Dr. Leis and the providers at the Mayo Clinic questioned the possibility of FND. (*Id.* at 9.) He states that a diagnosis of FND should be based on positive examination features and not treated as a diagnosis of exclusion, noting that FND examinations should include inconsistences or incongruencies. (*Id.*) However, Dr. Jeret stresses that none of the appropriate diagnostic techniques were ever applied in this case, and none of the positive signs of FND were identified. (*Id.* (citing Alberto J. Espay et al., *Current Concepts in Diagnosis and Treatment of Functional Neurological Disorders*, 75 JAMA 1132 (2018) (Ex. 87, p. 3)).) Furthermore, Dr. Jeret highlights that the Mayo Clinic neuropsychologist concluded

[21] Specifically, Dr. Jeret lists the following providers: Dr. Cannon, Dr. Uschmann, Dr. Auchus, Dr. Villacorta, Dr. Cullom, Dr. Veda, Dr. Saligram, Dr. Anderson, Dr. Abuzeid, Dr. Cheng, Dr. Folefack, Dr. Dhawan, and Dr. Phan. (Ex. 76, pp. 10-11; *see also* Ex. 113, p. 2.)

that petitioner did not present with any of the predisposing factors for the development of FND. (*Id.* at 9, 12.) He explains that treatments for FND include education, cognitive therapy, neuro physiotherapy, and focusing on reducing confounding factors, noting that psychological therapy is the current treatment of choice. (*Id.* at 9.) In that regard, he states the following:

> If a doctor truly believed in the diagnosis of FND, it would be incumbent upon that treater to initiate one of the recommended therapies or [] refer her to a psychiatrist. That was not the case here. Clearly, doctors were not certain about an FND diagnosis, given the wording of their charts, "working diagnosis," and the fact that they did not refer [petitioner] to the proper treatment options for FND.

(*Id.* (footnote omitted).) Accordingly, Dr. Jeret concludes that the diagnosis of FND "has not been proven with any of the provocative (positive) tests outlined in the literature" nor was any specific action or treatment undertaken to address a possible FND diagnosis. (*Id.* at 12.)

However, Dr. Jeret also states that petitioner could have both TM and FND, stressing that the two concomitant diagnoses are not mutually exclusive. (Ex. 76, p. 10.) He appears to suggest that it is possible that petitioner initially suffered from TM in January of 2018 and then developed FND secondary to the myelitis, with FND being the cause of her subsequent relapses. (*Id.* at 9-10.) Dr. Jeret states that this clinical presentation would explain petitioner's "subsequent repeatedly negative imaging and CSF." (*Id.* at 10.) Even if this is the case, Dr. Jeret opines that petitioner's FND was due to "real" TM. (*Id.*) Therefore, he argues that finding that petitioner suffered FND does not preclude a diagnosis of TM. (*Id.* at 9-11, 12.)

In sum, Dr. Jeret opines that petitioner suffered TM in January of 2018 when she developed sensory loss and weakness, which are symptoms indicative of myelopathy. (Ex. 76, p. 12.) He contends that petitioner's normal MR imaging is not dispositive of diagnosis, given the delay and suboptimal quality of petitioner's first MRI. (*Id.*) Moreover, Dr. Jeret stresses that petitioner also had objective physical exam findings, including an abnormal SSEP, which supports a diagnosis of TM and cannot be explained by FND. (*Id.*)

**b. Dr. Price's[22] Initial Report (Exhibit C)**

Dr. Price explains that TM is a heterogeneous inflammatory disease characterized by acute or subacute spinal cord dysfunction resulting in weakness, sensory deficits, and autonomic impairment presenting in regions of the body below the injured area of the spinal cord. (Ex. C, p. 15 (citing Shin C. Beh et al., *Transverse Myelitis*, 31 NEUROLOGIC CLINICS 79 (2013) (Ex. C, Tab 1)).) Individuals with TM present with a defined sensory level, which represents the point below which sensation to pinprick or temperature is diminished or absent. (*Id.*) "When the maximal level of deficit is reached, approximately 50% of patients have lost all movements of their legs, virtually all patients have bladder dysfunction, and 80 to 94% of patients have numbness, paresthesias, or band-like dysesthesias." (*Id.* (quoting TM Consortium, *supra*, at Ex. 99, p. 1).)

Dr. Price discusses the diagnostic criteria for idiopathic acute TM formulated by the Transverse Myelitis Consortium Working Group in 2002, which are the same diagnostic criteria outlined by Dr. Jeret. (Ex. C, p. 15 (discussing TM Consortium, *supra*, at Ex. 99).) He explains that a diagnosis of idiopathic acute TM requires satisfaction of all inclusion criteria, as well as the absence of all exclusion criteria. (*Id.* (discussing TM Consortium, *supra*, at Ex. 99, p. 2).)

Based on his review of the medical records, Dr. Price notes that petitioner's symptoms first presented around January 7, 2018, when she developed worsening numbness, weakness, and heaviness in her lower extremities that progressed to the point where she could no longer ambulate independently. (Ex. C, p. 15 (citing Ex. 8, p. 233).) He acknowledges that, based on petitioner's symptoms at the time, it was reasonable for her treating providers to include myelopathy in the differential. (*Id.* at 15-16.) However, Dr. Price highlights that when petitioner was examined by neurology on January 10, 2018, Dr. Uschmann documented that petitioner had experienced one episode of vertigo and nausea in addition to her worsening numbness and weakness. (*Id.* at 16 (citing Ex. 8, p. 272).) He further characterizes vertigo as an intermittent symptom for petitioner in January of 2018, noting that Dr. Villacorta documented a subsequent episode on January 29, 2018. (*Id.* (citing Ex. 5, p. 840).) Dr. Price explains that vertigo would be atypical in a patient with myelopathy, given that vertigo is most commonly localized to dysfunction of the vestibulocochlear cranial nerve at the

[22] Dr. Raymond Stephen Price received his medical degree from the University of Pennsylvania in 2004, before going on to complete an internship in internal medicine, a residency in neurology, and a fellowship in clinical neurophysiology with a neuromuscular focus at the University of Pennsylvania. (Ex. D, p. 1.) He is board certified in neurology with added qualifications in neuromuscular medicine, and he maintains an active medical license in Pennsylvania. (*Id.* at 2; Ex. C, p. 2.) He currently works as an associate professor in Clinical Neurology at the University of Pennsylvania School of Medicine, and as both the Neurology Residency Director and the Neurohospital Division Co-Director in the Department of Neurology at the University of Pennsylvania. (Ex. D, pp. 1-2.) He has published 16 peer-reviewed research articles and reviews; 15 editorials, reviews, and chapters; and one non-peer reviewed publications. (*Id.* at 14-17.) Additionally, he has "cared for hundreds of patients with myelopathies, including transverse myelitis, multiple sclerosis, neuromyelitis spectrum disorder, and MOG-associated disorders, and hundreds of patients with functional neurological disorders." (Ex. C, p. 2.)

pontomedullary junction of the brainstem or the cerebellum. (*Id.*) Assuming that petitioner's vertigo and worsening numbness and weakness were caused by a single process, Dr. Price contends that it was no longer reasonable for petitioner's treating providers to suspect myelopathy, noting that a brainstem lesion would be the most likely explanation.[23] (*Id.*) He stresses that petitioner's vertigo was the first of a multitude of symptoms reported by petitioner during her clinical course inconsistent with a diagnosis of TM. (*Id.*) Additionally, Dr. Price emphasizes that bladder or bowel issues were not a feature of petitioner's clinical presentation in January of 2018, which is highly atypical for TM given that "virtually all transverse myelitis patients" experience bladder dysfunction. (*Id.* at 18 (citing TM Consortium, *supra*, at Ex. 99, p. 1).)

Even if petitioner's reported vertigo is ignored, Dr. Price asserts that petitioner does not satisfy all of the inclusionary criteria required to support a diagnosis of TM. (Ex. C, p. 16.) In particular, he emphasizes that there was no evidence of inflammation within the spinal cord by CSF pleocytosis or elevated IgG index or gadolinium enhancement. (*Id.*) Although he recognizes that petitioner's occipital nerve stimulator obstructed her ability to undergo MR imaging during her initial hospitalization in January of 2018, Dr. Price maintains that this complicating factor did not preclude petitioner from satisfying the inclusionary criteria. (*Id.*) Rather, he points out that the criterion for evidence of spinal cord inflammation can also be met by on CSF studies via pleocytosis or elevated IgG index. (*Id.*) In that regard, Dr. Price notes that petitioner underwent a lumbar puncture on January 9, 2018, and CSF analysis revealed no evidence of spinal cord inflammation. (*Id.* (citing Ex. 8, p. 239).) Accordingly, Dr. Price opines that petitioner's presentation in January of 2018 fails to meet all of the required inclusionary criteria to make a diagnosis of TM. (*Id.*)

Dr. Price recognizes that in formulating the diagnostic criteria, the TM Consortium Working Group specifically acknowledged potential situations where spinal cord inflammation could not be demonstrated. (Ex. C, pp. 16-17 (discussing TM Consortium, *supra*, at Ex. 99, p. 3).) He notes that, in addressing the limitations of the proposed criteria, the authors state the following:

> There may be cases that fulfill all of the proposed criteria with the exception of objective documentation of inflammation within the spinal cord. Thus, a situation in which spinal MRI shows an appropriately located high signal intensity lesion on T2-weighted sequences but no clear-cut enhancement of the abnormality following gadolinium administration could be envisioned. If the CSF were normal, then a diagnosis of [acute transverse myelitis ("ATM")] would not be possible under the proposed criteria. Further, the clinical findings present in such an individual may not be consistent with a vascular myelopathy either. Nevertheless, labeling such a situation as "possible ATM" may be the best option at the moment.

[23] However, Dr. Price does concede that a multifocal process involving both the brainstem and spinal cord could cause vertigo in conjunction with numbness and weakness of the extremities. (Ex. C, p. 16.)

(*Id.* at 16-17 (quoting TM Consortium, *supra*, at Ex. 99, p. 3).) Dr. Price stresses that after petitioner's occipital nerve stimulator was removed on February 22, 2018, she had repeated normal MR imaging of the cervical and thoracic spine with contrast on March 8, 2018 (citing Ex. 14, p. 12); April 11, 2018 (citing Ex. 8, pp. 900-01); August 29, 2018 (citing Ex. 16, pp. 28-31); October 18, 2018 (citing Ex. 16, pp. 33-34); February 9, 2019 (citing Ex. 10, pp. 1284, 1288); and October 7, 2020 (citing Ex. 12, p. 64). (*Id.* at 17.) Therefore, he maintains that a diagnosis of possible TM is not appropriate in this case because petitioner never had evidence of a lesion in her spinal cord, despite repeated MR imaging throughout her clinical course. (*Id.*)

Dr. Price finds Dr. Jeret's reliance on the case report by Mamootil & Grewal to explain petitioner's repeatedly normal MR imaging unpersuasive for several reasons. (Ex. C, p. 17.) Most critically, Dr. Price stresses that "there is a significant difference between a normal spinal cord MRI with no lesions, as is the case for [petitioner], and improved but still present thoracic cord lesion and a near-complete (thus still not normal) cervical spinal cord lesion as in the case report." (*Id.* (discussing Mamootil & Grewal, *supra*, at Ex. 94).) Additionally, he emphasizes that the case report demonstrated a clinical correlation with MRI improvement and clinical improvement, noting that the patient experienced improvement in her strength and sensory symptoms by the time of her second MRI. (*Id.* (discussing Mamootil & Grewal, *supra*, at Ex. 94, p. 6).) In contrast, petitioner underwent several rounds of repeat MR imaging of her cervical and thoracic spine during various hospitalizations for worsening symptoms, including numbness and weakness. (*Id.*) Therefore, Dr. Price maintains that there was no clinical correlation between petitioner's "profound" symptoms and her normal MR imaging. (*Id.*) He further notes that several treating neurologists acknowledged the prominent dissociation between petitioner's repeatedly normal MR imaging and her severe neurologic symptoms in formulating their evaluations, with Dr. Shah specifically documenting that "[i]t will be extremely unusual to have all these symptoms on normal imaging studies." (*Id.* (citing Ex. 10, p. 1180); *see also id.* at 22 (citing Ex. 13, p. 39; Ex. 12, p. 25).)

Dr. Price challenges the significance Dr. Jeret places on SSEP testing in resolving the issue of diagnosis in this case. (Ex. C, pp. 17-18.) First, he disputes Dr. Jeret's suggestion that an abnormal SSEP study should be included among the diagnostic inclusionary criteria for TM. (*Id.*) Specifically, he responds with the following:

> Upper and lower extremity SSEPs have the potential to identify abnormal dorsal column or brainstem sensory function as seen with myelopathies or brainstem lesions from any cause. There is nothing about an abnormal SSEP that would indicate that the lesion is inflammatory in nature, and thus consistent with a transverse myelitis, as opposed to any myelopathy or brainstem lesion. In this context, SSEPs would not be included in the diagnostic inclusion criteria for idiopathic transverse myelitis since abnormalities could be caused by non-inflammatory etiologies as well as simply a false positive test result. At best, an abnormal SSEP could be treated similarly to a non-enhancing T2 hyperintensity on MRI, without CSF

pleocytosis or elevated IgG index to allow for a diagnosis of possible transverse myelitis.

(*Id.*) Therefore, he disagrees with Dr. Jeret's opinion that abnormal SSEP testing can be relied on to make a definite diagnosis of TM. (*Id.*)

Furthermore, Dr. Price stresses that on February 7, 2018, approximately one month after the onset of symptoms, petitioner underwent evoked potential studies, which were normal and revealed no evidence of conduction abnormalities in the upper or lower limb somatosensory, brainstem, or visual pathways of the spinal cord or brain. (Ex. C, p. 18 (citing Ex. 5, p. 9).) He explains that Dr. Leis, the provider who performed the evoked potential testing, interpreted the findings as unsupportive of a diagnosis of TM. (*Id.* (citing Ex. 5, p. 9).) Moreover, Dr. Price emphasizes that petitioner was symptomatic at the time of testing, noting that she was experiencing persistent weakness and involuntary movements of her limbs. (*Id.* (citing Ex. 5, pp. 3-5).) Therefore, Dr. Price opines that in this context, and as with the repeat MR imaging of the spine beginning on March 8, 2018, there is no evidence to support a finding that petitioner developed myelopathy around the time of symptom onset in January of 2018. (*Id.*)

Dr. Price also notes that Dr. Jeret failed to acknowledge petitioner's normal evoked potential testing on February 7, 2018, and instead relied on petitioner's abnormal SSEP testing on November 11, 2020, which demonstrated a symmetric delay in the cervical region.[24] (Ex. C, p. 18.) He recognizes that following the evoked potential testing on November 11, 2020, one of petitioner's treating neurologists, Dr. Willis, documented an impression that it was possible petitioner's initial event was a myelitis based on her history and abnormal SSEP. (*Id.* at 22 (citing Ex. 12, p. 64).) However, Dr. Price states his disagreement with Dr. Willis's impression, reiterating that petitioner's normal SSEP studies on February 7, 2018 are incompatible with a conclusion that petitioner had myelitis in January of 2018. (*Id.*) Moreover, he stresses that Dr. Willis only stated that it was possible, not probable, that petitioner's initial event was a myelitis, and notes that Dr. Willis also documented that extensive evaluation revealed no evidence of an ongoing or potentially recurrent neurologic process. (*Id.* (citing Ex. 12, p. 64).) Dr. Price interprets petitioner's SSEP studies as demonstrating at most the possible development of a myelopathy sometime after February 7, 2018. (*Id.* at 18.) Accordingly, Dr. Price contends that the SSEP studies do not support Dr. Jeret's opinion that petitioner developed TM in January of 2018. (*Id.*)

In addition to vertigo, Dr. Price maintains that petitioner continued to experience other symptoms atypical for TM throughout her clinical course. (Ex. C, pp. 18-23.) For example, he highlights that when petitioner was evaluated by Dr. Leis on February 9, 2018, approximately one month after symptom onset, she presented with multiple features inconsistent with TM, including spells of coarse shaking and jerking involving

[24] In his report, Dr. Price misstates the date of petitioner's repeat evoked potential testing as October 28, 2020. (Ex. C, p. 18.) Review of the medical records indicates that petitioner underwent repeat evoked potential testing on November 11, 2020. (Ex. 109, p. 21.)

the lower and upper extremities asymmetrically, as well as non-physiologic, giveaway weakness. (*Id.* at 18-19 (citing Ex. 5, p. 3).) Additionally, Dr. Price notes that petitioner's development of coarse limb movements after her discharge from inpatient rehabilitation on January 31 fails to comport with the diagnostic criteria for idiopathic acute TM, which require reaching nadir by 21 days after symptom onset. (*Id.* (discussing TM Consortium, *supra*, at Ex. 99).) He also highlights multiple examples within the medical records of providers documenting petitioner's poor or variable effort and inconsistent performance on physical exam, which Dr. Price asserts is not indicative of TM. (*E.g.*, *id.* at 20, 22-23 (citing Ex. 8, pp. 827, 837 (documenting petitioner's poor effort on neurologic exam during her April of 2018 hospitalization)); Ex. 5, p. 296 (documenting petitioner demonstrating almost exaggerated effort to raise legs off bed while in rehabilitation); Ex. 10, p. 2739 (documenting that petitioner was voluntarily tremulous, was unable to move her arm despite motor exam revealing no real signs of paralysis, and that petitioner's apparent arm paralysis resolved while still in the ED)).)

Moreover, Dr. Price emphasizes that idiopathic TM is a monophasic illness. (Ex. C, p. 19.) Following her initial episode in January of 2018, petitioner experienced several relapses involving similar symptoms and requiring hospitalization. (*Id.* at 19-20.) He also asserts that, with subsequent relapses, petitioner experienced new symptoms inconsistent with TM, such as vision loss in her right eye in September of 2018. (*Id.*)

Dr. Price opines that the most likely diagnosis in this case is FND in the context of a broader somatic symptom disorder with involvement of the cardiopulmonary and ophthalmologic systems. (Ex. C, pp. 19-23.) He asserts that, throughout her clinical course, petitioner's physical evaluations demonstrate numerous findings consistent with a diagnosis of FND, including poor and inconsistent effort, pseudo and giveaway weakness, inconsistent performance, coarse limb movements of variable amplitude and frequency, and astasia-abasia. (*Id.*) Additionally, Dr. Price emphasizes that documentation in the medical records indicates that multiple treating providers felt petitioner's overall clinical presentation was most suggestive of FND or conversion disorder, including Dr. Leis and Dr. Collazo. (*Id.* at 19-20, 23.) Furthermore, Dr. Price disputes Dr. Jeret's contention that none of petitioner's treating providers recommended treatment for FND. He notes, for example, that Dr. Collazo referred petitioner for neuropsychological assessment, and petitioner was ultimately evaluated by Dr. Sabsevitz, a neuropsychologist. (*Id.* at 20 (citing Ex. 22, pp. 41-42).) Despite both Dr. Leis and Dr. Collazo suggesting a diagnosis of FND, Dr. Price highlights that petitioner continued to seek out additional medical opinions, which he maintains exemplifies behavioral tendencies consistent with somatic symptom disorder. (*Id.* at 22.)

Additionally, Dr. Price notes that petitioner's ophthalmologic evaluation at the Mayo Clinic for her vision loss in her right was unremarkable and atypical for optic neuritis. (Ex. C, pp. 20-21 (citing Ex. 22, p. 95).) He stresses that the neuropathologist documented that both petitioner's description of her episodic diplopia and her exam were consistent with convergence spasm. (*Id.* at 21 (citing Ex. 22, p. 95).) Dr. Price asserts that functional ophthalmologic or neurologic disease is the most common cause

of convergence spasm. (*Id.*) Therefore, Dr. Price opines that petitioner's eye symptoms constitute nonphysiological ophthalmologic disease and clinical dissociation in ophthalmology. (*Id.*) Moreover, Dr. Price highlights that petitioner had a recurrent history of unexplained chest pain often accompanied by shortness of breath dating back to 2013. (*Id.*) Despite repeated CT scans of the chest, a pharmacological stress test, and a pulmonary function test, petitioner's workup was unrevealing. (*Id.* (citing Ex. 8, pp. 12, 190, 734; Ex. 10, p. 2119; Ex. 15, p. 14).) Therefore, Dr. Price contends that

> [t]hese repeat episodes of cardiopulmonary symptoms, with repetitively normal diagnostic testing, is the same pattern as her neurologic symptoms and normal MRIs, and her vision loss and normal [occipital coherence tomography]. Given this extensive history of physical symptoms affecting numerous organ systems, including cardiac, pulmonary, ophthalmologic, and neurologic, somatic symptom disorder is [petitioner's] most likely diagnosis.

(*Id.*)

In sum, Dr. Price opines that petitioner's clinical presentation starting in January of 2018 is inconsistent with a diagnosis of TM. (Ex. C, p. 23.) He stresses that petitioner does not satisfy the diagnostic criteria for idiopathic TM as there was no evidence of inflammation in her CSF studies. (*Id.*) Additionally, petitioner's evoked potential testing on February 7, 2018[25] was normal and revealed no evidence of myelopathy. (*Id.*) Furthermore, although initially delayed, petitioner's repeat MR imaging was consistently normal and never revealed any evidence of myelopathy, despite persistent clinical symptoms of numbness and weakness. (*Id.*) Based on his review of the medical records, FND in the context of a broader somatic symptom disorder is the best supported diagnosis in this case. (*Id.*)

**c. Dr. Jeret's First Supplemental Report (Exhibit 113)**

In his supplemental report, Dr. Jeret reiterates his opinion that petitioner suffered from TM. (Ex. 113, p. 1.) While he agrees that motor strength testing requires patient cooperation and that weakness could reflect poor effort, Dr. Jeret emphasizes that the medical records document multiple objective physical examination findings that would not have been impacted by petitioner's effort, including hyperreflexia, positive Babinski response, and positive Hoffman sign. (*Id.* at 1-2.) Dr. Jeret argues that these findings are not "fake-able" and are objective evidence of a spinal cord abnormality. (*Id.* at 2.) He also stresses that hyperreflexia, positive Babinski response, and positive Hoffman sign are inconsistent with FND. (*Id.* at 1.) Moreover, Dr. Jeret argues that Dr. Price made no effort to offer another diagnostic interpretation of or explanation for these findings. (*Id.* at 1-3.) Therefore, Dr. Jeret opines that these involuntary and objective physical exam findings were most likely caused by petitioner's TM. (*Id.* at 2-3.)

[25] In his expert report, Dr. Price misstates the date of petitioner's initial evoked potential testing as February 9, 2018. (Ex. C, p. 23.) Review of the medical records indicates that petitioner underwent repeat evoked potential testing on February 7, 2018. (Ex. 5, p. 9.)

Additionally, Dr. Jeret further stresses the significance of SSEP testing for resolving the issue of diagnosis in this case. (Ex. 113, pp. 2-3.) He states that he agrees with Dr. Price's opinion that "an abnormality on SSEP is akin to a T2 hyperintesity on spine MRI and consistent with myelopathy/myelitis, although inadequate to prove inflammation." (*Id.* at 2.) Again, Dr. Jeret emphasizes that petitioner's evoked potential testing on November 11, 2020, revealed abnormal median SSEP bilaterally, which he contends is objective evidence that supports a diagnosis of TM. (*Id.* at 2-3.) He argues that Dr. Price discounted the results of this study simply because it was performed nearly three years after the onset of petitioner's TM. (*Id.* at 2.) However, he maintains that evoked potential abnormalities can persist for three years or longer, even after clinical recovery. (*Id.*) Moreover, Dr. Jeret opines that Dr. Price failed to appropriately appreciate Dr. Leis's opinion as the treating provider that "residual from possible transverse myelitis in 2018 may be causative." (*Id.* at 2-3.) He also addresses Dr. Price's argument that if petitioner did in fact develop a myelopathy, it occurred between February 7, 2018, and November 11, 2020, based on the findings of the respective evoked potential studies. (*Id.*) Specifically, Dr. Jeret responds that, "[a]lthough superficially his logic is sound, it would be very unlikely that [petitioner] suffered two bouts of TM. Occam's razor would argue against his explanation and in favor of mine." (*Id.* at 3.)

Dr. Jeret maintains that it is inappropriate to rule out a diagnosis of TM in this case based on the lack of MRI evidence when MR imaging could not be performed in a timely manner due to petitioner's occipital nerve stimulator. (Ex. 113, p. 3.) He reemphasizes that multiple contemporaneous treating providers diagnosed petitioner with TM and treated her accordingly. (*Id.* at 2-3.) Therefore, Dr. Jeret opines that "[w]hen the examinations and diagnosis by multiple physicians confirms TM and the SSEP is consistent with this—it is appropriate to make a diagnosis of TM." (*Id.* at 3.)

#### d. Dr. Price's Supplemental Report (Ex. F)

In his supplemental report, Dr. Price reiterates that petitioner's vertigo is inconsistent with a diagnosis of TM, noting Dr. Jeret's hypothesis that petitioner suffered TM in January of 2018 would require a second lesion outside of the spinal cord to explain petitioner's vertigo. (Ex. F, pp. 1-2.) He also reemphasizes his opinion that petitioner's overall clinical course is incompatible with a diagnosis of TM, given that TM is a monophasic illness. (*Id.* at 2.) Dr. Price emphasizes that petitioner suffered a series of relapses involving similar symptoms, and also developed new symptoms, such as vision loss of the right eye, during later relapses. (*Id.*) Therefore, Dr. Price asserts that petitioner's relapses demonstrate a non-monophasic course, and the subsequent development of new symptoms shows that petitioner did not reach nadir within 4 hours and 21 days, as required by the diagnostic criteria for idiopathic TM. (*Id.*) Furthermore, Dr. Price opines that petitioner's relapses and right vision loss meet the exclusion criteria. (*Id.*) Specifically, he states that the exclusion criteria for a diagnosis of idiopathic TM include MR imaging of the brain suggestive of MS or a history of clinically

apparent optic neuritis. (*Id.* (citing TM Consortium, *supra*, at Ex. 99, p. 2).) Thus, Dr. Price maintains the following:

> The only parsimonious medically plausible explanations for [petitioner's] presentation with relapses of limb weakness in 4/2018, 9/2018, and 3/2021, atypical symptoms such as coarse limb jerking in 2/2018, or symptoms not referrable to the spinal cord such as vertigo in 1/2018 or right vision loss in 9/2018 are somatoform symptom disorder alone, multiple sclerosis or a multiple sclerosis mimic, such as neuromyelitis optica spectrum disorder.

(*Id.*) Petitioner's evaluation for MS and testing for aquaporin-4 antibodies for NMO were negative. (*Id.*) Accordingly, Dr. Price reiterates that somatic symptom disorder is the most likely diagnosis in this case, and he further argues that Dr. Jeret's proposed diagnosis of isolated TM is not a neurologically plausible explanation for petitioner's clinical presentation. (*Id.* at 2-3, 11.)

Dr. Price contends that Dr. Jeret misrepresents petitioner's extensive medical records by concluding that multiple contemporaneous treating physicians diagnosed petitioner with TM and treated her accordingly. (Ex. F, pp. 3-6.) He asserts that Dr. Jeret selectively identified 13 physicians of different specialties and qualifications, with at least two being resident physicians in training. (*Id.* at 3.) Moreover, he argues that it is factually inaccurate to represent that these 13 treating physicians consistently diagnosed petitioner with and treated her for TM. (*Id.*) To support his contention, Dr. Price provides a non-comprehensive list of documentation in the medical records evidencing the diagnostic uncertainty, alternative diagnoses, and discontinuation of treatment for TM among the 13 treating physicians identified by Dr. Jeret. (*Id.* at 3-6.)

For example, he emphasizes that Dr. Villacorta's documentation demonstrates diagnostic uncertainty among petitioner's treating providers in January of 2018, noting that Dr. Villacorta documented that definitive diagnosis was limited due to the inability to obtain MR imaging. (Ex. F, pp. 3-4 (citing Ex. 5, pp. 825-30).) He stresses that, by April of 2018, Dr. Villacorta's documentation indicates that the opinions of petitioner's treating physicians had evolved to concern for a nonphysiologic neurologic disorder, such as somatic symptoms disorder or conversion disorder. (*Id.* at 3-4 (citing Ex. 5, pp. 296-339).) Several of the physicians identified by Dr. Jeret treated petitioner during her hospitalization in April of 2018. (*Id.* at 4-5.) Dr. Price notes that, while petitioner was initially treated with steroids, her steroid treatment was de-escalated and petitioner's request for IVIG or plasma exchange therapy were denied given that her workup, including repeat MR imaging and CSF studies, revealed no evidence of myelitis. (*Id.* (citing Ex. 8, pp. 781, 817-22, 840).) Additionally, Dr. Anderson questioned whether petitioner's symptoms were due to small fiber neuropathy and recommended petitioner undergo outpatient evaluation. (*Id.* (citing Ex. 8, p. 818).) Therefore, Dr. Price maintains that Dr. Jeret's contention that 13 treating physicians repeatedly diagnosed petitioner with TM and treated her accordingly is a mischaracterization of the medical records. (*Id.* at 3-6.)

Furthermore, Dr. Price explains that petitioner was evaluated by numerous treating physicians beyond the list provided by Dr. Jeret. (Ex. F, pp. 6-8.) He asserts that many of these treating providers, including multiple neurologists, did not document a definitive diagnosis of TM. (*Id.*) For example, based on his evaluation of petitioner in February of 2018, Dr. Leis documented that petitioner's clinical presentation, including coarse limb movements, was most suggestive of conversion disorder. (*Id.* at 6-7 (citing Ex. 5, p. 3).) Additionally, Dr. Collazo documented that the differential for petitioner's clinical presentation included FND while also noting that a neuromuscular disorder or atypical migraine could not be ruled out. (*Id.* at 7 (citing Ex. 22, pp. 41-42).) However, Dr. Collazo's assessment included no mention of TM. (*Id.*) Moreover, when questioned by petitioner for clarification regarding her diagnosis, Dr. Blair responded that "There is no imaging that supports a diagnosis of transverse myelitis. Dr. Okuda has not made a diagnosis of transverse myelitis or multiple sclerosis. The Mayo Clinic is [sic] not made a diagnosis of transverse myelitis or multiple sclerosis. She does have a mild peripheral neuropathy." (*Id.* at 7-8 (citing Ex. 13, p. 39).) Dr. Price argues that Dr. Jeret failed to address the discordant neurology opinions including throughout petitioner's medical record, which cast doubt on a definitive diagnosis of TM. (*Id.* at 6-8.)

Additionally, Dr. Price addresses Dr. Jeret's contention that petitioner had objective physical exam findings, which are not impacted by effort and, thus, inconsistent with FND. (Ex. F, pp. 9-11.) He explains that reflexes are assessed using the following grading scale: 0 (absent); 1+ (hyporeflexia); 2+ (normal); 3+ (hyperreflexia); and 4+ (hyperreflexia with unstained or sustained clonus). (*Id.* at 9.) While hyperreflexia with sustained clonus is "definitively pathologic" as a result of disinhibition of the corticospinal tract, Dr. Price emphasizes that symmetric hyperreflexia without sustained clonus is not always an abnormal finding, noting that such a presentation is "quite common" in younger women. (*Id.* at 9-10.) Therefore, Dr. Price contends that Dr. Jeret's references to petitioner's symmetric hyperreflexia on physical exam does not, by itself, imply that such findings are pathological. (*Id.* at 10.) Moreover, Dr. Price reiterates that petitioner was adequately evaluated for her hyperreflexia with multiple MRIs of her cervical and thoracic spine, which revealed no evidence of spinal cord pathology. (*Id.*) Additionally, he notes that SSEP testing assesses dorsal column sensory function not corticospinal tract function. (*Id.*) Thus, abnormal SSEP testing would not explain hyperreflexia. (*Id.*) Accordingly, Dr. Price opines that the most likely explanation for petitioner's symmetric hyperreflexia is that it constitutes a normal, non-pathologic presentation. (*Id.*)

He acknowledges that Dr. Jeret identified three instances of a finding of a positive Babinski response. (Ex. F, p. 10.) However, Dr. Price stresses that there are innumerable neurological examinations performed on petitioner that documented a finding of an absent or negative Babinski sign (downgoing plantar response) or uncertainty regarding the Babinski response (equivocal plantar response) interspersed with the examinations selectively identified by Dr. Jeret. (*Id.*) He criticizes Dr. Jeret for only addressing the examinations that support his opinion, while ignoring the multitude of other examinations. (*Id.*) In that regard, Dr. Price provides a non-comprehensive list of examples of the variability in different providers' interpretations of petitioner's plantar

response. (*Id.* at 10-11.) He explains that the discrepancy in neurological examination is an example of poor intra-rater and inter-rater reliability of the physical exam. (*Id.* at 10.) Testing for a Babinski response, which involves applying a noxious stimulus to the outer aspect of the sole of the foot with a stereotyped extension of the great toe representing a positive Babinski sign, can be difficult to assess for patients who are sensitive to stimuli applied to the foot, leading them to withdraw their foot and extend their toes. (*Id.*) Accordingly, Dr. Price indicates that it is not uncommon for there to be variability in how different providers interpret testing for a Babinski response. (*Id.*)

Dr. Price continues to assert that FND in the context of a broader somatoform symptom disorder is the most likely diagnosis in this case. (Ex. F, pp. 8-9, 11-12.) He reemphasizes that his opinion is consistent with the assessment of multiple treating providers. (*Id.* at 8-9, 11.) Additionally, he clarifies that his conclusion that petitioner has FND/somatoform symptom disorder does not imply that he believes petitioner was faking her symptoms. (*Id.* at 11.) To the contrary, Dr. Price states that the symptoms experienced by individuals with a somatoform symptom disorder are real manifestations of psychologic stressors. (*Id.*)

#### e. Dr. Jeret's Second Supplemental Report (Exhibit 149)

In his final report, Dr. Jeret stresses that FND and TM are not mutually exclusive conditions. (Ex. 149, pp. 1-2.) Therefore, he argues that even if petitioner had FND, such a finding does not preclude the possibility that petitioner also suffered from TM. (*Id.*) He also reemphasizes petitioner's abnormal SSEP study on November 11, 2020, which Dr. Jeret contends confirms the presence of a spinal cord lesion, consistent with TM. (*Id.* at 2.)

Dr. Jeret indicates that petitioner's recurring episodes of weakness, as well as her course limb jerking, could be explained by FND. (Ex. 149, p. 2.) However, Dr. Jeret reemphasizes petitioner's "repeatedly-abnormal objective findings" on physical exam, which he contends cannot be explained by FND and are crucial to diagnosis in this case. (*Id.* at 1-2.) Although he agrees with Dr. Price's opinion that some young women present with nonpathological hyperreflexia (3+ reflexes), Dr. Jeret maintains that such a finding may be pathologic in some cases. (*Id.* at 1.) Moreover, he opines that if a plantar response is normal (downgoing) on one side and equivocal on the other, the equivocal side is viewed as abnormal and indicative of a disorder impacting the CNS. (*Id.*) While he suggests that it is not uncommon in practice to see cloned and templated neurology exams that include countless normal findings, such as normal 2+ reflexes, which were never examined, Dr. Jeret argues that findings of 3+ reflexes and a positive Babinski sign would never be cloned or part of a normal physical exam template carried over from one assessment to the next. (*Id.*) Accordingly, Dr. Jeret opines that such findings "carry more weight and believability." (*Id.* at 1-2.) Furthermore, Dr. Jeret contends that petitioner's treating providers offered no diagnosis other than TM to explain these objective findings, nor has Dr. Price offered any explanation for these abnormal findings. (*Id.* at 2.)

In response to Dr. Price's list of providers who did not diagnose petitioner with TM and/or referred petitioner to a non-physician mental health professional, Dr. Jeret argues that none of those physicians addressed petitioner's objective, abnormal exam findings. (Ex. 149, p. 2.) Furthermore, Dr. Jeret argues that FND resulting in multiple hospitalizations requires the care of a psychiatrist. (*Id.*) In this case, petitioner was never referred to a psychiatrist nor is there any record confirming Dr. Price's favored diagnosis of FND. (*Id.* at 1-2.)

## V. Analysis

Petitioner's burden of proof in a cause-in-fact claim is ultimately to meet the three-part *Althen* test. 418 F.3d at 1278. However, before reaching that analysis, it is first appropriate to determine whether petitioner has preponderantly demonstrated that she suffers TM as alleged. *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2011); *Lombardi v. Sec'y of Health & Human Servs*., 656 F.3d 1343, 1353 (Fed. Cir. 2011).

### a. It is appropriate to determine as a threshold matter whether petitioner suffered TM

Petitioner asserts that she has preponderantly demonstrated that she suffered TM, based on both the treating physicians' "firm" diagnosis of TM, as well as her expert's opinion. (ECF No. 74, p. 32.) However, she argues that it would be inappropriate to treat diagnosis as a threshold issue, impeding consideration of her expert's opinion under *Althen*, because this case does not present a diagnostic "dilemma" given that there is both expert and medical record support for her proposed diagnosis. (*Id*. at 33.) This is not persuasive. The fact that there is some evidence of record to support petitioner's allegation is not the point. As respondent explains extensively in his motion response, the very presence of any TM is contested. (ECF No. 83, pp. 27-50.)

Petitioner focuses on *Broekelschen*, 618 F.3d at 1346, to suggest that diagnosis becomes a threshold issue only where two competing diagnoses are at issue. (ECF No. 74, p. 33.) However, although petitioner is correct that *Broekelschen* itself involved two competing diagnoses, nothing in the reasoning of the Federal Circuit's analysis limits its application to such a scenario. The Circuit concluded that, because an *Althen* analysis is "decided relative to the injury," it is appropriate for a special master to resolve a disputed diagnosis prior to engaging in an *Althen* analysis if the evidence on causation is dependent upon the diagnosis. *Broekelschen*, 618 F.3d at 1346. Thus, as respondent observes, the Federal Circuit subsequently cited *Broekelschen* for the proposition that, where qualified medical experts disagree, the special master may "first determine what injury, *if any*, was supported by the evidence presented in the record before applying the *Althen* test to determine causation." *Lombardi*, 656 F.3d at 1352-53 (emphasis added). Later, in *Lasnetski v. Secretary of Health & Human Services*, the Federal Circuit confirmed that *Lombardi* and *Broekelschen* support the proposition that "'identification of a petitioner's injury is a *prerequisite* to an *Althen* analysis of causation'

and thus 'in the absence of a showing of the very existence of *any specific injury* of which the petitioner complains, the *question of causation is not reached*.'" 696 F. App'x 497, 507 (Fed. Cir. 2017) (quoting *Lombardi*, 656 F.3d at 1352-53) (citing *Broekelschen*, 618 F.3d at 1349).)

Here, the theory that Dr. Akbari presented on petitioner's behalf purports to explain how a flu vaccine can cause TM specifically, Dr. Jeret's medical opinion asserting petitioner's condition was vaccine-caused was likewise premised on TM, and petitioner's petition and motion for a ruling on the written record do not allege any vaccine-caused injury other than TM. Accordingly, if respondent is persuasive in contending that the fact of petitioner's alleged TM is not preponderantly demonstrated, which for the reasons discussed below he is, then an *Althen* analysis based on TM would be entirely hypothetical. And that remains true regardless of whether the evidence otherwise preponderates in favor of any other diagnosis for petitioner's condition.

It is important to note that "the function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record evidence as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner's] injury.'" *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009) (quoting *Knudsen v. Sec'y of Health & Human Servs*., 35 F.3d 543, 549 (Fed. Cir. 1994)). A special master does err if a threshold inquiry into diagnosis results in relevant causal evidence being disregarded. *Contreras v. Sec'y of Health & Human Servs.*, 844 F.3d 1363, 1368 (Fed. Cir. 2017). For example, in *Contreras*, the special master erred by concluding that the petitioner suffered TM but not GBS and then conducting an *Althen* analysis based only on TM when the parties' experts did not disagree that petitioner suffered both TM and GBS. *Id.* at 1366, 1368-69. Similarly, the *Broekelschen* Court likewise distinguished that case from a situation where two disputed diagnoses were variants of the same disorder. 618 F.3d at 1346 (citing *Kelley v. Sec'y of Health & Human Servs*., 68 Fed. Cl. 84, 100-01 (2005)). Thus, I stress that, unlike *Contreras*, respondent's expert has clearly placed the existence of any TM lesion and the underlying etiology of her clinical presentation at issue. And, unlike *Kelley*, the issue is not whether petitioner suffered some variant of TM, but rather whether the condition was present *at all*.

Therefore, even if petitioner was successful in demonstrating under *Althen* prong one that the flu vaccine can cause TM, and even if she was further successful in contending that the onset of her condition coincided with an appropriate temporal relationship pursuant to her theory, her inability to preponderantly demonstrate the presence of an inflammatory spinal lesion consistent with TM would still be fatal to her case under *Althen* prong two for all the same reasons discussed herein. *E.g.*, *Hibbard v. Sec'y of Health & Human Servs*., 698 F.3d 1355, 1365 (Fed. Cir. 2012) (explaining that "[g]iven that Ms. Hibbard had to show both the medical plausibility of her theory of causation and that she suffered an injury consistent with that theory of causation, there was no reason to require the special master to address the first question when the

answer to that question could have no possible effect on the outcome of the case."). The Federal Circuit has stressed that *Althen* prong two "is not without meaning" and that

> [t]here may well be a circumstance where it is found that a vaccine can cause the injury at issue and where the injury was temporally proximate to the vaccination, but it is illogical to conclude that the injury actually caused by the vaccine. A claimant could satisfy the first and third prongs [of *Althen*] without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury, or where the probability of coincidence or another cause prevents the claimant from proving that the vaccine caused the injury by preponderant evidence.

*Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1327 (Fed. Cir. 2006). Afterall, the *Althen* court explained that "[a]lthough probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation." *Althen*, 418 F.3d at 1278 (citing *Grant*, 956 F.2d at 1149).

Thus, although I have discussed the absence of evidence supporting an inflammatory spinal lesion as a threshold issue of whether any injury was present at all, the same result would follow if the same issue was instead addressed under *Althen* prong two, because all of the causal opinions that petitioner argues as supportive of her case are premised on the presence of such a lesion, which is not ultimately preponderantly supported. *Accord Baldwin v. Sec'y of Health & Human Servs*., 151 Fed. Cl. 431, 447 (2020) (citing *Broekelschen*, 618 F.3d at 1339, for the proposition that under *Althen* prong two a petitioner is "required to prove by a preponderance of the evidence that one of her expert's theories actually occurred"); *see also Dobrydnev v. Sec'y of Health & Human Servs.,* 566 F. App'x 976, 982-83 (Fed. Cir. 2014) (holding that the special master was correct in noting that "[w]hen an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion" (alteration in original) (quoting *Dobrydneva v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2010 WL 8106881, at *9 n.12 (Fed. Cl. Spec. Mstr. Oct. 27, 2010), *rev'd*, 98 Fed. Cl. 190 (2011), *rev'd sub nom. Dobrydnev v. Sec'y of Health & Human Servs.*, 566 F. App'x 976 (Fed. Cir. 2014)) (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 242 (1993))); *Bushnell v. Sec'y of Health & Human Servs.*, No. 02-1648V, 2015 WL 4099824, at *12 (Fed. Cl. Spec. Mstr. June 12, 2015) (finding that "because Dr. Marks' opinion is based on a false assumption regarding the onset of J.R.B.'s condition, and the incorrect assumption of a 'stepwise regression' after each vaccine administration, it should not be credited").

**b. The evidence of record does not preponderate in favor of a finding that petitioner suffered TM**

i. <u>The objective evidence does not support a diagnosis of TM</u>

*1. There is no contemporaneous objective evidence of a spinal cord lesion of any kind despite significant testing*

Petitioner had her first MRI of the cervical and thoracic spine on March 8, 2018, which was normal. (Ex. 14, pp. 69-70.) An initial MRI that is negative does not definitively rule out TM as a possible diagnosis; however, the proposed diagnostic criteria instruct providers to repeat MR imaging. (TM Consortium, *supra*, at Ex. 99, p. 2.) Between April of 2018 and March of 2023, petitioner underwent extensive repeat MR imaging of the spine, which remained negative. (*See* Ex. 8, pp. 900-01 (April 11, 2018 MRI of cervical and thoracic spine); Ex. 16, pp. 28-31 (August 29, 2018 MRI of cervical and thoracic spine); *id.* at 32-35 (October 18, 2018 MRI of cervical and thoracic spine); Ex. 10, p. 1284 (February 9, 2019 MRI of cervical spine); *id.* at 1288 (February 10, 2019 MRI of thoracic spine); Ex. 18, pp. 32-33 (October 7, 2020 MRI of cervical and lumbar spine); Ex. 158, p. 470 (March 6, 2023 MRI of cervical spine).) Accordingly, petitioner had no evidence of a detectable spinal cord lesion on MRI, despite several rounds of repeat testing.

Dr. Jeret opined that the MR imaging was performed too late in petitioner's clinical course to be informative, stressing that the first MRI was performed about four and a half months after symptom onset. (Ex. 76, p. 8.) As an initial point, Dr. Jeret overstates the delay in imaging as petitioner's first MRI was performed on March 8, 2018, approximately two months post-onset. (*See* Ex. 14, pp. 69-70.) More critically, Dr. Jeret's argument might have been compelling if the only issue was a lack of enhancement of the spinal cord lesion on MRI. However, a lack of enhancement is not the same as the complete absence of a lesion. In order to be persuasive, Dr. Jeret would have needed to convincingly address how petitioner's ongoing clinical course was consistent with the resolution of the TM lesion, but he has not done that here. Indeed, petitioner's initial MRI of March 8, 2018 was performed because petitioner remained symptomatic at that time and her treating providers felt that there was still a continued need to investigate her ongoing condition. (*See, e.g.*, Ex. 8, pp. 696-97 (Dr. Duckworth documenting that petitioner reported feeling extremely weak at encounter on February 5, 2018, and noting that the plan was for petitioner to undergo an MRI to evaluate for possible MS or NMO); Ex. 6, p. 3 (Dr. Cullom documenting that petitioner's treating neurologist was anxious to get an MRI scan to try and nail down petitioner's diagnosis at petitioner's encounter on February 13, 2018); Ex. 14, pp. 9-11 (petitioner complaining of numbness in her feet and involuntary movements in her lower extremities at her February 27, 2018 encounter with Dr. Veda).) In his attempt to downplay the significance of petitioner's repeatedly normal MR imaging, Dr. Jeret cited

a single case report by Mamootil & Grewal. (Ex. 76, p. 8 (citing Mamootil & Grewal, *supra*, at Ex. 94).) However, this case report is not helpful on this issue.[26]

Dr. Jeret also cited petitioner's abnormal SSEP study of November 11, 2020, as objective evidence supporting a diagnosis of TM. (Ex. 76, pp. 2-9; Ex. 113, pp. 2-3; Ex. 149, p. 2.) Specifically, he suggested that petitioner's abnormal SSEP study confirmed a spinal cord lesion. (Ex. 149, p. 2.) Dr. Jeret contended that this evidence should not be discounted merely because testing occurred nearly three years after symptom onset, given that SSEP abnormalities can persist for three years or longer. (Ex. 113, p. 2.) He further opined that SSEP testing is "the more accurate test to diagnose acute TM" (Ex. 76, p. 4) and suggested that evoked potential testing is more sensitive to spinal cord abnormalities than MRI (*Id.* at 6). Therefore, Dr. Jeret asserted that the lack of evidence of a spinal cord lesion on MRI should not be dispositive of diagnosis in this case. (*Id.* at 7-9.)

However, Dr. Jeret's reliance on petitioner's abnormal SSEP study as confirming a diagnosis of TM is unpersuasive. Petitioner's initial evoked potential study, inclusive of SSEP testing, performed on February 7, 2018, was normal. (Ex. 5, p. 9.) Given Dr. Jeret's argument that SSEP is more sensitive to abnormalities than MRI and, thus, the most accurate test to diagnosis TM, it is difficult to understand why these results should be disregarded. Dr. Jeret has not adequately explained why the results of petitioner's SSEP study on November 11, 2020, performed nearly three years post-onset, should be favored over the results of her SSEP testing performed approximately one month after symptom onset. In fact, I do not see any effort on Dr. Jeret's part to reconcile the results of petitioner's initial SSEP study with his overall assessment. Therefore, accepting *arguendo* the significance Dr. Jeret attributes to SSEP testing in confirming a diagnosis of TM, petitioner's initial SSEP results favor a finding that petitioner did not suffer TM in January of 2018.[27]

---

[26] In Mamootil & Grewal, the patient's initial MRI revealed a longitudinally extensive enhancing lesion. (Mamootil & Grewal, *supra*, at Ex. 94, pp. 2, 5.) When repeat imaging was performed eight days later after the conclusion of treatment with IV steroids and plasma exchange therapy, the MRI showed "nearly complete resolution" of the signal abnormality at the C7 level and "significantly improved" signal abnormality in the thoracic spine. (*Id.* at 5-6.) At the time of repeat imaging, the patient had experienced improvement in her symptoms, demonstrating equal strength in her lower extremities and resolution of her sensory symptoms. (*Id.* at 6.) In contrast, as stated above, petitioner never had evidence of a lesion on MRI, despite repeated evaluation. Moreover, the near complete resolution and significant improvement of a lesion is not equivalent to the complete absence of a lesion. Therefore, this case report is of little to no relevance in explaining petitioner's repeatedly normal MR imaging.

[27] Considering the results of both studies and assuming that there was no false positive or false negative result, Dr. Price interpreted the SSEP studies as demonstrating the possible development of a myelopathy after February 7, 2018, but before November 11, 2020. (Ex. C, p. 18.) While Dr. Jeret conceded that Dr. Price's logic is superficially sound, he countered that, per Occam's razor, it would be highly unlikely that petitioner suffered two bouts of TM. (Ex. 113, p. 3.) Thus, he asserted that Occam's razor would argue against Dr. Price's explanation, and in favor of his. (*Id.*) However, the fact that two bouts of TM would be highly unlikely begs the very question of whether an initial TM in January of 2018 even existed in the first place.

Given the above, I find Dr. Jeret's dismissal of petitioner's normal MRI results and his reliance on petitioner's much later abnormal SSEP study to evidence a TM beginning in January of 2018 wholly unpersuasive. Accordingly, there is no contemporaneous evidence in this case of a spinal cord lesion of any kind, either on MR imaging or evoked potential testing, at any time around the onset of petitioner's condition.

*2. Even if there was a spinal cord lesion, there is no evidence it was inflammatory*

Given that none of petitioner's MRI studies revealed any evidence of a spinal cord lesion of any kind, there necessarily is also no evidence of enhancement. (*See* Ex. 14, pp. 69-70; Ex. 8, pp. 900-01; Ex. 16, pp. 28-35; Ex. 10, p. 1284, 1288; Ex. 18, pp. 32-33; Ex. 158, p. 470.) Additionally, petitioner's initial CSF analysis and repeat CSF testing were negative. (*See, e.g.*, Ex. 8, pp. 275, 280, 295, 754-56, 792, 817; Ex. 10, pp. 61, 118.) Therefore, petitioner cannot satisfy the diagnostic inclusion criteria requiring evidence of inflammation within the spinal cord, despite repeat evaluation. (TM Consortium, *supra*, at Ex. 99, p. 2.)

Dr. Jeret recognized that petitioner cannot satisfy the inclusion criteria requiring evidence of spinal cord inflammation. (Ex. 76, p. 8.) However, he argued that not including abnormal SSEP testing among the inclusion criteria was a likely oversight and further opined that, if petitioner's abnormal SSEP study is considered, "the diagnosis of TM is definite." (*Id.*) There are several issues with Dr. Jeret's contention. First, as stated above, petitioner's SSEP abnormality was not detected until almost three years after the onset of petitioner's symptoms. (Ex. 109, p. 21.) Therefore, even assuming that an abnormal SSEP study confirms the presence of a spinal cord lesion, there was no contemporaneous evidence of a spinal cord lesion at the time of symptom onset. Moreover, both Dr. Price and Dr. Jeret agree that SSEP testing cannot detect inflammation. (Ex. C, p. 18; Ex. 113, p. 2.) Accordingly, petitioner's abnormal SSEP does not resolve the issue of a complete lack of spinal cord inflammation in this case. To the extent that Dr. Jeret suggests that an individual can satisfy the proposed diagnostic criteria with an abnormal SSEP despite normal MR imaging and CSF analysis, this is not credible given his concession that SSEP testing is inadequate to determine whether a spinal cord process is inflammatory.[28]

[28] In a prior case, the undersigned concluded that the petitioner preponderantly demonstrated the presence of TM despite the fact that he did not satisfy the diagnostic criteria given that there was no objective evidence of inflammation. *Moore v. Sec'y of Health & Human Servs.*, No. 19-1904V, 2026 WL 2322449, at *22-25 (Fed. Cl. Spec. Mstr. July 14, 2026). However, the instant case is distinguishable. In *Moore*, while there was no evidence of enhancement on MRI and the petitioner's CSF analysis was normal, MR imaging did confirm the presence of a spinal cord lesion. *Id.* at *23. Additionally, the petitioner's clinical course was monophasic, which is consistent with a diagnosis of acute TM; the differential diagnoses were limited to conditions that would be caused by a spinal cord lesion; and his treating providers favored a diagnosis of TM over other possible diagnoses, including a spinal cord infarct as argued by respondent, even after reviewing petitioner's CSF and MRI results. *Id.* at *23-24. Even considering all of these factors, the undersigned stressed that the question of diagnosis remained "a very close call." *Id.* By contrast, the issue of diagnosis does not represent a close call in this case for all the reasons discussed throughout this analysis.

*3. Even if crediting the other objective findings cited by Dr. Jeret, none are specific to TM*

Beyond petitioner's abnormal SSEP study of November 11, 2020, the only other objective evidence that Dr. Jeret points to in support of his favored diagnosis of TM are physical exam findings of hyperreflexia, positive Babinski responses, and positive Hoffman sign. (Ex. 76, pp. 7, 10, 12; Ex. 113, pp. 1-3; Ex. 149, pp. 1-2.) However, these physical exam findings are not specific to TM. While Dr. Jeret argues that no diagnosis other than TM has been offered to explain these physical exam findings (Ex. 113, p. 3), the fact that no cause has been identified is not a reason to attribute these findings to TM where the clinical picture does not otherwise fit. Moreover, while Dr. Price agrees that hyperreflexia with sustained clonus is "definitively pathologic" secondary to corticospinal tract dysfunction (Ex. F, p. 9), there is no medical record evidence indicating that petitioner experienced sustained clonus. He explained that hyperreflexia without sustained clonus is not necessarily a pathologic finding and is a common finding in young women. (*Id.*) Furthermore, Dr. Price is persuasive in noting the significant variability of petitioner's physical examination findings throughout her clinical course, particularly with respect to the presence or absence of a Babinski response. (*Id.* at 9-11.) Accordingly, without more, these physical examination findings are not significant evidence that petitioner suffered TM.

4. *Petitioner's clinical course does not appear to have been monophasic, which undermines any argument that petitioner was appropriately diagnosed with TM*

As Dr. Price explained in his expert report, idiopathic TM typically presents as a monophasic illness. (Ex. C, p. 19.) Over the longer course, petitioner experienced several "relapses" and recurrent episodes involving similar symptoms, as well as new manifestations. (*See generally* Exs. 5, 8, 10; *see also* Ex. 1 (petitioner representing that she experienced several relapses of TM).) Accordingly, her overall clinical course is inconsistent with the typical presentation of TM. Dr. Jeret does not appear to dispute the relapsing nature of petitioner's clinical course. (Ex. 76, pp. 9-10.) Instead, he proposed the possibility that petitioner's overall course is explained by an initial TM in January of 2018 followed by subsequent relapses due to FND secondary to TM. (*Id.*) However, given the lack of evidence supporting a finding that TM was initially present in January of 2018, Dr. Jeret's suggestion is speculative at best.

5. *Dr. Price is persuasive in identifying symptoms that cannot be explained by a diagnosis of TM*

Dr. Price identified several symptoms, such as vertigo and nonphysiological chest pain, that cannot be explained by a diagnosis of TM. (Ex. C, pp. 16, 18-23.) Dr. Jeret did not explicitly respond to this point or explain how TM could cause these symptoms. Instead, Dr. Jeret seemed to agree that some elements of petitioner's clinical presentation were inconsistent with a diagnosis of TM. (*E.g.*, Ex. 149, p. 2 (Dr.

Jeret stating that a diagnosis of FND could explain petitioner's recurrent limb weakness and coarse limb jerking).) While Dr. Jeret repeatedly stressed that petitioner had symptoms and physical examination findings that cannot be faked and thus cannot be explained by FND (Ex. 76, pp. 4-5, 10; Ex. 113, pp. 1-2; Ex. 149, pp. 1-2), it is not necessary to resolve whether petitioner's condition can otherwise be diagnosed as FND. It is not the function of special masters to diagnose vaccine-related injuries. *Andreu*, 569 F.3d at 1382; *Knudsen*, 35 F.3d at 549. The diagnostic issue at hand is whether petitioner has preponderantly established that she suffered TM in January of 2018. Therefore, it is not necessary for this decision to reach whether FND is an appropriate diagnosis. Regardless of their cause, these incompatible symptoms underscore why TM was not definitively diagnosed despite being included within the differential.

ii. <u>A holistic review of the treating provider opinions does not support a "firm" or controlling diagnosis of TM as argued by petitioner</u>

In her briefing, petitioner contends that her treating physicians firmly diagnosed her with TM, citing several physicians as having diagnosed TM or otherwise acknowledged her condition as TM. (ECF No. 74, pp. 25 & n.3, 32.) Dr. Jeret likewise listed treating physicians, who he contends contemporaneously diagnosed petitioner with TM and treated her accordingly. (Ex. 76, pp. 10-11; Ex. 113, p. 2.) However, based on a holistic review of the medical records filed in this case, petitioner overstates the extent to which she was diagnosed with TM. She and Dr. Jeret employ a selective reading of the medical records.

1. *Petitioner's initial hospitalization and inpatient rehabilitation in January of 2018 did not result in a definitive diagnosis of TM*

Petitioner contends that she had a diagnosis of TM in January of 2018. (ECF No. 97, pp. 2-3.) While petitioner is correct in stating that her discharge record for her initial hospitalization in January of 2018 lists "[a]cute transverse myelitis in demyelinating disease of central nervous system" among petitioner's "final diagnoses" (*Id.* (citing Ex. 8, p. 229)), throughout petitioner's hospitalization, the neurology team characterized TM as a presumptive and working diagnosis based on petitioner's examination and reported symptoms. (*E.g.*, Ex. 8, pp. 274-75, 295-96, 305, 313-14, 316.) Indeed, the neurology providers repeatedly documented that the etiology of petitioner's progressive extremity weakness and parasthesias of the extremities and trunk was ultimately unclear given that petitioner's CSF studies were normal and MR imaging could not be performed due to petitioner's occipital nerve stimulator. (*E.g.*, *id.* at 274-75, 280, 295-96, 305, 313-14, 316.) Moreover, in the discharge summary, the neurology team documented that, "[d]ue to inability to perform MRI, patient was treated as though she had transverse myelitis, despite negative CSF studies," which evidences that a diagnosis of TM was merely tentative at the time of discharge. (*Id.* at 238.) The neurology team specifically recommended that petitioner have her occipital nerve stimulator removed to allow for MR imaging, indicating that her treating providers felt further diagnostic workup was warranted. (*Id.*) Moreover, her subsequent inpatient

rehabilitation records explicitly document the diagnosis as "unconfirmed" (Ex. 5, p. 786), and her rehabilitation discharge summary continued to indicate that a definitive diagnosis of inflammatory myelopathy was limited by the fact that MR imaging could not be obtained due to petitioner's nerve stimulator (*Id.* at 857).

Accordingly, a holistic review of the medical records from petitioner's hospitalization and inpatient rehabilitation in January of 2018 indicates that petitioner's diagnosis at that time is best characterized as presumptive TM or a working diagnosis of TM. But in any event, even assuming *arguendo* that petitioner had been definitively diagnosed with TM in January of 2018, such an opinion is not binding and must be evaluated for reasonableness and weighed against other evidence of record. *Accord Hibbard*, 698 F.3d at 1367-68 (finding no error where the special master weighed treating physician opinions against other evidence of record, including the opinions of other treating physicians). Given that these records repeatedly reference the lack of available MR imagining confirmation as a limiting factor, it is difficult to accept that any such initial diagnosis of TM would withstand the subsequent negative imaging. The fact that petitioner's treating providers in January of 2018 did not have the benefit of reviewing petitioner's repeatedly normal MR imaging limits the overall weight of their diagnostic assessments.

2. *A holistic review of the medical records does not support a conclusion that Dr. Veda definitively diagnosed petitioner with TM*

One of the treating physicians that petitioner contends discussed and diagnosed petitioner with TM is Dr. Veda. (ECF No. 74, p. 25 n.3 (citing Ex. 14, pp. 9-12).) When petitioner first presented to Dr. Veda for outpatient evaluation on February 27, 2018, Dr. Veda documented an assessment of acute TM. (Ex. 14, p. 11.) Again, this encounter occurred prior to petitioner's first MRI study. Additionally, it is unclear whether Dr. Veda's diagnostic assessment reflects his own independent evaluation or if it was influenced by petitioner's working diagnosis of TM from her recent hospitalization. When petitioner followed up with Dr. Veda following her initial MR imaging on March 12, 2018, Dr. Veda continued to assess petitioner with acute TM but recommended that petitioner undergo an MRI of the brain to evaluate for lesions in the subcortical white matter that could explain her symptoms. (*Id.* at 18.) This recommendation for additional testing reflects that the etiology of petitioner's symptoms remained uncertain.

Moreover, following petitioner's hospitalization in April of 2018 and petitioner's repeat MR imaging of the spine, which was normal, Dr. Veda discontinued his diagnosis of acute TM, and instead assessed petitioner with mild paraparesis of both lower extremities and muscle weakness. (Ex. 14, p. 31.) At that time, Dr. Veda specifically remarked that petitioner's workup, which included extensive imaging, had failed to reveal a lesion in the brain or spinal cord. (*Id.*) From that point forward, Dr. Veda continued to assess petitioner with mild paraparesis of the lower extremities and muscle weakness, rather than acute TM. (*E.g.*, *id.* at 36, 44, 50-52.) Therefore, while Dr. Veda did initially assess petitioner with acute TM, a review of the complete medical records

indicates that Dr. Veda ultimately did not maintain that diagnostic assessment following repeat normal MR imaging. Accordingly, contending that Dr. Veda diagnosed petitioner with TM constitutes an incomplete and inaccurate representation of Dr. Veda's ultimate diagnostic assessment.

3. *Petitioner's repeated reports of a prior medical history of TM diagnosed in January of 2018 cloud subsequent medical records*

Following petitioner's initial hospitalization and inpatient rehabilitation in January of 2018, there are numerous notations in petitioner's medical records reflecting a history of TM. However, the undersigned stresses that these notations mainly reflect subjective, repeated reports from petitioner of a prior history of TM diagnosed in January of 2018. (*E.g.*, Ex. 8, p. 781 (petitioner reporting a history of TM diagnosed in January of 2018 during her hospitalization in April of 2018); Ex. 10, pp. 29, 46, 49 (petitioner reporting a past medical history of TM diagnosed in January of 2018, as well as a TM relapse in April of 2018, during her hospitalization in August and September of 2018); Ex. 20, p. 76 (petitioner reporting a history of TM with apparent recurrences throughout 2018 at her encounter with Dr. Phan on January 18, 2019); Ex. 10, pp. 1153, 1179 (petitioner reporting a history of TM with exacerbations during her hospitalization in February of 2019); Ex. 20, pp. 69, 71-72 (petitioner reporting a complicated history of TM with multiple relapses following her initial event at an encounter to establish transitional care services on March 12, 2019); Ex. 17, p. 49 (petitioner reporting a history of TM diagnosed in January of 2018 and requiring extensive steroid therapy at a hepatology consultation on August 16, 2019); Ex. 159, p. 1526-27 (petitioner reporting being diagnosed with myelitis in 2018 at a urology encounter on February 23, 2021); Ex. 10, p. 2734 (petitioner reporting a history of TM at an ED encounter on March 30, 2021); Ex. 158, p. 533 (petitioner reporting a history of TM at an ED encounter on April 5, 2022); Ex. 156, p. 144 (petitioner reporting a history of TM at an orthopedics evaluation on November 21, 2022). As explained above, petitioner's medical records do not reflect that petitioner was diagnosed with TM in January of 2018 with any degree of certainty. Accordingly, these notations reflecting a history of TM are not strong evidence of diagnosis in this case.

4. *Petitioner ignores notations within the medical records reflecting continued diagnostic uncertainty and competing diagnostic assessments*

Petitioner continued to undergo diagnostic workups after her initial hospitalization and inpatient rehabilitation in January of 2018. For example, she was worked up for MS and NMO, and she presented to the Mayo Clinic for a thorough evaluation of her ongoing neurologic symptoms as well as her new eye symptoms. (*E.g.*, Ex. 10, pp. 49, 121; Ex. 13, pp. 16-21; Ex. 22, pp. 38-100; *see also* Ex. 20, p. 72 (documenting that petitioner's plan to undergo evaluation at the Mayo Clinic was "certainly reasonable" given the lack of "a clear cut diagnosis").) Documentation in the medical records indicates that treating providers also considered neuropathy, including small fiber

neuropathy. (*E.g.*, Ex. 8, pp. 818, 830; Ex. 13, pp. 24, 39-40; Ex. 18, pp. 53, 55; Ex. 20, p. 59.)

Furthermore, there are other notations within the medical records that reflect the continued uncertainty of petitioner's diagnosis. For example, during petitioner's inpatient rehabilitation in April of 2018, petitioner expressed discouragement regarding the uncertainty of her medical condition, as well as her concern that her treating providers would stop looking for a physiological cause of her symptoms. (Ex. 5, pp. 290, 292.) At a primary care encounter on February 13, 2020, petitioner voiced frustration regarding the lack of clarity regarding the cause of her symptoms. (Ex. 20, p. 34.) Additionally, when petitioner presented to for a neuroimmunology consultation on September 23, 2020, "undiagnosed neurological symptoms" was listed as the reason for the self-referral. (Ex. 12, pp. 19-20.) These notations cut against a finding that petitioner received a clear diagnosis of TM in January of 2018.

Moreover, petitioner and Dr. Jeret ignore the opinions of treating providers who doubted or rejected a diagnosis of TM. For example, despite petitioner reporting a history of TM diagnosed in 2018 that she believed was caused by the flu shot (Ex. 13, p. 12), Dr. Blair explicitly informed petitioner that there was no evidence supporting a diagnosis of TM at an encounter on January 22, 2020 (*Id.* at 24, 39-40). Dr. Blair stressed that petitioner had undergone multiple evaluations by specialists, including Dr. Okuda and at the Mayo Clinic, and these providers did not render a diagnosis of TM. (*Id.* at 39-40.) Additionally, several providers seriously considering a conversion disorder or FND as a possible diagnosis. (Ex. 5, p. 3 (Dr. Leis documenting that petitioner neurological examination and electrophysiologic studies were most suggestive of conversion disorder); *id.* at 154, 294 (possible conversion disorder being recorded as one of the reasons for petitioner's admission to inpatient rehabilitation); *id.* at 289-91 (petitioner's psychiatric diagnostic interview, which was suggestive of adjustment disorder and a history of anxiety disorder, while also discussing the possibility of a conversion disorder diagnosis); *id.* at 292 (petitioner's follow up psychotherapy session listing adjustment disorder and a history of anxiety disorder as the diagnoses for the encounter); *id.* at 293 (petitioner's psychotherapy provider encouraging petitioner to continue with psychotherapy after discharge as conversion disorder remained in the differential); Ex. 22, pp. 69-72 (Dr. Collazo documenting that the differential for petitioner's spells of quadriparesis and visual disturbance included FND); *id.* at 38-41 (Dr. Sabsevitz documenting that FND should be explored if petitioner's medical workup continued to be unremarkable and listing somatization disorder as the primary diagnosis for the encounter).)

5. *Petitioner's abnormal SSEP testing did not result in a presumptive or definite diagnosis of TM*

As explained above, Dr. Jeret places significant emphasis on the results of petitioner's abnormal SSEP study of November 11, 2020, in resolving the issue of diagnosis in this case. He contended that, based on these results, Dr. Leis diagnosed petitioner with TM as a result of the flu vaccine. (Ex. 76, pp. 5-6 (citing Ex. 109, pp. 22,

24).) Additionally, Dr. Jeret represented that petitioner's treating providers at UMMC neuroimmunology recorded a presumptive diagnosis of myelitis following petitioner's abnormal SSEP study. (*Id.* at 6 (citing Ex. 12, p. 144 (petitioner's encounter with NP Quarles on February 25, 2021).)

However, Dr. Jeret misrepresents the assessments of these treating providers. Based on petitioner's abnormal SSEP study of November 11, 2020, Dr. Leis indicated the results could be consistent with residual from a *possible* TM in 2018, but noted that the ultimate etiology remained undetermined. (Ex. 109, p. 21 (emphasis added).) At her follow up encounter on November 13, 2020, Dr. Willis similarly documented that "[b]ased on the history and evoked potentials, it's *possible* that her initial event was a myelitis and she now has sequelae from that." (Ex. 12, p. 64 (emphasis added).) However, Dr. Willis remarked that there was no evidence, despite extensive evaluation, of an ongoing or potentially recurrent neurologic process, and recommended that petitioner focus on symptoms management moving forward. (*Id.*) At subsequent encounters, Dr. Willis and NP Quarles continued to document that it was possible petitioner initially experienced a myelitis in January of 2018 while stressing the lack of evidence of a neurologic process. (Ex. 159, pp. 1503, 1559, 1612, 1664, 1747, 1827, 1854, 1908, 1946.) Stating that a diagnosis is possible is not the same as characterizing a condition as either a presumptive or definite diagnosis.

## VI. Conclusion

I stress that this decision does not seek to diagnose petitioner. However, for all of the reasons discussed above, petitioner's condition is notably divergent from the generally accepted diagnostic criteria and expected clinical presentation for TM as cited by both parties' experts. And this is true regardless of whether any other diagnosis is available to explain petitioner's condition. Even granting that the diagnostic criteria should not be applied rigidly in the real-world context, petitioner's condition is striking with regard to the complete absence of objective evidence of a spinal cord lesion or inflammation to support a diagnosis of TM. Moreover, although petitioner's treating physicians did *consider* the possibility she suffered TM, the opinions of petitioner's treating providers, viewed collectively, do not overcome these significant shortcomings or preponderantly demonstrate a diagnosis of TM. Therefore, although petitioner has my sympathy for the pain and discomfort she has endured, for all the reasons discussed above, I find that she has not met her burden of proof.

Pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master